UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
(SOUTHERN DIVISION)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:26-cv-11166 |
| v. | ) | |
| | ) | |
| COUNTY OF WASHTENAW, Michigan; | ) | |
| ALYSHIA M. DYER, Sheriff of the County | ) | |
| of Washtenaw, Michigan, in her official | ) | |
| capacity; COUNTY OF WASHTENAW | ) | |
| SHERIFF'S OFFICE; ELI SAVIT, | ) | |
| Prosecuting Attorney for the County of | ) | |
| Washtenaw, Michigan, in his official capacity; | ) | |
| COUNTY OF WASHTENAW OFFICE OF | ) | |
| THE PROSECUTING ATTORNEY; and the | ) | |
| WASHTENAW COUNTY BOARD OF | ) | |
| COMMISSIONERS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## **PRELIMINARY STATEMENT**

1.      Within hours of assuming the Presidency, President Donald J. Trump took immediate action to fulfill his campaign promise to the American people and declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens." Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). This declaration was necessary given the flood of illegal immigration into our Nation under the prior administration's

1

open border policies incentivizing disregard for laws passed by Congress. As a result, millions of illegal aliens settled in American communities in flagrant violation of federal law, resulting in "significant threats to national security and public safety" and aliens "committing vile and heinous acts against innocent Americans." Exec. Order 14,159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025).

2.      Immediately following President Trump's declaration of a national emergency at our Southern border, the U.S. Department of Homeland Security ("DHS") and its components U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") prioritized nationwide efforts to identify and remove criminal illegal aliens from the United States in accordance with federal law.

3.      Federal immigration agents exercise discretion and common sense in carrying out their duties, including in deciding where arrests and other enforcement actions should be undertaken to best ensure the safety of the community. *See* Memorandum from former Acting Secretary of DHS Benjamine Huffman, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025) ("DHS Protected Areas Memorandum") (Ex. 1); Memorandum from Acting Director of ICE Todd M. Lyons, *Civil Immigration Enforcement Actions In or Near Courthouses* (May 27, 2025) ("ICE Courthouses Memorandum") (Ex. 2); Memorandum from former Acting Director of ICE Caleb Vitello, *Common Sense Enforcement Actions in or Near Protected Areas* (Jan. 31, 2025) ("ICE Protected Areas Memorandum") (Ex. 3). In other words, there are no "bright line rules regarding where our immigration laws are permitted to be enforced," DHS Protected Areas Memorandum at 1, and instead, the location of a civil enforcement action is properly determined "on a case-by-case basis considering the totality of the circumstances," ICE Courthouses

2

Memorandum at 2; *see also* ICE Protected Areas Memorandum at 2 ("case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action").

4.      Despite the ongoing threat that unvetted illegal aliens pose to American lives and property and the communities in which Americans reside, the County of Washtenaw, Michigan ("Washtenaw County"), through the actions of its officials, insists on obstructing federal immigration enforcement operations and shielding criminal offenders from apprehension by federal law enforcement. Washtenaw County's policies aim to obstruct federal law enforcement and celebrate thwarting the constitutional obligation of the President of the United States to take care that federal immigration law be faithfully executed. *See* Exec. Order 14,287, *Protecting American Communities From Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025).

5.      Such blatant disregard for federal laws that have been on the books for over three decades is not merely a political statement but is also deliberate action that jeopardizes the public safety of all Americans. These actions and more by Washtenaw County officials flout the Supremacy Clause of the United States Constitution, which prohibits state, county, city, or other local governments from usurping congressional authority. Accordingly, the United States files this action to preserve the integrity of federal law penned by Congress aimed at securing the safety and flourishing of our Nation.

6.      Defendant County of Washtenaw, by and through its officials and agencies, has sought to undermine federal immigration laws and federal law enforcement through the actions of three county government agencies: (1) Defendant Washtenaw County Sheriff's Office, (2) Defendant Washtenaw County Office of the Prosecuting Attorney, and (3) Defendant Washtenaw County Board of Commissioners. Specifically, each of these Defendant agencies of Defendant Washtenaw County has taken steps to shield illegal aliens from the reach of federal law

enforcement through prohibiting county employees from honoring ICE detainers, prohibiting county employees from sharing immigration information with federal immigration authorities, and banning federal immigration law enforcement from all Washtenaw County properties unless the federal agents have court-approved judicial warrants to be there.

7. In so doing, Defendant Washtenaw County and its officials and agencies interfere with the Federal Government's authority to protect Americans from criminal illegal aliens. This federal authority to protect Americans residing in Washtenaw County derives not from Michigan's state constitution but rather the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent.

8. The actions of Defendant Washtenaw County, by and through its officials and agencies, also interferes with vital foreign policy objectives and national security interests of the United States by releasing unvetted, illegal aliens onto the streets of the Nation and undermining the efforts of the Federal Government to apprehend such aliens.

## JURISDICTION AND VENUE

9. This action arises under the Constitution of the United States, Article VI, Clause 2 and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.* This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

10. Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because Defendants Washtenaw County, its Sheriff, its Sheriff's Office, its Prosecuting Attorney, its Prosecuting Attorney's Office, and the Washtenaw County Board of Commissioners, all reside within the Eastern District of Michigan and a substantial part of the events or omissions giving rise to this Complaint arose from events occurring within this judicial district.

11.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

**PARTIES**

12.     Plaintiff, the United States of America, regulates immigration under its inherent, constitutional, and statutory authorities, and it enforces federal immigration laws through its Executive Branch agencies, including the Department of Justice ("DOJ"), Department of State ("DOS"), and DHS, as well as DHS's component agencies ICE, CBP, and U.S. Citizenship and Immigration Services ("USCIS"). Plaintiff, United States of America, is suing on its own behalf, as well as on behalf of DOJ, DOS, DHS, ICE, CBP, and USCIS.

13.     Defendant Washtenaw County is a political and geographical subdivision of the State of Michigan, a state of the United States of America.

14.     Defendant Alyshia M. Dyer is the Sheriff of Washtenaw County, Michigan and is the chief law enforcement official responsible for policing Washtenaw County, Michigan, by performing a wide variety of public safety, corrections, law enforcement, traffic management, criminal investigations, community engagement, reentry, and emergency response roles and is being sued in her official capacity.

15.     Defendant Washtenaw County Sheriff's Office is the chief law enforcement agency responsible for policing Washtenaw County, Michigan and performing a wide variety of public safety, corrections, law enforcement, traffic management, criminal investigations, community engagement, reentry, and emergency response roles.

16.     Defendant Eli Savit is the Prosecuting Attorney of Washtenaw County, Michigan and is the chief law enforcement official responsible for prosecuting crimes under Michigan law

and enforcing state, county, city, and other local laws within Washtenaw County, Michigan and is being sued in his official capacity.

17.     Defendant Washtenaw County Office of the Prosecuting Attorney is the chief law enforcement agency of Washtenaw County, Michigan responsible for prosecuting crimes under Michigan law and enforcing state, county, city, and other local laws within Washtenaw County, Michigan.

18.     Defendant Washtenaw County Board of Commissioners is the governing authority of Washtenaw County, Michigan responsible for overseeing county operations, adopting budgets, setting county policies, levying taxes, appointing members to various advisory boards and commissions, and managing property of Washtenaw County, Michigan.

### SUPREMACY CLAUSE, PREEMPTION, AND INTERGOVERNMENTAL IMMUNITY LAW BACKGROUND

19.     The challenged policies and actions of Defendant Washtenaw County and its officials and agencies are invalid under the Supremacy Clause of the United States Constitution and therefore must not be permitted to further obstruct the efforts of federal immigration law enforcement to carry out its mission assigned by Congress. Such a result is required under the Supremacy Clause of the United States Constitution, the principles of federal constitutional preemption, and the doctrine of intergovernmental immunity.

#### *Supremacy Clause*

20.     The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, a state, county, or city enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

21.     As early as *McCulloch v. Maryland*, 17 U.S. 316 (1819), the Supreme Court has recognized that Supremacy Clause means that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id.* at 436. "Because federal law is supreme, 'there is a plain repugnance' in letting states 'interfer[e] with or control[] the operations of the Federal Government." *CoreCivic, Inc. v. Governor of NJ*, 145 F.4th 315, 321 (3d Cir. 2025) (quoting *McCulloch*, 17 U.S. at 431).

### *Federal Law Preemption*

22.     The Supreme Court has identified two general ways in which federal law can preempt state, county, city and other local laws. First, federal law can *expressly* preempt such laws when a federal statute or regulation contains explicit preemptive language. Second, federal law can *impliedly* preempt state law when Congress's preemptive intent is implicit in the relevant federal law's structure and purpose.

23.     Express preemption occurs when Congress explicitly supersedes all state enactments in a particular area. *Pacific Gas & Elec. Co. v. State Energy Res. Conserv. & Develop. Comm'n*, 461 U.S. 190, 203-04 (1983); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (finding express preemption where the federal law provided that "[N]o State … shall enact or enforce any law … relating to rates, routes, or services of any air carrier.").

24.     In the absence of express preemption, state, county, city, and local laws must yield to a federal statute when Congress "intends federal law to 'occupy the field'" (field preemption)

or when the state or local laws conflict with a federal statute (conflict preemption). *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).

25.     One category of conflict preemption occurs when the state law creates an obstacle to a federal statutory purpose (obstacle preemption). *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

### *Doctrine of Intergovernmental Immunity*

26.     The Constitution's Supremacy Clause also embodies the doctrine of intergovernmental immunity, which "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022) (citing *Baker*, 485 U.S. at 523).

27.     "[P]reventing discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841. Discrimination occurs when a state, county, city, or other locality "treats someone else better than" the federal government, or singles out the federal government for "less favorable 'treatment.'" *Id.* at 839. "Without the prohibition on discrimination, what prevents a State from imposing unduly high costs on the Federal Government for the benefit of the State's own citizens?" *Id.* at 841.

28.     The doctrine of intergovernmental immunity also prohibits regulation by the states of the Federal Government. A state, county, city, or other local law violates this doctrine if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435. "A state regulation can violate the Supremacy Clause either by directly regulating the federal government or by conflicting with an affirmative command of Congress. *Adkisson v. Jacobs Eng'g Group, Inc.*, 36 F.4th 686, 697 (6th Cir. 2022); *CoreCivic*, 145 F.4th at 327 (stating that when state, county, city, or other local

8

governments "substantially interfere[e] with [the federal government's] operations," they "directly regulate[] the federal government[.]"

29.     These intergovernmental immunity principles against discrimination and regulation operate even in the absence of a specific conflicting federal law, ensuring that "federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd*, 54 F.3d 825 (D.C. Cir. 1995) (citing *In Re Neagle*, 135 U.S. 1, 10 (1890)).

## FEDERAL IMMIGRATION LAW BACKGROUND

30.     Stemming from its inherent rights as an independent Nation and constitutional powers to conduct relations with foreign nations, the United States has broad authority to establish immigration laws, maintain control over its borders, and ensure the safety and flourishing of its citizens, the execution of which authority neither state, county, city, or local government can obstruct or discriminate against. *See generally Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893); *Ping v. United States*, 130 U.S. 581, 603–04 (1889); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Arizona v. United States*, 567 U.S. 387, 394–95 (2012); *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality); *id.* at 444–47 (Scalia, J., concurring).

31.     Pursuant to that broad authority, the Constitution affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, and affords the President of the United States the authority to "take Care that the Laws be faithfully executed[.]" U.S. Const. art. II, § 3. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394.

32.     Congress has exercised its broad authority to make laws governing the entry, presence, status, and removal of aliens within the United States by enacting an "extensive and complex" statutory scheme for the "governance of immigration and alien status" reflected in the various provisions of the INA, 8 U.S.C. § 1101 *et seq*., to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1224, 1226, 1227, 1228, and 1231.

33.     In crafting federal immigration law and policy, Congress has necessarily taken into account multiple and often competing national interests. Assuring effective enforcement of the provisions against illegal migration and unlawful presence is a highly important governmental interest, but it is not the singular goal of the federal immigration laws. The laws also take into account other uniquely national interests, including facilitating trade and commerce; welcoming foreign nationals who visit or immigrate *lawfully* and ensuring their fair and equitable treatment wherever they may reside; responding to humanitarian concerns at the global and individual levels; and otherwise ensuring that the treatment of aliens present in our Nation does not harm our foreign relations with the countries from which they come or jeopardize the treatment of U.S. citizens abroad.

34.     Because immigration control and management is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal citations omitted), Congress vested substantial discretion in the President of the United States and the administering federal agencies to adjust the balance of these multiple interests as appropriate—both globally and in individual cases.

35.     DOJ is an executive department of the United States. *See* Act to Establish the Department of Justice, ch. 150, 16 Stat. 162 (1870). The Attorney General, as head of DOJ, shares certain immigration-related responsibilities with the Secretary of Homeland Security, and he may, among his various immigration functions, order aliens removed from the United States and order the cancellation of removal. *See, e.g.*, 8 U.S.C. §§ 1103, 1158, 1182, 1227, 1229a, 1229b.

36.     DOS is an executive department of the United States. *See* State Department Basic Authorities Act of 1956, Pub. L. No. 84-885, as amended; 22 U.S.C. § 2651 *et seq.* The DOS is partially responsible for administering aspects of the federal immigration laws, including but not limited to the administration of visas.

37.     DHS is an executive department of the United States. *See* Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002). DHS is responsible for the administration and enforcement of laws relating to immigration, as well as the investigation of immigration crimes and protection of the United States border against illegal entry of aliens. *See* 8 U.S.C. § 1103. DHS is also responsible for providing citizenship and immigration services through USCIS.

38.     Congress also recognized that cooperation with state and local law enforcement is *essential* to enable the Federal Government to implement the INA. As part of the complex statutory framework of the INA, Congress therefore prescribed by statute a number of ways in which states may assist the Federal Government in the enforcement of our Nation's immigration laws. *See, e.g.*, 8 U.S.C. § 1103(a)(10) (authorizing DHS to empower state or local law enforcement with immigration enforcement authority when an "actual or imminent mass influx of aliens . . . presents urgent circumstances requiring an immediate Federal response"); 8 U.S.C. § 1357(g)(1)-(9) (authorizing DHS to enter into agreements to provide appropriately trained and supervised state and local officers with the authority to perform functions related to the investigation, apprehension,

and detention of aliens); 8 U.S.C. § 1373(a)-(b) (preempting state and local laws that prohibit information-sharing between local law enforcement and federal immigration authorities and proscribing such a prohibition); 8 U.S.C. § 1252c (authorizing state and local law enforcement to arrest aliens who are unlawfully present in the United States and were previously removed after being convicted of a felony in the United States).

39.     But the opportunity that federal law provides for participation by state and local officials does not mean that states are permitted to take measures to rival or undermine the national immigration policy. The formulation of immigration policy and balancing of immigration enforcement priorities is a matter reserved for the Federal Government. Such state and local measures do not fall within the states' traditional police powers and remain the exclusive province of the Federal Government.

40.     An important tool that enables federal immigration officials to work with local authorities is the issuance of an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody[.]" 8 C.F.R. § 287.7(a). This is commonly referred to as an "ICE detainer request."

41.     When DHS issues a detainer request to a law enforcement agency, that agency "*shall* maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department." *Id.* § 287.7(d) (emphasis added). And in some instances, DHS is required by statute to issue detainers, and

attempt to take custody of certain aliens, including when Washtenaw County officials request that DHS take custody of certain aliens arrested for "violation[s] of any law relating to controlled substances." 8 U.S.C. § 1357(d).

42.     Last year, again recognizing the vital importance to having federal and state/local law enforcement working together, Congress strengthened the INA with the enactment of The Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), which "mandates the federal detention of illegal immigrants who are accused of burglary, theft, larceny, shoplifting, or assaulting of a law enforcement officer, and any crime that causes death or serious bodily injury to another person. *Id.* (codified at 8 U.S.C. § 1226(c)(1)(E)(ii)).

43.     The Laken Riley Act requires DHS to detain any alien who is unlawfully present in the United States and "is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" *See id.*

44.     Federal immigration authorities also "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). And in other instances, the INA gives the federal immigration authorities the discretion to detain a given alien based on an administrative warrant of arrest. *Id.* § 1226(a). Such an alien may be "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.*

45.     In addition, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Absent any cooperation at all from

"local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of NY v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

46.     Congress has therefore directed that a state, county, city, or other local government official or agency may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* § 1644 (same); *see also id.* § 1357(g)(10)(A) (providing for state, county, city, and other local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Likewise, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." *Id.* § 1373(b).

47.     Critically, Congress passed § 1373 to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see City of NY*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted).

48.     Congress has also codified basic principles of cooperation and comity between state, county, city, and other local authorities and the Federal Government. For example, federal law contemplates that removable aliens in local custody who have been convicted of state, county,

city, or other local criminal offenses will generally serve their sentences before being subject to removal, but that they will be taken into federal custody upon the expiration of their state prison terms or release from local custody. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), 1231(a)(4). And federal authorities must "make available" to state, county, city, and other local authorities "investigative resources … to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A).

49.     Likewise, federal officials must also "designate and train officers and employees … to serve as a liaison to" state, county, city, and other local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B); *see id.* §§ 1226(c), 1231(a). Congress also authorized states, counties, cities, and other localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10)(B).

50.     Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

51.     DHS, through ICE and CBP, performs significant law enforcement activities in the United States. ICE Enforcement and Removal Operations ("ERO") protects the country through the arrest and removal of those who undermine the safety of our communities and the integrity of our immigration laws.[1] And CBP is responsible for enforcing the immigration laws at international ports of entry, including apprehending attempted entrants with criminal convictions or who are national security concerns.

---

[1] *Who We Are*, https://www.ice.gov/about-ice/ero (last visited March 8, 2026) [https://perma.cc/D3MR-5CL2].

52. Courts have recognized, moreover, that ICE may avail itself of publicly owned property for the purpose of carrying out its statutorily assigned mission. *See, e.g.*, *United States v. King Cnty., Washington*, 122 F.4th 740, 758 (9th Cir. 2024) ("Requiring this form of non-discriminatory access to [public] property consistent with the intergovernmental immunity doctrine does not create a back-end anti-commandeering problem. [The court] would not perceive a threat of unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways.").

## CHALLENGED WASHTENAW COUNTY POLICIES AND ACTIONS

### Washtenaw County Sheriff's Office General Order

53. On or about January 30, 2025, the Washtenaw County Sheriff's Office declared that the enforcement of federal immigration law "is not an investigative or law enforcement role or activity of the Sheriff's Office" and announced that "[t]he Sheriff's Office will not detain an individual under the sole justification of an Immigration Detainer or Warrant of Removal/Deportation issued by [ICE] and signed by an ICE agent when there is no valid judicial warrant or order by a judge." Washtenaw County Sheriff's Office, *General Order 1.14* (Jan. 30, 2025) (Ex. 4) ("General Order").

54. The General Order was prepared by Defendant Sheriff Dyer and also prohibits Sheriff's Office employees from "us[ing] Sheriff's Office resources to enforce federal immigration law or assist[ing] in immigration related matters." *Id.* at 2.

55. The General Order states that those who violate the policy are in violation of the Sheriff's Office professional conduct standards and may receive disciplinary action, which includes potential discharge from the department.

56. The General Order states that employees with the Sheriff's Office cannot use their "resources to enforce federal immigration law or assist in immigration related matters." *Id.* Section

16

III(F) of the Order further states that "Any requests to use resources to assist immigration enforcement shall be immediately reported to the Division Commander and Undersheriff." *Id.* Therefore, information sharing between the Sheriff's Office and ERO, pursuant to this Order, has come to a complete halt. Currently, the Sheriff's Office requires formal FOIA requests to obtain information and the information that is provided under a FOIA request is heavily redacted and delayed, making the procurement of intelligence unnecessarily cumbersome and difficult. *See infra* Complaint, ECF 1 ¶¶ 119-121.

57.     The actions of the Washtenaw County Sheriff's Office make it clear that Washtenaw County has indeed prohibited "all full and part-time Sheriff's Office employees who make or have investigative, law enforcement, or custodial contact with individuals and the incarcerated population as a part of their assigned duties" from honoring immigration detainers. *Id.* at 1; *see also* Declaration of Kevin C. Raycraft ¶¶ 16-48 (Ex. 5) ("Raycraft Decl.").

58.     An immigration detainer is a lawful request from ICE that asks a federal, state, county, city, or other local law enforcement agency—including jails, prisons, or other confinement facilities—to (i) notify the requesting agency as early as possible before they release a removable illegal alien and (ii) hold the alien for up to forty-eight hours beyond the time local authorities would ordinarily release the alien. Immigration detainers enable DHS to have time to assume custody of illegal aliens in accordance with federal immigration law.

59.     When jails, prisons, or other confinement facilities agree to honor immigration detainers, ICE officers can take custody of removable aliens in a safe, controlled environment instead of at-large in the community. Raycraft Decl. ¶ 14. At-large arrests are unpredictable and can be dangerous to the public, aliens, and federal law enforcement officers, because it is safer to assume custody of removable aliens in a secure, private environment where, for example, officers

know in advance that the alien is not in possession of any weapons. Detainers also conserve scarce government resources and taxpayer dollars. For example, when a confinement facility allows ICE to take custody of removable aliens when they are released, the agency doesn't need to expend resources to locate and arrest an alien in the community. *Id.*

### *Washtenaw County Prosecuting Attorney's Policy Directive 2021-12*

60.     On or about February 24, 2021, the Washtenaw County Office of the Prosecuting Attorney similarly declared that it would prohibit coordination with federal immigration enforcement efforts and that "the collateral immigration consequences of a case should always be considered wherever such consequences are known to an [Assistant Prosecuting Attorney]." Washtenaw County Office of the Prosecuting Attorney, *Policy Directive 2021-12: Policy Regarding Immigration and Immigration-Adjacent Issues*, at 2 (Feb. 24, 2021) (Ex. 6) ("Policy Directive").

61.     Under this policy, local county prosecutors*, i.e.*, Assistant Prosecuting Attorneys ("APAs"), are instructed to structure plea offers, eliminate multiple counts in criminal charging documents, and use language in official criminal records that "avoid triggering immigration consequences." *Id.* at 6. Local county prosecutors are further instructed to coordinate with criminal defense attorneys to "request that defense counsel provide legal authority or a memo by a reputable immigration authority analyzing the immigrant consequences specific to the defendant." *Id.* at 7.

62.     Acknowledging that "[f]ederal law does provide that government agencies and officials cannot be restricted from 'sending to, or receiving from' the federal government information regarding a person's 'citizenship or immigration status," the Prosecuting Attorney's Policy Directive seeks to evade these notification requirements by prohibiting prosecutors from "contact[ing ICE] to verify the record of a noncitizen or to inform ICE of pending charges."

Moreover, the Policy Directive seeks to undermine federal law by urging local county prosecutors to use "pre-charge deflection (such as the Law Enforcement Assisted Diversion and Deflection program, or LEADD), in circumstances where a defendant's immigration status is known at the charging phase." *Id.* at 8-9.

63.     To further avoid having to provide information to the Federal Government about illegal aliens, the Policy Directive urges local county prosecutors to consider delaying or abandoning criminal prosecutions altogether:

> APAs may consider adjourning the case for a period of time, then–if the defendant complies with requirements such as making restitution to the crime survivor, and not being charged in a new criminal case—dismissing the charges altogether.

*Id.* at 9.

64.     In short, the Prosecuting Attorney's Policy Directive is a nefarious roadmap demanding that local county prosecutors in Washtenaw County shirk their reporting obligations to federal immigration officials under federal law unless an exception is explicitly granted by the Chief Assistant Prosecuting Attorney. *Id.* at 11. Exceptions "will be granted only in exceptional circumstances, and where public safety requires that deviation." *Id.* Even more concerning is that the challenged Policy Directive instructs local county prosecutors in Washtenaw County to dismiss criminal charges against illegal aliens rather than reporting them to federal immigration officials.

### *Washtenaw County Board of Commissioners' Resolution*

65.     On or about January 21, 2026, Defendant Washtenaw County Board of Commissioners adopted a resolution to ban ICE agents from all county buildings unless they provide a judicial warrant. Washtenaw County Board of Commissioners Resolution*, A Resolution Opposing the Use of County Buildings and Face Coverings by Immigration and Customs Enforcement (ICE) Officers, Customs and Border Protection Officers, or their Contractors During*

*Civil Immigration Enforcement Activities in Washtenaw County* (Jan. 21, 2026) (Ex. 7) ("Resolution").

66.    Specifically, the Washtenaw County Board of Commissioners Resolution states that "Immigration and Customs Enforcement (ICE) officers shall not be permitted to enter, remain in, or conduct civil immigration enforcement activities within any Washtenaw County-owned, leased, or operated building, facility, or property (including parking areas) unless required by law or pursuant to a valid judicial warrant or court order." *Id.* at 2.

67.    The Resolution to deny ICE officers access to County-owned property extends to "County employees, contractors, and agents." *Id.* at 2-3. Additionally, upon adoption of this Resolution, Board member Yousef Rabhi was reported to have said "when the Nazis come to Ann Arbor, we are going to have to stand as a community to face them." *See* Kevin Meerschaert, *Washtenaw County Board of Commissioners votes to ban ICE without a warrant*, WEMU All Things Considered, at 2 (Jan. 22, 2026) (available at https://www.wemu.org/wemu-news/2026-01-22/washtenaw-county-board-of-commissioners-votes-to-ban-ice-without-a-warrant) (last visited Apr. 7, 2026).

68.    On its face, the Resolution prevents federal immigration agents from entering county-owned property accessible to state, county, city, and other local law enforcement and prohibits County employees, contractors, and agents from facilitating such access. The Resolution discriminates against the Federal Government by treating federal immigration authorities differently than other law enforcement agents through access restrictions to property.

69.    Defendants' General Order, Policy Directive, and Resolution (collectively the "Challenged Policies") have the purpose and effect of making it more difficult for federal immigration officers to carry out their responsibilities in Washtenaw County and obstruct the

sharing of information envisioned and affirmatively protected by Congress, including sharing basic information such as release dates, court appearance dates, and custodial status.

70. The Challenged Policies also impair federal detention of removable aliens, including dangerous criminals, contrary to federal law, and purport to direct federal officials to procure criminal arrest warrants to take custody of removable aliens, even though Congress has made an explicit policy choice that such apprehensions for removal can be effectuated by *civil* arrest warrants for immigration enforcement. *See, e.g.*, 8 U.S.C. § 1226(c) (requiring the mandatory detention of certain aliens who are removable due to criminal convictions or terrorist activities); *id.* § 1231(a) (requiring detention and removal of aliens who have a final order of removal).

71. The Challenged Policies further facilitate the release of dangerous criminals into the community by directing city employees to refuse to transfer such aliens to federal officials in a secure environment—thereby resulting in the criminals' release onto the streets, where they all too often reoffend and commit serious crimes, requiring ICE to risk officer safety and expend considerable resources to effectuate arrests in communities. This intentional sabotage of federal immigration enforcement is unlawful and dangerous.

72. The Challenged Policies unlawfully regulate the Federal Government by preventing federal agents from using the tools Congress gave them to facilitate alien detentions and removals. Stemming from the Supremacy Clause, the doctrine of intergovernmental immunity prevents states from regulating the Federal Government's activities. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also McCulloch*, 17 U.S. at 436 (explaining that the states have no power to "in any manner control" the operations of the Federal Government). Thus, as previously mentioned,

21

"even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993), *aff'd* 54 F.2d 825 (D.C. Cir. 1995) (citing *Cunningham v. Neagle*, 135 U.S. 1 (1890)).

73.     Under those principles, the challenged Sheriff's General Order improperly regulates the Federal Government by requiring immigration enforcement authorities to procure judicial warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the Attorney General has discretion to issue warrants, which are executed by federal officers). Whereas administrative warrants issue on probable cause that the individual is an alien subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that the subject has committed a crime, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but the Challenged Policies prevent federal agents from doing so unless they satisfy the latter, higher standard.

74.     This forecloses federal immigration authorities' use of the detention method Congress authorized and directly imposes a different method—with a different standard—on the Federal Government. Defendants have no such power to prevent federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187,

190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)). Again, "Federal officers are immune from state interference with acts necessary and proper to the accomplishment of their federal duties." *Ferrara*, 847 F. Supp. at 968 (internal quotation omitted).

75.     With respect to the challenged Prosecuting Attorney's Policy Directive, which instructs Washtenaw County local prosecutors to "seek to avoid immigration consequences wherever possible" when charging criminal illegal aliens, local prosecutors serve as the gatekeepers as to what information is provided to federal immigration officials. The challenged Policy Directive even goes so far as to instruct local prosecutors not to prosecute at all, if such prosecution would provide federal immigration officials with information having "immigration consequences." In this respect, Washtenaw County has placed itself as the "ultimate regulator" under the INA, insofar as local prosecutors are charged with regulating that statute to avoid its effect and intended purpose through the deliberate, systematic, and surreptitious sanitization of records for criminal illegal aliens.

76.     Under this scheme, the challenged Policy Directive seeks to restrict the access of federal immigration officials to vital information, thereby creating a false portrait that such defendants have not engaged in any conduct that might impact their immigration status, when in fact they have. In truth, by requiring local county prosecutors to withhold such information from federal immigration officials, the challenged Policy Directive regulates federal immigration officials by depriving them of the relevant information they need to perform their lawful duties.

77.     The challenged Resolution, too, improperly regulates the manner and location in which federal immigration authorities position themselves to discharge their duties in

apprehending criminal illegal aliens. The Resolution regulates federal immigration officials by requiring a judicial warrant or court order before any such official can enter Washtenaw County property, even if they merely seek to park a vehicle at a local Washtenaw County public parking lot. And if a federal immigration official violates this ban on entry, he or she becomes subject to the enforcement mechanisms of the Washtenaw County Prosecuting Attorney's Office.

78.    As a result of that interference, the Challenged Policies "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See King County*, 122 F.4th at 756. In addition to interfering with federal immigration enforcement in and of themselves, the Challenged Policies could also be used by local prosecutors to haul ICE officials into local courts on allegations of contempt for violating, for example, the ban on entry by ICE officials onto Washtenaw County property. "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to detain and remove aliens, the Challenged Policies constitute an unlawful regulation of federal immigration officials and are therefore invalid under the intergovernmental immunity doctrine's regulation prohibition. *See King County*, 122 F.4th at 756-57 (finding unlawful regulation where a county order directed local officials to ensure that operators who leased space from the county's airport would not service ICE charter flights, thereby overriding the Federal Government's choice to use contractors to run its flights).

79.    As the district court decided in *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467 (D.N.J. 2023), "a state law that wholesale deprives the federal government of its chosen method of detaining individuals for violating federal law cannot survive Supremacy Clause scrutiny." *Id.* at 478. The Third Circuit affirmed that decision on appeal, holding that "the very essence of supremacy empowers the federal government to remove all obstacles to its action within its own

24

sphere . . . [and] exempt its own operations from [state] influence." *CoreCivic*, 145 F.4th at 321 (internal quotations and citations omitted).

80.     Here, the Challenged Policies impose restrictions on federal immigration officials that Congress has not seen fit to do. Accordingly, these Challenged Policies are invalid under the Supremacy Clause and must be enjoined. The United States brings this declaratory and injunctive action to prohibit Defendant Washtenaw County, its agencies, and its officials from enforcing Washtenaw County policies and taking actions that aim to thwart and undermine federal immigration law and to act in accordance with such federal immigration law.

**FACTUAL BACKGROUND**

81.     Responsibility for enforcing the federal immigration laws lies primarily with DHS and two of its components: ICE and CBP.

82.     ICE is the largest investigative branch of DHS, enforcing over 400 federal laws. Its mission is to protect the United States from cross-border crime and illegal immigration. ICE has three core operational directorates: ERO, Homeland Security Investigations, and the Office of the Principal Legal Advisor. ERO personnel include ICE deportation officers who are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs officer authority under 19 U.S.C. § 1589a.

83.     It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, a federal misdemeanor, and those who illegally reenter the United States after having been removed, a federal felony—or otherwise undermine the integrity of federal immigration laws and border control efforts. ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these

individuals when necessary, and to remove illegal aliens from the United States. ERO prioritizes the apprehension, arrest, and removal of aliens who threaten the safety of our nation's communities and the integrity of U.S. immigration laws.

84.     The Criminal Alien Program (CAP) focuses on identifying, arresting, and removing criminal aliens incarcerated in federal, state, county, or local detention facilities. The CAP safely transfers these individuals into federal custody, reducing the risk to the public. Additionally, under The Laken Riley Act, ICE is required to take into custody aliens who commit certain acts in the United States. 8 U.S.C. § 1226(c)(1)(E)(ii).

85.     The Fugitive Operations Program ("FOP") locates and arrests at-large aliens who are not in law enforcement custody and who pose a threat to national security or public safety, have entered the United States illegally, are subject to orders of removal, or undermine immigration laws and border control.

86.     ERO traditionally partners with other law enforcement agencies to ensure community safety, enhancing its ability to arrest and remove criminal and fugitive aliens.

87.     Transfers to ICE custody are made when state, county, or local authorities honor ICE detainers, which are authorized by 8 U.S.C. § 1357 and 8 C.F.R. § 287.7. A detainer is a notice from DHS to law enforcement agencies stating ICE intends to take custody of an individual for removal, and it requests information like release dates and booking details.

88.     If a detainer is not honored, or an alien is released without ICE notification, CAP or FOP teams must then locate and arrest the alien, which requires significantly more resources and creates avoidable potential safety risks to aliens, ERO personnel, and the community. Jurisdictions that honor detainers typically hold aliens for up to 48 hours after their detention ends

26

and allow ICE officers access to secure jail areas to safely take custody of the alien. Raycraft Decl. ¶ 14.

89.     Some Michigan municipalities and counties no longer cooperate with ICE or honor ICE's immigration detainers; Defendant Washtenaw County is one of these jurisdictions.

### *Washtenaw County Sheriff's Office General Order*
### *Mandates Non-Compliance with ICE Detainers*

90.     Defendant Sheriff Dyer was officially sworn in as the Sheriff of Washtenaw County on December 3, 2024, and began her term as the Sheriff on January 1, 2025. One day before Defendant Sheriff Dyer began her term as Sheriff, in the morning of Tuesday, December 31, 2024, Brenden Smotherman, Community Service Officer with Defendant Washtenaw County Sheriff's Office sent an email to two deportation officers at the Detroit, Michigan, ERO Office. *Id.* ¶ 16 (Mr. Smotherman's email of December 31, 2024 is attached as Exhibit A to Raycraft Decl.). Officer Smotherman stated in his email that, effective January 1, 2025, the Washtenaw County Sheriff's Office would no longer honor ICE detainer requests that are signed by immigration and deportation officers. The email explained that for incarcerated individuals, the Washtenaw County Sheriff's Office would henceforth require an order or a warrant signed by a federal judge.

91.     Following the email which stated that ICE detainers would no longer be honored, ICE leadership met with Defendant Sheriff Dyer, Undersheriff Mathew Harshberger, and the command staff from Washtenaw County. Defendant Washtenaw County Sheriff's Office informed ICE leadership that Defendant Washtenaw County Sheriff's Office had no interest in information sharing, nor was the Sheriff's Office willing to recall its decision to not honor ICE detainer requests. Raycraft Decl. ¶ 18.

92.     In response to Defendant Washtenaw County Sheriff's Office continued obstruction of lawful federal immigration operations, the Acting Special Agent in Charge of the Detroit Field

Office of Homeland Security Investigations and ERO Detroit Field Office Director hand-delivered a letter dated April 9, 2025, to Defendant Sheriff Dyer. The letter was another plea for cooperation by Defendant Sheriff Dyer and a statement of consequences for the anti-ICE policies of the Washtenaw County Sheriff's Office. *Id.* ¶ 23 (the April 9, 2025 letter is attached as Exhibit C to Raycraft Decl.).

93.     The April 9, 2025, letter—enclosed as Exhibit C to the attached Raycraft Declaration—states that since Defendant Sheriff Dyer began her term as Sheriff, at least four immigration detainers were ignored. Prior to ICE filing these detainer requests, the aliens at issue were convicted of a variety of crimes including felony dangerous drugs, felony larceny, domestic violence, and possession of firearms. The letter firmly stated, "Rather than allowing ICE Enforcement and Removal Operations to take custody of these aliens, you chose to release these public safety threats into the community." *Id.* ¶ 25. The letter further explained that when such individuals are released, federal immigration officials are forced to make arrests in unpredictable public situations that pose a greater threat to everyone involved. *Id.*

94.     The letter of April 9, 2025, enumerated four additional consequences for noncooperation between Washtenaw County and ICE: (1) the County's exclusion from the Cyber Rescue Task Force of Washtenaw County (CREW), (2) the suspension of a Joint Task Force Officer Detective Kevin Parviz, (3) the end of sharing forfeiture assets, and (4) the discontinuance of overtime reimbursement. *Id.*

95.     Additionally, Defendant Washtenaw County has declined to enter a § 287(g) agreement with ICE. The "Section 287(g)" program, authorized by Congress, allows ICE to work directly with state and local agencies to enforce federal immigration laws, improving public safety and the efficient removal of criminal aliens. The Section 287(g) program relies on cooperation and

information sharing between federal and local authorities. Reduced compliance with ICE detainer requests and the absence of § 287(g) agreements force ICE to conduct more at-large arrests instead of secure transfers from local custody. *Id.* ¶ 33.

96.     Although the sanctuary policies of Defendant Washtenaw County and its officials and agencies purport to permit cooperation where ICE has a judicial warrant, such warrants are not required by federal law. Following the issuance of the Washtenaw County Sheriff's Office General Order, the County continues to decline to honor ICE detainer requests and does not participate in the Section 287(g) program. *Id.* ¶ 34.

97.     Such consequences not only harm the federal officers working to enforce the immigration laws, but they also harm the public at large. When resources between law enforcement agencies are combined, the positive effect is not cumulative, but exponential. The letter conveyed that ICE's goal was to mend the relationship with the County, and that the agency hoped that the measures would be only temporary. *Id.* ¶ 27.

98.     As a result, ERO Detroit experiences the operational impacts of Defendants' actions, such as releases from Washtenaw County custody, delays in enforcement actions, and additional use of resources. There are numerous examples of this.

99.     For example, Mario Araujo Rodriguez, an alien unlawfully present in the United States, was charged in the Washtenaw County Circuit Court with three counts of criminal sexual conduct in the second degree with a person under the age of thirteen. On January 29, 2026, he was sentenced to 365 days in jail. His sentence was short enough to avoid a prison sentence and be transferred to the Michigan Department of Corrections, which is located outside of Washtenaw County. Mr. Araujo Rodriguez waived 196 days of time that he had previously served for this sentence. A detainer was sent to the Washtenaw County Sheriff's Office, but pursuant to the

challenged Washtenaw County Sheriff's Office General Order, Washtenaw County jail staff will be prohibited from complying with the ICE detainer request or notifying ICE of his release from criminal custody when that day ultimately arrives. *Id.* ¶ 36.

100.    Miguel Angel Aparicio-Navas is another example of a previously removed alien that unlawfully reentered the United States. He was charged with the following crimes in the Washtenaw County Circuit Court: (1) one count of criminal sexual conduct in the third degree with an incapacitated victim, (2) two counts of criminal sexual conduct-assault with intent to commit sexual penetration, and (3) one count of criminal sexual conduct in the fourth degree by force or coercion, assault, and domestic violence. Multiple victims were represented by these charges. And on May 1, 2025, Mr. Aparicio-Navas was convicted of two counts of sexual assault and one count of domestic violence. He, too, was sentenced to 365 days in jail, a sentence that would keep him at the Washtenaw County jail. ICE has obtained a federal arrest warrant for reentry after removal under 8 U.S.C. § 1326 and is waiting to see whether the federal arrest warrant will be honored by Washtenaw County. Mr. Aparicio-Navas's scheduled release is April 12, 2026, and he will be released to the public unless Washtenaw County honors the warrant of arrest that ICE has obtained. *Id.* ¶ 38.

101.    These sentences appear to be in line with the Prosecuting Attorney's Policy Directive, which was adopted and continues to be implemented by Defendant Eli Savit as the Prosecuting Attorney for Washtenaw County. *Id.* ¶ 39. The first of four points listed in Defendant Eli Savit's Policy Directive to local prosecutors is that they should seek to avoid immigration consequences whenever possible. In his role as the Prosecuting Attorney of Washtenaw County, Defendant Eli Savit directs local prosecutors to offer pleas that do not carry immigration consequences, to eliminate multiple counts of the same charge, to use language in dispositions that

30

will "avoid triggering immigration consequences" and should agree to sentences that do not affect an alien's immigration status. The Policy Directive is very clear that deviations from the policy will be made only with approval of the Chief Assistant Prosecuting Attorney or the Prosecuting Attorney and "only in exceptional circumstances":

> Requests for deviations from this Policy shall be made in writing, and require the approval of the Chief Assistant Prosecuting Attorney or the Prosecuting Attorney. A deviation from this Policy will be granted only in exceptional circumstances, and where public safety requires that deviation.

Policy Directive at 11. Certain aliens may still face immigration consequences irrespective of their criminal record, nevertheless, and their release into the community makes ERO's job of apprehension more challenging and creates avoidable potential safety risks to aliens, ERO personnel, and the public at large. Raycraft Decl. ¶ 39.

102.     Defendant Washtenaw County Sheriff's Office, through Defendant Sheriff Dyer, released false allegations accusing ERO teams of targeting mothers, children, and bus stops. Defendant Sheriff Dyer alleged in a Facebook post that "ICE detained a mother in front of her child in the Ypsilanti area, along with other residents." *Id.* ¶ 41; *see* Victor Skinner, *Washtenaw Sheriff Alyshia Dyer Walks Back Fearmongering About ICE Targeting Parents at School Bus Stops*, The Midwesterner (Jan. 30, 2026) https://www.themidwesterner.news/2026/01/washtenaw-sheriff-alyshia-dyer-walks-back-fearmongering-about-ice-targeting-parents-at-school-bus-stops/ (last visited Apr. 8, 2026).

103.     In 2024, three ICE detainer requests in November and five ICE detainer requests in December were not honored by Defendant Washtenaw County Sheriff's Office. In 2025, the following number of detainers were not honored in Washtenaw County: three in February, six in March, five in April, seven in May, four in June, two in July, three from August, two from October, three from November, and five from December. One detainer was not honored in February 2026.

In 2025 alone, 40 ICE detainers were not honored by Defendant Washtenaw County Sheriff's Office, an average of over three a month. Raycraft Decl. ¶ 42.

104.   Each ICE detainer that is not honored is an opportunity for a criminal alien to re-offend and requires federal immigration officials to expend additional valuable federal resources to rearrest the individual in the community at large. One such instance is that of Marco Aleman-Garcia. Mr. Aleman-Garcia is a previously removed alien that has unlawfully reentered the United States on multiple occasions. He originally entered the United States on May 27, 2004, and was ordered removed on February 6, 2008. He has been removed three times from the United States on February 24, 2009, May 26, 2009, and May 29, 2009. *Id.* ¶ 43.

105.   On July 27, 2015, Mr. Aleman-Garcia was arrested by Defendant Washtenaw County Sheriff's Office for operating a vehicle while intoxicated and was subsequently convicted and sentenced to 93 days in jail with 6 months of probation. *Id.* ¶ 44.

106.   On December 6, 2024, Defendant Washtenaw County Sheriff's Office arrested Mr. Aleman-Garcia again, this time for Criminal Sexual Conduct, in the second degree, with a person under the age of 13. This charge was dismissed, though Mr. Aleman-Garcia was convicted of misdemeanor assault and sentenced on September 25, 2025, to 93 days of community service in lieu of active jail time. ICE ERO had previously became aware that Mr. Aleman-Garcia was held at the Washtenaw County Jail in Ann Arbor, Michigan, on December 18, 2024. But despite ICE submitting a detainer request for Mr. Aleman-Garcia, he was released from the Washtenaw County Jail without notification to federal immigration officials. *Id.* ¶ 45.

107.   Nearly a year later, on November 25, 2025, ICE conducted a targeted vehicle stop on Mr. Aleman-Garcia, placed him under arrest, and transported him to the Detroit Field Office for removal. *Id.* ¶ 46.

108.    Nixo Ivan Flores-Sosa, an alien unlawfully present in the United States is another example of a criminal alien whose charges were dismissed by Defendant Washtenaw County Prosecuting Attorney's Office. Mr. Flores-Sosa was arrested on September 3, 2024, and charged by the Defendant Washtenaw County Prosecuting Attorney's Office with domestic violence and assault with intent to do great bodily harm less than murder. Both charges were dismissed. Despite an ICE detainer request being made on September 5, 2024, it was not honored and Mr. Flores-Sosa was released to the public. *Id.* ¶ 47.

109.    On May 1, 2025, ICE officers traveled to Ypsilanti, Michigan, in search of Flores-Sosa and attempted to perform a vehicle stop on a vehicle driven by him. ICE officers activated their emergency equipment, however, Mr. Flores-Sosa failed to yield and tried to pass a bus traveling in front of him. ICE was able to pull in front of Mr. Flores-Sosa and slowed him down to prevent him from absconding. Once stopped, Mr. Flores-Sosa was non-compliant and resisted arrest by grabbing onto the steering wheel and bracing his legs inside the vehicle. Mr. Flores-Sosa was eventually forcibly removed from the vehicle, placed on the ground, handcuffed, and taken into custody. *Id.* ¶ 48.

### *Washtenaw County's Policies Increase the Danger to ICE Personnel and the Public*

110.    Over the past year, ICE officers operating out of ERO Detroit have been confronted with increased threats, aggression, attacks, and obstruction of immigration enforcement operations. The increase in these types of incidents has obstructed enforcement operations, interfered with officers' official duties, and posed significant safety risks, not only to ICE officers, but also the public. Prior to 2025, this type of behavior was virtually nonexistent. *Id.* ¶ 49.

111. While carrying out their official duties, ICE officers have faced increasing acts of aggression from those whom they seek to arrest. These acts of aggression have often led to significant damage to government property and vehicles. *Id.* ¶ 50.

112. Many vehicle stops in Defendant Washtenaw County result in attempts to abscond, such as aliens jumping out of the vehicles and running. There are numerous examples of this happening in Washtenaw County. *Id.* ¶ 51.

113. For example, Daniel Reyes Gamoa, an illegal alien who was first encountered by CBP on April 6, 2016, was previously removed from the United States on April 9, 2016. However, Mr. Reyes Gamoa reentered the United States and was arrested on August 23, 2025, by Defendant Washtenaw County Sheriff's Office for domestic violence and child abuse in the fourth degree. Both charges were dismissed, and Mr. Reyes Gamoa was released from Defendant Washtenaw County's custody. On November 24, 2025, an ERO fugitive team attempted to conduct a traffic stop on Mr. Reyes Gamoa who was traveling with another individual. *Id.* ¶ 52.

114. When the officers activated their emergency equipment, Mr. Reyes Gamoa accelerated his vehicle and rammed it through the surrounding government vehicles, striking a U.S. Marshals Service government owned vehicle (GOV) and continued to drive his vehicle past multiple law enforcement vehicles with their emergency equipment activated. Later, Mr. Reyes Gamoa abruptly stopped his vehicle, which resulted in an ICE GOV rear-ending Mr. Reyes Gamoa's vehicle. Mr. Reyes Gamoa then took off on foot attempting to flee from the officers. Officers pursued him on foot and Mr. Reyes Gamoa was eventually arrested. These vehicle ramming incidents place many unsuspecting members of the public at risk. *Id.* ¶ 53.

115. Another example of such activity is Jaime Humberto Villalobos-Penate, an alien from El Salvador who entered the United States without inspection on multiple occasions. Mr.

Villalobos-Penate was arrested by the Glen Cove City Police Department in New York on September 23, 2006, for intimidation and criminal possession of a weapon. Mr. Villalobos-Penate was again arrested by the same department on December 1, 2026, for criminal possession of a weapon. On May 9, 2025, he was arrested by Defendant Washtenaw County Sheriff's Office for assault. Three days later, on May 10, he was charged with assault with intent to do great bodily harm less than murder and aggravated domestic violence. Mr. Villalobos-Penate was released on bond by the 14B District Court[2] in Washtenaw County, and on January 5, 2026, an ERO fugitive team, through conducting surveillance, was able to conduct a traffic stop on Mr. Villalobos-Penate and his four passengers, two of which were also from El Salvador. All passengers were placed under arrest, and Mr. Villalobos-Penate is currently in the U.S. Marshals Service custody for federal criminal prosecution. *Id.* ¶ 54.

116. Consider yet another example, Cristobal Rafael Villalobos-Penate, who is an active gang associate and was arrested by the New York Nassau County Police Department in 2007 and subsequently convicted of possession of a weapon. In 2008, Mr. Villalobos-Penate was convicted of homicide (statutory murder). An immigration judge ordered his removal on June 4, 2009, and on January 5, 2026, an ERO fugitive team traveled to Defendant Washtenaw County to look for Jaime Humberto Villalobos-Penate and found Cristobal Rafael Villalobos-Penate as a passenger in the vehicle with Jaime Humberto Villalobos-Penate. *Id.* ¶ 55.

---

[2] The John B. Collins 14B District Court processes all cases arising in Ypsilanti Township. The 14B District Court is one of three district courts in Washtenaw County that process criminal misdemeanors (penalty is up to 1 year in jail), civil infractions (traffic tickets and dog licensing violations), municipal civil infractions (property maintenance code and zoning violations), civil cases (claim amount is $25,000 or less), and landlord/tenant cases and information.

117.     To discharge its duty of enforcing federal immigration law, ICE ERO officers must conduct these high-profile arrests of violent criminals in Washtenaw County without the County's support and without information from the County regarding the end of their sentence, where the alien may travel to upon their release, or information regarding their criminal charges. *Id.* ¶ 56.

118.     Often these at-large arrests come with increased difficulties. For example, agitators are prevalent in Washtenaw County, where a deportation officer and his team once encountered a group of protestors waiting for them at the hospital while they were providing medical care to an alien. When the ERO team departed the hospital, the protestors followed them aggressively and forced the deportation officer to block the path of the agitators so the government vehicle with the alien could depart safely. *Id.* ¶ 57.

### *Washtenaw County's Block to Information Sharing And County Property Impedes Law Enforcement Efforts*

119.     Washtenaw County has blocked all information sharing with ICE and refuses to allow federal immigration officials to enter Washtenaw County property. At first, the non-cooperation began with the refusal to honor ICE detainer requests. However, last year, ICE was notified that Defendant Washtenaw County would no longer provide police reports and that information must be sought through a FOIA request. *Id.* ¶ 58. This year, the obstructionist policies have escalated to now ban federal immigration officials from Washtenaw County property.

120.     On March 20, 2025, an ICE Enforcement and Removal Assistant ("ERA") sent an email to Washtenaw County Sheriff's Office Records requesting police reports for Edgar Hernandez-Najera, an alien unlawfully present in the United States who was charged with assault. The ERA requested that all reports be sent to his ICE email address, but the ERA was informed, "Due to new administration you may submit a formal FOIA request form." The email provided the link to the public facing Washtenaw County website where members of the public can click

"Submit an FOIA Request Form." *See* Freedom of Information Act, Washtenaw County, Michigan, (March 18, 2026) https://www.washtenaw.org/1128/FOIA-Freedom-of-Information-Act (last visited Apr. 8, 2026). But when police reports are produced by the County, they are so heavily redacted that the reports are rendered nearly useless. Raycraft Decl. ¶ 59.

121.    In a law enforcement environment where expediency is essential, FOIA requests are slow, cumbersome, and apt to delays. For example, in an email dated May 2, 2025, Tammy Richards, Lead FOIA coordinator for Defendant Washtenaw County, responded to a different FOIA request made by the ERA. The email acknowledged that the original FOIA request was made on April 24, 2025. However, the Washtenaw County FOIA coordinator stated that the County needed a ten-day extension and therefore would not have the documents to ICE until on or about May 16, 2025. Delays in information sharing may afford an alien additional time to abscond. *Id.* ¶ 60.

122.    Defendant Washtenaw County and its officials and agencies have put up multiple obstacles to prevent ICE from executing its duties within the County. Through the Defendant Washtenaw County Sheriff's Office General Order demanding that local officials do not honor ICE detainers, to the Defendant Board of Commissioner's Resolution prohibiting ICE from accessing County property and mandating what officers can and cannot wear, to the Defendant Prosecutor's Office Policy Directive reducing immigration consequences of convictions, Defendant Washtenaw County by and through its officials and agencies has become a sanctuary from the enforcement of federal immigration law and a harbor to removable criminal aliens. ICE's mission is to protect the public through criminal investigations and enforcing immigration laws to preserve national security and public safety, and while such "sanctuary" policies make ICE's

operations more cumbersome, involved, and resource intensive, ultimately, it is the residents of Defendant Washtenaw County and the State of Michigan who suffer the most. *Id.* ¶ 63.

## CLAIMS FOR RELIEF

### COUNT ONE – FEDERAL PREEMPTION
### (WASHTENAW COUNTY SHERIFF'S OFFICE GENERAL ORDER)

**(*Defendants Washtenaw County, Alyshia M. Dyer & Washtenaw County Sheriff's Office*)**

123.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

124.    The United States Constitution, and the Supremacy Clause, provides that "[t]his Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

125.    The Courts have decided "it is necessary for uniformity that the laws of the United States be dominant over those of any state." *Mayo*, 319 U.S. at 445. That principle is only strengthened in the immigration context. *See* U.S. Const. art. I, § 8, cl. 4.

#### *Express Preemption*

126.    Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). State and local governments may not prohibit or restrict the sharing of "information regarding the citizenship or immigration status" with federal immigration officials. 8 U.S.C. § 1373(a); *see also id*. § 1644 (similar). Further, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity" from "[s]ending", "[m]aintaining," or "[e]xchanging" with any other government entity "information regarding the immigration status, lawful or unlawful, of any individual." *Id*. § 1373(b).

127.    The Washtenaw County Sheriff's Office General Order denies that it has any obligation to cooperate with federal immigration officials. According to the General Order, "Employees shall never ask about an individual's immigration status when performing their duties." The General Order also prohibits Sheriff's Office employees from honoring ICE detainer requests "when there is no valid judicial warrant or order by a judge." The General Order further prohibits Sheriff's Office employees from using any resources to assist with federal immigration officials.

128.    Accordingly, the challenged General Order and the actions of Defendants Washtenaw County, Sheriff Alyshia M. Dyer, and the Washtenaw County Sheriff's Office are thus expressly preempted under the clear directive of Congress to have state and local law enforcement working together with federal immigration officials to accomplish the objectives of the INA.

### *Obstacle Preemption*

129.    In the absence of express preemption, state, county, city, and local laws must yield to a federal statute when Congress "intends federal law to 'occupy the field'" (field preemption) or when the state or local laws conflict with a federal statute (conflict preemption). *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). One category of conflict preemption occurs when the state law creates an obstacle to a federal statutory purpose (obstacle preemption). *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

130.    The challenged Washtenaw County General Order attempts to severely restrict the manner and locations in which federal immigration officials can perform their duties. By instructing Sheriff's Office employees not to inquire about the immigration status of individuals in Washtenaw County custody, the Sheriff's Office is impeding the sharing of information with federal immigration authorities and undermining the federal immigration officials' ability to

engage in civil immigration enforcement according to the laws of the United States. *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see also* 18 U.S.C. §§ 372, 1071.

131. Moreover, the Sheriff's General Order prohibits honoring detainer requests or any similar federal request without a *judicial* warrant and creates an obstacle to Congress's objective because federal law authorizes officers to arrest and detain aliens pursuant to *administrative* warrants. Similarly, the refusal of Defendant Washtenaw County, its Sheriff, and its Sheriff's Office to detain illegal aliens who have committed certain offenses upon their release from local custody—a release process solely under that locality's control—presents yet another obstacle to federal immigration officials requiring the released detainee to be re-arrested in the community at large as mandated by federal law. 8 U.S.C. § 1226(c).

132. Defendant Washtenaw County's prohibition, as implemented through its Sheriff and its Sheriff's Office, regarding compliance with reasonable information requests from the Federal Government further leaves federal agents to facilitate congressionally authorized arrests without the most basic information about the alien and creates an obstacle to Congress's "full purposes and objectives," as articulated in the INA. *Hines*, 312 U.S. at 67.

133. Accordingly, the challenged General Order and the actions of Defendants Washtenaw County, Alyshia M. Dyer, and the Defendant Washtenaw County Sheriff's Office violate the Supremacy Clause, undermine and interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government and are invalid on those bases under federal preemption principles.

134. As a result of Defendant Washtenaw County, its Sheriff, and its Sheriff's Office, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged General Order threatens and harms the United States' sovereign interest in the

supremacy and enforcement of federal law, particularly the INA. The challenged General Order also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

## COUNT TWO – FEDERAL PREEMPTION
## (WASHTENAW COUNTY PROSECUTING ATTORNEY'S POLICY DIRECTIVE)

### (*Defendants Washtenaw County, Eli Savit & Washtenaw County Prosecuting Attorney's Office*)

135.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

### *Express Preemption*

136.    The Washtenaw County Prosecuting Attorney's Office Policy Directive—like the Sheriff's Office General Order—instructs local prosecutors to "avoid immigration consequences wherever possible" and to not inquire about a criminal defendant's immigration status except in "off the record" private discussions with defense counsel. The Policy Directive further denies that the Prosecuting Attorney's Office has an obligation to cooperate with federal immigration officials: "APAs should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies to enforce federal immigration laws or policies."

137.    The Prosecuting Attorney's Policy Directive also actively encourages avoiding convictions of illegal aliens because they may adversely impact on the aliens' immigration status, urging local prosecutors instead to enter into more-lenient plea agreements, eliminating multiple counts of the same charge, or implement a deflection program in lieu of criminal prosecution. Local prosecutors are also urged to carefully select language used in disposition documents, records of conviction, striking language from charging documents, and urging shorter sentences for criminal illegal aliens for the express purpose of shielding such aliens from federal immigration

41

officials. To avoid immigration consequences, local prosecutors should consider dropping all charges against illegal aliens:

> APAs may consider adjourning the case for a period of time, then—if the defendant complies with requirements such as making restitution to the crime survivor, and not being charged in a new criminal case—dismissing the charges altogether.

According to the Policy Directive, "In every case involving a noncitizen defendant, APAs should assess whether a reasonable alternative conviction exists that would help the defendant avoid immigration consequences." *Id.* at 8.

138.   Although the Prosecuting Attorney's Policy Directive does briefly acknowledge that local government officials "cannot be restricted from 'sending to, or receiving from' the federal government information regarding a person's 'citizenship or immigration status,'" *id.* at 7, the entire Policy Directive is dedicated to showing local prosecutors exactly how to do precisely what the Policy Directive purports not to do. The only exception to withholding information from federal officials is when the Chief Assistant Prosecuting Attorney grants an exception "only in exceptional circumstances, and where public safety requires that deviation." *Id.* at 11. In so doing, the Policy Directive projects an appearance that the Prosecuting Attorney's Office is following the law, when it actually requires conflict with federal law.

139.   Accordingly, the challenged Policy Directive and the actions of Defendants Washtenaw County, Prosecuting Attorney Eli Savit, and the Washtenaw County Prosecuting Attorney's Office are thus expressly preempted under the clear directive of Congress to have state and local law enforcement working together with federal immigration officials to accomplish the objectives of the INA.

### Obstacle Preemption

140.   The challenged Policy Directive of the Washtenaw County Prosecuting Attorney and its Prosecuting Attorney's Office attempts to severely restrict the manner in which federal

42

immigration officials can perform their duties. By instructing Prosecuting Attorney's Office employees not to inquire about the immigration status of individuals in Washtenaw County custody except in "off the record" discussions with defense counsel, the Prosecuting Attorney's Office is impeding the sharing of information with federal immigration authorities and undermining the federal immigration officials' ability to engage in civil immigration enforcement according to the laws of the United States. *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see also* 18 U.S.C. §§ 372, 1071.

141. Moreover, the decision of Defendant Washtenaw County, through the actions of its Prosecuting Attorney and Prosecuting Attorney's Office, to receive more-lenient charges and plea agreements presents yet another obstacle to federal immigration officials requiring the released detainee to be re-arrested in the community at large as mandated by federal law. 8 U.S.C. § 1226(c).

142. Defendant Washtenaw County's prohibition, as implemented through its Prosecuting Attorney and its Prosecuting Attorney's Office, regarding compliance with reasonable information requests from the Federal Government further leaves federal agents to facilitate congressionally authorized arrests without the most basic information about the alien and creates an obstacle to Congress's "full purposes and objectives," as articulated in the INA. *Hines*, 312 U.S. at 67.

143. Accordingly, the challenged Policy Directive and the actions of Defendants Washtenaw County, Prosecuting Attorney Eli Savit and the Washtenaw County Prosecutor's Office violate the Supremacy Clause, undermine and interfere with federal law, and create obstacles to the enforcement of federal immigration law both on their face and as applied to the Federal Government and are invalid on those bases under federal preemption principles.

43

144.     As a result of Defendant Washtenaw County, its Prosecuting Attorney, and its Prosecuting Attorney's Office, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged Policy Directive threatens and harms the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The Policy Directive also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

**COUNT THREE – FEDERAL PREEMPTION**
**(ACCESS RESTRICTIONS TO WASHTENAW COUNTY PROPERTY)**

**(*Defendants Washtenaw County & Washtenaw County Board of Commissioners*)**

145.     Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

146.     Defendant Washtenaw County Board of Commissioners' Resolution restricting federal immigration officials from entering County property creates burdensome obstacles to the enforcement of federal immigration law. These restrictions prevent federal immigration officials from questioning illegal aliens and effectuating their arrest. The Resolution "stand[s] as an obstacle to the accomplishment and execution" of federal immigration law. *Arizona*, 567 U.S. at 406.

147.     Defendant Washtenaw County Board of Commissioners' Resolution is therefore invalid due to conflict preemption and the Supremacy Clause. The Resolution attempts to severely restrict the locations in which federal immigration agents can perform their duties. The strict limitations thus impede the agents' ability to engage in civil immigration enforcement according to the laws of the United States. *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see also* 18 U.S.C. §§ 372, 1071.

148. As a result of Defendant Washtenaw County and its Board of Commissioners, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged Resolution threatens and harms the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The General Order also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

## COUNT FOUR – VIOLATION OF THE SUPREMACY CLAUSE

### *(Defendants Washtenaw County, Alyshia M. Dyer & Washtenaw County Sheriff's Office)*

149. Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

### *Unlawful Discrimination Against the Federal Government*

150. The challenged Washtenaw County General Order discriminates against the Federal Government as it only applies to federal authorities enforcing federal immigration law. The challenged General Order has no application to any other citizen, county, state, or federal entity.

151. The challenged General Order singles out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when no other member of the public or law enforcement is so treated. This constitutes an undue and burdensome regulation specifically aimed at impeding the Federal Government.

152. The intergovernmental immunity doctrine dictates that discriminatory targeting of the Federal Government is unlawful. *See*, *e.g., Washington*, 596 U.S. at 839 ("[S]tate law discriminates against the Federal Government . . . if it 'singles them out' for less favorable

'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'").

153.    Accordingly, the challenged General Order violates the doctrine of intergovernmental immunity, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government and is therefore additionally or alternatively in violation of the Supremacy Clause and is invalid on that basis.

### *Unlawful Regulation of the Federal Government*

154.    The challenged General Order effects direct regulation of the Federal Government.

155.     By refusing to honor ICE detainer requests and administrative warrants expressly authorized by Congress, Defendants Washtenaw County, Alyshia M. Dyer, and the Washtenaw County Sheriff's Office have unlawfully eliminated these means for federal immigrations officials to carry out their statutory functions.

156.     Likewise, by restricting access to detention facilities and the aliens within them, Defendants Washtenaw County, Alyshia M. Dyer, and the Washtenaw County Sheriff's Office unlawfully prevent the Federal Government from carrying out the INA's command that aliens in this country "*shall* be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The challenged General Order limits the circumstances in which federal immigration authorities may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

157.     Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. Accordingly, the challenged General Order unlawfully regulates the Federal Government, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal

Government and is therefore additionally and/or alternatively in violation of the Supremacy Clause and is invalid on that basis.

158. As a result of the challenged General Order, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged General Order threatens and harms the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The challenged General Order also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

**COUNT FIVE – VIOLATION OF THE SUPREMACY CLAUSE**

***(Defendants Washtenaw County, Eli Savit & Washtenaw County Prosecuting Attorney's Office)***

159. Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

***Unlawful Discrimination Against the Federal Government***

160. The challenged Policy Directive discriminates against the Federal Government as it only applies to federal authorities enforcing federal immigration law. The challenged Policy Directive has no application to any other citizen, county, state, or federal entity.

161. The challenged Policy Directive singles out federal immigration officials by focusing only on concealing information having "immigration consequences," expressly and implicitly, for unfavorable and uncooperative treatment when no other member of the public or law enforcement is so treated. This constitutes an undue and burdensome regulation specifically aimed at impeding the Federal Government.

162. The intergovernmental immunity doctrine dictates that discriminatory targeting of the Federal Government is unlawful. *See*, *e.g., Washington*, 596 U.S. at 839 ("[S]tate law

47

discriminates against the Federal Government . . . if it 'singles them out' for less favorable 'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'").

163. Accordingly, the challenged Policy Directive violates the doctrine of intergovernmental immunity, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government and is therefore additionally or alternatively in violation of the Supremacy Clause and is invalid on that basis.

### *Unlawful Regulation of the Federal Government*

164. The challenged Policy Directive effects direct regulation of the Federal Government.

165. By instructing local prosecutors to offer more-lenient plea agreements, implement deflection programs in lieu of criminal prosecution, and reduce sentences by charging only lesser-included offenses, Defendants Washtenaw County, Eli Savit, and the Washtenaw County Prosecuting Attorney's Office unlawfully avoid federal mandatary arrests of criminal illegal aliens. This elaborate scheme is expressly designed to frustrate the efforts of federal immigration officials in enforcing federal immigration law through the deliberate, systematic, and surreptitious sanitization of records for criminal illegal aliens. Under this scheme, Defendants Washtenaw County, Eli Savit, and the Washtenaw County Prosecuting Attorney's Office seek to restrict the access of federal immigration officials to vital information, thereby creating a false portrait that such defendants have not engaged in any conduct that might impact their immigration status, when in fact they have. In truth, by requiring local county prosecutors to withhold such information from federal immigration officials, Defendants Washtenaw County, Eli Savit, and the Washtenaw

County Prosecuting Attorney's Office are regulating federal immigration officials by depriving them of the relevant information they need to perform their lawful duties.

166.    Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. Accordingly, the challenged Policy Directive unlawfully regulates the Federal Government, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government and is therefore additionally and/or alternatively in violation of the Supremacy Clause and is invalid on that basis.

167.    As a result of the challenged Policy Directive, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged Policy Directive threatens and harms the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The challenged Policy Directive also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

## COUNT SIX – VIOLATION OF THE SUPREMACY CLAUSE

### *(Defendants Washtenaw County and Washtenaw County Board of Commissioners)*

168.    Plaintiff hereby incorporates foregoing paragraphs of the Complaint as if fully stated herein.

### *Unlawful Discrimination Against the Federal Government*

169.    The challenged Resolution discriminates against the Federal Government as it only applies to federal authorities enforcing federal immigration law. The challenged Resolution has no application to any other citizen, county, state, or federal entity.

170.    The challenged Resolution singles out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment when no other member of the public or law enforcement is so treated by restricting access to Washtenaw County property only by federal immigration officials. This constitutes an undue and burdensome regulation specifically aimed at impeding the Federal Government.

171.    The intergovernmental immunity doctrine dictates that discriminatory targeting of the Federal Government is unlawful. *See*, *e.g., Washington*, 596 U.S. at 839 ("[S]tate law discriminates against the Federal Government . . . if it 'singles them out' for less favorable 'treatment' or if it regulates them unfavorably on some basis related to their governmental 'status.'").

172.    Accordingly, the challenged Resolution violates the doctrine of intergovernmental immunity, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government and is therefore additionally or alternatively in violation of the Supremacy Clause and is invalid on that basis.

### *Unlawful Regulation of the Federal Government*

173.    The challenged Resolution effects direct regulation of the Federal Government.

174.     By restricting access to Washtenaw County property, Defendants Washtenaw County and the Washtenaw County Board of Commissioners unlawfully prevent the Federal Government from carrying out the INA's command that aliens in this country "*shall* be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The challenged Resolution limits the location in which federal immigration authorities may interrogate illegal aliens, even though the text of the INA itself imposes no such limitations. *See id.* § 1357(a)(3).

175.    Likewise, the challenged Resolution effects direct regulation of the Federal Government by eliminating nonpublic spaces of Washtenaw County property as permissible

locations for facilitating federal enforcement of civil immigration law, and by eliminating Washtenaw County property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law.

176. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. Accordingly, the challenged Resolution unlawfully regulates the Federal Government, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government and is therefore additionally and/or alternatively in violation of the Supremacy Clause and is invalid on that basis.

177. As a result of the challenged Resolution, Plaintiff and its component agencies have suffered and continue to suffer harm. Specifically, the challenged Resolution threatens and harms the United States' sovereign interest in the supremacy and enforcement of federal law, particularly the INA. The challenged Resolution also undermines and conflicts with federal immigration enforcement policy and imposes financial harm on the United States and taxpayers by increasing the costs of immigration enforcement in Washtenaw County. A favorable ruling would redress the United States' harms.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

1. That this Court enter a judgment declaring that the challenged Washtenaw County Sheriff's Office *General Order 1.14* (Jan. 30, 2025) violates the Supremacy Clause, is preempted by federal law, and is therefore invalid;

51

2.      That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees from enforcing or implementing the challenged Washtenaw County Sheriff's Office *General Order 1.14* (Jan. 30, 2025);

3.      That this Court enter a judgment declaring that the challenged Washtenaw County Prosecutor's Office *Policy Directive 2021-12, Policy Regarding Immigration and Immigration-Adjacent Issues* (Feb. 24, 2021) violates the Supremacy Clause, is preempted by federal law, and is therefore invalid;

4.      That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees from enforcing or implementing the challenged Washtenaw County Prosecutor's Office *Policy Directive 2021-12, Policy Regarding Immigration and Immigration-Adjacent Issues* (Feb. 24, 2021);

5.      That this Court enter a judgment declaring that the challenged Washtenaw County Board of Commissioners Resolution, *A Resolution Opposing the Use of County Buildings and Face Coverings by Immigration and Customs Enforcement (ICE) Officers, Customs and Border Protection Officers, or their Contractors During Civil Immigration Enforcement Activities in Washtenaw County* (Jan. 21, 2026) violates the Supremacy Clause, is preempted by federal law, and is therefore invalid;

6.      That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees from enforcing or implementing the challenged Washtenaw County Board of Commissioners Resolution, *A Resolution Opposing the Use of County Buildings and Face Coverings by Immigration and Customs Enforcement (ICE) Officers, Customs and Border Protection Officers, or their Contractors During Civil Immigration Enforcement Activities in Washtenaw County* (Jan. 21, 2026);

7.        That this Court award the United States its costs and fees in this action; and

8.        That this Court award any other relief it deems just and proper.

DATED: April 9, 2026                      Respectfully submitted,

| | |
|---|---|
| STANLEY E. WOODWARD, JR.<br>Associate Attorney General | */s/ Robert O. Lindefjeld*<br>ROBERT O. LINDEFJELD<br>Assistant Director (DC Bar No. 44423) |
| BRETT A. SHUMATE<br>Assistant Attorney General<br>Civil Division | United States Department of Justice<br>Enforcement & Affirmative Litigation Branch<br>P.O. Box 868, Ben Franklin Station<br>Washington, D.C. 20044 |
| ANNA EDWARDS<br>Counsel to the Associate Attorney General | Telephone: (202) 451-7488<br>Email: robert.o.lindefjeld@usdoj.gov |
| YAAKOV M. ROTH<br>Principal Deputy Assistant Attorney General<br>Civil Division | KEVIN ERSKINE<br>Assistant United States Attorney<br>Eastern District of Michigan<br>211 W. Fort St., Suite 2001 |
| SEAN SKEDZIELEWSKI<br>Counsel to the Assistant Attorney General | Detroit, MI 48226<br>Telephone: (313) 226-9610<br>Email: Kevin.Erskine@usdoj.gov |
| | *Local designee for the United States<br>pursuant to E.D. Mich. LR 83.20(g)* |
| | *Attorneys for the United States of America* |