# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>COUNTY OF WASHTENAW, Michigan; ALYSHIA M. DYER, Sheriff of the County of Washtenaw, Michigan, in her official capacity; COUNTY OF WASHTENAW SHERIFF'S OFFICE; ELI SAVIT, Prosecuting Attorney for the County of Washtenaw, Michigan, in his official capacity; COUNTY OF WASHTENAW OFFICE OF THE PROSECUTING ATTORNEY; and the WASHTENAW COUNTY BOARD OF COMMISSIONERS,<br><br>        Defendants. | Civ. Action No. 5:26-cv-11166<br><br>Hon. F. Kay Behm<br><br>Mag. Elizabeth A. Stafford |

## DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT AND <u>ACCOMPANYING MEMORANDUM OF LAW</u>

## DEFENDANTS' JOINT MOTION TO DISMISS

Upon the accompanying Memorandum of Law, Defendants County of Washtenaw, Michigan; Alyshia M. Dyer, Sheriff of the County of Washtenaw, Michigan, in her official capacity; County of Washtenaw Sheriff's Office; Eli Savit, Prosecuting Attorney for the County of Washtenaw, Michigan, in his official capacity; County of Washtenaw Office of the Prosecuting Attorney; and the Washtenaw County Board of Commissioners, move this Court, before the Honorable F. Kay Behm of the United States of District Court for the Eastern District of Michigan, 600 Church Street, Flint, MI 48502, for an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing the complaint at ECF No. 1.

## LOCAL RULE 7.1 COMPLIANCE

Pursuant to Local Rule 7.1, counsel for Defendants contacted counsel for the United States to explain the nature of this motion and its legal basis.  Defendants requested but did not obtain concurrence in the relief sought.

i

## BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS

## STATEMENT OF THE ISSUES

1. Whether the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, preempts certain local policies limiting local officials' ability to use local resources to assist immigration-enforcement efforts.

2. Whether the intergovernmental-immunity doctrine—which bars state or local rules that regulate the federal government or discriminate against it—applies to certain local policies that direct local officials not to assist immigration-enforcement efforts.

## AUTHORITY FOR THE RELIEF SOUGHT

1. This Court should dismiss the federal government's preemption claims (Counts I-III) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The government fails to identify any federal statutory provision that expressly or impliedly preempts the challenged local policies. *See* U.S. Const. art. VI, cl. 2; *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

2. This Court should dismiss the federal government's intergovernmental-immunity claims (Counts IV-VI) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The intergovernmental-immunity doctrine bars only those local rules that either *directly* regulate the federal government or discriminate against it. *See United States v. Washington*, 596 U.S. 832, 838 (2022); *North Dakota v. United States*, 495 U.S. 423, 434-35 (1990). The challenged policies do neither.

**TABLE OF CONTENTS**

PAGE

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

    A.    Statutory Background.................................................................3

    B.    The Administration's Campaign Against "Sanctuary Cities" ..............5

    C.    Washtenaw County Policies.......................................................8

    D.    This Lawsuit .........................................................................11

ARGUMENT .......................................................................................................12

I.    Federal Law Does Not Preempt the Challenged Policies (Counts I-III).......13

    A.    The INA Does Not Expressly Preempt the Challenged Policies ........14

    B.    The Challenged Policies Do Not Present an Improper Obstacle to Federal Immigration Enforcement...................................................18

    C.    The Government's Reading of the INA Violates the Anti-Commandeering Doctrine ................................................................24

II.    The Challenged Policies Do Not Violate Intergovernmental Immunity (Counts IV-VI).................................................................................26

    A.    The Challenged Policies Do Not Regulate the United States ............27

    B.    The Challenged Policies Do Not Discriminate Against the United States.........................................................................29

    C.    The Anti-Commandeering Doctrine Forecloses the Government's Intergovernmental-Immunity Arguments ...................34

CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Adderley v. State of Florida*, 385 U.S. 39 (1966) ....................................................35

*Arizona v. United States*, 567 U.S. 387 (2012)...........................................3, 4, 13, 23

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders &*
    *Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ........................................29

*Bond v. United States*, 572 U.S. 844 (2014)...............................................................25

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011)..............................14, 18

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018)........................................35

*Counts v. Gen. Motors, LLC*, 139 F.4th 576 (6th Cir. 2025)............................14, 18

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)............................................30

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades*
    *Council*, 485 U.S. 568 (1988) .........................................................................25

*Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ............................................22, 35

*Geo Grp., Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025)..........................................32

*Hamama v. Adducci*, 946 F.3d 875 (6th Cir. 2020)...................................................24

*Kansas v. Garcia*, 589 U.S. 191 (2020)........................................................................3

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) ......................................19, 21

*M'Culloch v. Maryland*, 17 U.S. 316 (1819)..............................................................33

*McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ..................................passim

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)....................passim

*North Dakota v. United States*, 495 U.S. 423 (1990) ...........................27, 28, 30, 33

*Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135 (6th Cir. 2023)..................13, 16

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*,
    8 F.4th 176 (3d Cir. 2021) ...............................................................................26

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .................................................................21

*Printz v. United States*, 521 U.S. 898 (1997)..............................................................24

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008)........................................................19

*Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013)..............23

*State Farm Bank v. Reardon*, 539 F.3d 336 (6th Cir. 2008)....................................17

*Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024) ...........................................................30

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ...............................passim

*United States v. City of Boston*, 2026 WL 1493706 (D. Mass. May 28, 2026) ........7

*United States v. Colorado*, 2026 WL 878882 (D. Colo. Mar. 31, 2026) ......7, 25, 34

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) .......................passim

*United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025)..................passim

**PAGE**

**CASES—CONTINUED:**

*United States v. Washington*, 596 U.S. 832 (2022) ....................................27, 30, 34
*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)..............................................14, 20
*Wyeth v. Levine*, 555 U.S. 555 (2009) ...................................................................14

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const.
    art. VI, cl. 2 ...................................................................................................13
    amend. IV.....................................................................................................23, 34
    amend. X ..................................................................................................*passim*
Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*...............................*passim*
    § 1103.............................................................................................................4
    § 1151.............................................................................................................3
    § 1181.............................................................................................................3
    § 1225...........................................................................................................29
    § 1226....................................................................................................*passim*
    § 1226a.........................................................................................................26
    § 1231.................................................................................................3, 20, 26
    § 1252c...........................................................................................................4
    § 1357....................................................................................................*passim*
    § 1373....................................................................................................*passim*
    § 1644...................................................................................................*passim*
8 C.F.R. § 287.7 ...............................................................................................5, 7, 22
Executive Order 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)................................5, 6
Executive Order 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025)................................6
Executive Order 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025)................................6
Fed. R. Civ. P. 12 .................................................................................................13

## OTHER AUTHORITIES

Spencer E. Amdur, *The Right of Refusal: Immigration Enforcement and the New Cooperative Federalism*, 35 Yale L. & Pol'y Rev. 87 (2016).....................5
Defs.' Mem. in Supp. of Mot. for Partial J. on the Pleadings, *Moreno v. Napolitano*, 2014 WL 4814776 (N.D. Ill. Sept. 29, 2014) ...............22
*Immigration Detainers*, ICE (May 8, 2026), https://perma.cc/7TQ9-X9EF...........31
Memorandum from the Attorney General Re. Sanctuary Jurisdiction Directives (Feb. 5, 2025), https://perma.cc/N4KE-K3MW ................................6

**INTRODUCTION**

This is the latest in a series of lawsuits in which the federal government has sought to compel States and localities to support its immigration agenda.  Other courts have had no difficulty rejecting those claims.  This Court should do the same.  The federal government may disagree with Washtenaw County's policies and politics.  But the Tenth Amendment prohibits it from commandeering *local* officials to implement its *federal* immigration agenda.

Consistent with that bedrock constitutional rule, Congress in the Immigration and Nationality Act (INA) gave States and localities the choice whether to assist federal immigration efforts—for instance, by entering agreements to partner with the federal government in enforcing immigration laws.  But the INA left States and localities free to decline the offer.

Operating within that framework, Washtenaw County officials chose not to help federal immigration enforcement.  They feared that using limited local resources to advance immigration enforcement would undermine vital local functions, including policing and the provision of critical services.  If residents know interacting with the local government heightens the risk of immigration enforcement, the County concluded, residents will be less likely to report crimes or to access services.  Accordingly, the County's Office of the Prosecuting Attorney instructed prosecutors to consider immigration consequences in charging decisions.  The Sheriff's Office

1

ordered officers not to ask about immigration status when performing their duties. And the County's Board of Commissioners decided not to allow federal immigration officers into County property without a judicial warrant. Each policy expressly states that local officials must comply with applicable laws. In short, as the INA permits, the County prioritized local concerns over federal ones.

The federal government, however, claims those policies improperly undermine its immigration-enforcement efforts. In the government's view, the INA preempts the County's policies. The government also claims the intergovernmental-immunity doctrine forbids the policies because they seek to directly regulate the federal government or discriminate against federal officials. As multiple courts have held, those arguments falter under even a cursory inspection.

As to preemption, the government fails to identify a single provision of the INA that conflicts with the challenged policies. Although the INA prohibits localities from restricting local officials' communications with immigration officers concerning "immigration status" information, 8 U.S.C. §§ 1373, 1644, none of the challenged policies restricts such communications. And none of the other federal-law provisions the government invokes mandates state or local cooperation. The government's contrary reading creates a severe commandeering problem, generating an unconstitutional statute that forces nonconsenting localities to spend resources assisting federal immigration efforts.

2

As to intergovernmental immunity, the County's policies neither regulate the federal government nor discriminate against it.  Far from seeking to directly control federal immigration efforts, the policies merely exercise the County's authority over its own property and personnel.  Nor do the policies treat federal officials worse than their state or local counterparts.  Immigration enforcement is a federal function, so policies prohibiting the expenditure of local resources on immigration will always impact federal officials, but that fact does not prove unlawful discrimination.

This Court should dismiss the complaint with prejudice.

## BACKGROUND

### A.    Statutory Background

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*., "sets out the terms and conditions of admission to the country and the subsequent treatment of [noncitizens] lawfully in the country," *Kansas v. Garcia*, 589 U.S. 191, 195 (2020) (citation omitted).  The INA establishes the qualifications for various immigration statuses, specifies when the federal government may detain noncitizens, and empowers federal officials to remove unlawfully present noncitizens from the country.  *See* 8 U.S.C. §§ 1151(a), 1181, 1226, 1231.

Within that regime, Congress tasked Immigration and Customs Enforcement (ICE), an agency within the Department for Homeland Security, with identifying, apprehending, and removing unlawfully present individuals.  *See Arizona v. United*

*States*, 567 U.S. 387, 397 (2012); Compl. ¶ 37.  ICE may "interrogate any alien … as to his right to be or to remain in the United States," 8 U.S.C. § 1357(a)(1), and may "arrest[] and detain[]" noncitizens pursuant to administrative warrants "pending a decision on whether the alien is to be removed," *id.* § 1226(a).

The INA contemplates federal-state cooperation in immigration enforcement. Congress, for example, authorized the Attorney General to enter agreements with state and local officials permitting them to "perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408 (citing 8 U.S.C. § 1357(g)(1)).  And Congress authorized local officers to arrest and detain certain noncitizens with felony convictions until ICE assumes custody.  8 U.S.C. § 1252c(a); *see also id.* § 1103(a)(10). But those functions are entirely optional; States may assume them only "to the extent permitted by relevant State and local law." *E.g.*, *id.* §§ 1252c(a), 1357(g)(1).

Federal officials also may request specific kinds of voluntary assistance from States. *Arizona*, 567 U.S. at 411-12.  State and local governments "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *accord id.* § 1644 (similar).

The INA further permits federal agents to ask, but not compel, state and local officers to provide advance notice of when a noncitizen charged with an offense involving controlled substances will be released from jail or prison.  *Arizona*, 567

4

U.S. at 410 (citing 8 U.S.C. § 1357(d)).  Although the INA nowhere authorizes federal agents to request that state and local officers continue to *detain* noncitizens in their custody on a suspicion that they might be removable, the government has authorized such requests by regulation.  *See* 8 C.F.R. § 287.7(a), (d).  ICE "detainer requests" ask state and local agencies to (1) "advise [ICE], prior to release of [an] alien, in order for [ICE] to arrange to assume custody" and (2) "maintain custody of the alien for a period not to exceed 48 hours."  *Id.*

For decades, States and localities have taken varied approaches to cooperation with federal immigration enforcement.  Although some jurisdictions have elected to offer assistance, others have taken a more circumspect approach.  Citing the "financial cost, litigation risk, and harm to community policing" that can accompany assisting federal immigration efforts, by mid-2014 "about 300 states, counties, cities, and law enforcement agencies had adopted policies limiting their cooperation with detainers, and sometimes notification requests [for immigration-status information] as well."  Spencer E. Amdur, *The Right of Refusal: Immigration Enforcement and the New Cooperative Federalism*, 35 Yale L. & Pol'y Rev. 87, 108-09 (2016).

**B.**     **The Administration's Campaign Against "Sanctuary Cities"**

Upon assuming office in 2025, President Trump pledged to address "illegal immigration into the United States" by "faithfully execut[ing] the immigration laws against all inadmissible and removable aliens."  Executive Order 14,159 §§ 1-2, 90

5

Fed. Reg. 8443 (Jan. 20, 2025).  As part of that effort, the Administration targeted States and localities with noncooperation policies, which the Administration called "sanctuary jurisdictions."  The Administration claimed that these communities "interfere with the lawful exercise of Federal law enforcement operations."  *Id.* § 17.

On January 20, 2025, the President directed the Attorney General and the Secretary of Homeland Security to withhold "Federal funds" from "'sanctuary' jurisdictions" and to bring "criminal or civil" lawsuits against local "practices that interfere with the enforcement of Federal law."  *Id.*  On April 28, 2025, the President further directed the Attorney General and the Secretary to "publish a list of States and local [sanctuary] jurisdictions," "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law," and "pursue all necessary legal remedies and enforcement measures to end these violations."  Executive Order 14,287 §§ 2-3, 90 Fed. Reg. 18761 (Apr. 28, 2025); *see also* Executive Order 14,218 § 2(a)(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (restricting funding to sanctuary cities).

Pursuant to those executive orders, the Attorney General issued a directive requiring the DOJ's Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and to "take legal action to challenge such laws, policies, or practices."  Memorandum from the Attorney General Re. Sanctuary Jurisdiction Directives (Feb. 5, 2025), https://perma.cc/N4KE-K3MW.

The Civil Division followed that command, filing more than a dozen lawsuits in 2025 and 2026 attempting to force States and localities to assist federal immigration efforts. The government has taken the position that federal immigration laws preempt local measures limiting cooperation with immigration enforcement. *See, e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025); *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025); *United States v. Colorado*, 2026 WL 878882 (D. Colo. Mar. 31, 2026); *United States v. City of Boston*, 2026 WL 1493706 (D. Mass. May 28, 2026).[1] In support of that argument, the government has relied on the INA's requirement that States permit the sharing of immigration-status information, 8 U.S.C. § 1373, as well as the statute's authorization of administrative warrants and regulatory detainer requests, *id.* §§ 1226, 1357(d); 8 C.F.R. § 287.7. In the government's view, local rules limiting the sharing of information about noncitizens, preventing compliance with detainer requests, and restricting ICE access to buildings unlawfully undermine federal immigration enforcement authority.

---

[1] *See also United States v. Rochester*, No. 25-6226 (W.D.N.Y. filed Apr. 24, 2025); *United States v. Newark*, No. 25-5081 (D.N.J. filed May 22, 2025); *United States v. Los Angeles*, No. 25-5917 (C.D. Cal. filed June 30, 2025); *United States v. City of New York*, No. 25-4084 (E.D.N.Y. filed July 24, 2025); *United States v. Minnesota*, No. 25-3798 (D. Minn. filed Sept. 29, 2025); *United States v. New Jersey*, No. 26-1770 (D.N.J. filed Feb. 23, 2026); *United States v. Connecticut*, No. 26-568 (D. Conn. filed Apr. 13, 2026).

To date, courts have uniformly rejected the Administration's arguments. Courts have found no conflict between the INA and local rules limiting assistance for federal immigration enforcement. *See, e.g.*, *Illinois*, 796 F. Supp. 3d at 514-33. Courts also have rejected the government's argument that local noncooperation policies violate the intergovernmental-immunity doctrine. Such policies, courts have repeatedly held, neither regulate federal officials nor discriminate against the federal government. *See, e.g.*, *id.* at 533-36; *accord New York*, 810 F. Supp. 3d at 352-54.

### C.  Washtenaw County Policies

Between 2021 and 2026, Washtenaw County, Michigan, and its officials joined other jurisdictions nationwide by limiting assistance to federal immigration authorities. The County decided that spending finite local resources helping federal immigration efforts risked undermining local policing and the provision of services to residents. If interactions with local government carry the risk of increased exposure to immigration enforcement, the County concluded, residents might be less likely to report crimes, participate in public processes, or access essential services. *See* Ex. 6, at 2; Ex. 4, at 3.[2] To that end, the County adopted three relevant policies.

### 1.  *The Prosecuting Attorney's Policy Directive 2021-12 (Feb. 24, 2021).*

Recognizing that fear of adverse immigration consequences can deter "noncitizen

---

[2] All references to exhibits refer to the exhibits attached to the complaint.

survivors and witnesses" from reporting crimes, and defendants from cooperating, the Washtenaw County Prosecutor's Office resolved to "minimize" those consequences. Ex. 6, at 3. The Prosecutor's Office thus directed prosecutors to "refrain from questioning witnesses about immigration status," and not to "assist in any way with federal immigration enforcement related to noncitizen civilians, crime survivors, witnesses, or defendants." *Id.*

The policy directs prosecutors to avoid adverse immigration consequences for defendants when consistent with ensuring "the safety and security of crime survivors and their families." *Id.* at 7. While keeping public safety front and center, prosecutors should consider: (1) plea deals that do not carry immigration consequences, (2) charges without "multiple counts of the same charge" to avoid "unfair collateral consequences that may attach to multiple convictions," and (3) sentences that do not carry immigration penalties (*e.g.*, terms of imprisonment under 365 days). *Id.*

The policy also instructs prosecutors to refrain from "contact[ing] [ICE] to verify the record of a noncitizen or to inform ICE of pending charges," to the extent consistent with state and federal laws requiring the communication of a person's "citizenship or immigration status." *Id.* at 8-9 & n.41. "Beyond these legal requirements … [prosecutors] should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies." *Id.* at 9.

9

**2.  *The Sheriff's Office General Order 1.14 (Jan. 30, 2025).*** Because "federal immigration law" is a federal "function," not a local responsibility, the Washtenaw County Sheriff's Office resolved not to use its "resources to enforce federal immigration law or assist in immigration related matters."  Ex. 4, at 2-3.

Specifically, officers may not use immigration status as a "reason to take investigative action" or "ask about an individual's immigration status when performing their duties."  *Id.*  Instead, officers must act "based upon reasonable suspicion or probable cause supported by clearly articulated facts and circumstances not relating to immigration status."  *Id.*  Although the Order prevents officers from asking about immigration status while performing their duties, the Order does not stop employees from sharing information with ICE if gathered through other means.  *Id.*

The Order also states that the Sheriff's Office "will not detain an individual under the sole justification of an Immigration Detainer or Warrant of Removal/Deportation issued by [ICE] and signed by an ICE agent when there is no valid judicial warrant or order by a judge."  *Id.* at 3.

Pursuant to the Order, the Sheriff's Office has declined "at least four immigration detaine[r]" requests.  *See* Ex. 5, at 25.  The Office also has required ICE to submit FOIA requests to access police reports, rather than disclosing them voluntarily to ICE.  *Id.* at 16; Compl. ¶¶ 56, 120-21.

10

***3. The Board of Commissioners' Resolution (Jan. 21, 2026).*** Following reports of ICE officers eroding community trust by conducting "discriminatory enforcement actions" based on racial "profiling" and "wearing masks or other face coverings" during "enforcement," Washtenaw County's governing body, the Board of Commissioners, partially restricted ICE officers' access to County buildings. Ex. 7, at 2-4. The Board feared that "the presence of ICE officers conducting civil immigration enforcement activities within County buildings may deter residents … from accessing essential services, participating in public processes, or engaging with County programs." *Id.* at 3.

The Board thus denied ICE officers permission "to enter, remain in, or conduct civil immigration enforcement activities within any Washtenaw County–owned, leased, or operated building, facility, or property (including parking areas) unless required by law or pursuant to a valid judicial warrant or court order." *Id.* The Board also directed "County employees, contractors, and agents" not to "cooperate" with ICE within "County-owned, leased, or operated buildings, facilities," "except where such assistance is required by law." *Id.* at 3-4.

## D.    This Lawsuit

On April 9, 2025, ICE wrote to the Washtenaw County Sheriff's Office to "express [its] dissatisfaction" with the County's policies, claiming that they "obstruc[t] lawful federal immigration operations." Ex. 5, at 25. As "consequences"

11

for the Office's "actions," ICE excluded the Sheriff's Office from a Homeland Security Investigations task force dedicated to investigating sex-trafficking crimes, stopped sharing funds generated from asset seizures, and threatened "additional consequences" for both the Office and Washtenaw County more generally, including the loss of federal government "contracts, subcontracts, grants, cooperative agreements, loans, and other covered transactions." *Id.* at 25-26.

When those threats proved ineffective, on April 9, 2026, the United States filed this lawsuit against the County; Alyshia M. Dyer, Sheriff; the Sheriff's Office; Eli Savit, Prosecuting Attorney; the Office of the Prosecuting Attorney; and the Board of Commissioners (Defendants). As in similar suits against other localities, the United States argues that Washtenaw County's policies are either preempted by federal immigration laws (Counts I to III) or unlawfully regulate or discriminate against the federal government in violation of the intergovernmental-immunity doctrine (Counts IV to VI). The government seeks a declaratory judgment and injunctive relief as to each of the challenged policies.

## ARGUMENT

This Court should dismiss the federal government's claims because no federal statute preempts the challenged policies and the policies do not violate the intergovernmental-immunity doctrine. *See* Fed. R. Civ. P. 12(b)(6); *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 138 (6th Cir. 2023).

12

## I.  Federal Law Does Not Preempt the Challenged Policies (Counts I-III)

The Constitution's Supremacy Clause supplies a rule of priority, ensuring that federal laws take precedence over contrary state statutes.  U.S. Const. art. VI, cl. 2. Federal laws can displace state rules either expressly or by implication.  Congress expressly preempts state laws where it "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision."  *Arizona*, 567 U.S. at 399.  By contrast, Congress impliedly preempts state laws where a federal statute renders "compliance with both federal and state regulations … a physical impossibility" or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as expressed in the federal statute.  *Id.* at 399 (cleaned up).[3]

Both types of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

In all preemption cases—and "particularly" those involving areas, like local law enforcement, that "the States have traditionally occupied"—courts "start with

---

[3] Congress also may preempt state laws by reserving an entire "field" exclusively for federal regulation, *Arizona*, 567 U.S. at 399, but the government does not allege that Congress has done so here.

13

the assumption that the historic police powers of the States were not to be super-seded." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up).  "Invoking some brooding federal interest or appealing to a judicial policy preference" is not enough to win preemption; litigants must instead "point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.) (citation omitted).

Even "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (citation omitted).  Instead, a local law poses an impermissible obstacle to a federal command only where it con-flicts with "the federal statute's text, not on a judge's sense of what the statute's purposes might be." *Counts v. Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025).  In short, showing that a "state law is to be preempted for conflicting with the purposes of a federal Act" requires meeting a "high threshold." *Chamber of Com.*, 563 U.S. at 607.

### A.    The INA Does Not Expressly Preempt the Challenged Policies

In support of its express preemption theory, the government invokes 8 U.S.C. §§ 1373 and 1644.  *See* Compl. Counts I-III.  Section 1373(a) prevents a "State, or local government" from "prohibit[ing], or in any way restrict[ing], any government entity or official from sending to, or receiving from, [ICE] information regarding the

14

citizenship or immigration status, lawful or unlawful, of any individual."   Section 1644 likewise provides that "no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from [ICE] information regarding the immigration status, lawful or unlawful, of an alien in the United States." In the government's view, those provisions expressly preempt the challenged policies because the policies restrict local officials from freely communicating information about noncitizens to ICE.

That argument fails. Although the challenged policies restrict Washtenaw officials' communications with ICE about other matters, they do not prevent officials from conveying any information "regarding … immigration status."

As courts have uniformly recognized, "the phrase 'information regarding the citizenship or immigration status, lawful or unlawful, of any individual' is naturally understood as a reference to a person's legal classification under federal law." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (quoting 8 U.S.C. § 1373(a)); *accord New York*, 810 F. Supp. 3d at 350 (same).  That phrase does not, by contrast, concern other information like a noncitizen's release date from state detention or his address.  *California*, 921 F.3d at 891; *accord Illinois*, 796 F. Supp. 3d at 516-17 (holding that "contact information, custody status, and release dates" is not information "related to citizenship or immigration status").

15

The challenged policies come nowhere close to restricting local officials from communicating with ICE about an individual's "immigration status."

1.  ***The Prosecuting Attorney's Policy Directive*** advises prosecutors not to proactively "contact [ICE] to verify the record of a noncitizen or to inform ICE of pending charges." Ex. 6, at 8-9. That restriction does not prevent prosecutors from responding to ICE requests regarding immigration status. To the contrary, the policy explains that prosecutors are "of course subject" to 8 U.S.C. § 1373. *See id.* And if ICE makes a "federal immigration related request," the policy directs line prosecutors to notify the Prosecutor and the "Chief Assistant Prosecuting Attorney" so they may analyze whether federal law "mandates provision of … information." *Id.* at 9 n.41; *see New York*, 810 F. Supp. 3d at 350 (finding that sections 1373 and 1644 did not preempt an information-sharing restriction with an express exception for assistance required by federal law).[4]

2.  ***The Sheriff's Office General Order*** provides that employees shall not "ask about an individual's immigration status when performing their duties." Ex. 4, at 2; *see also id.* at 3. But prohibiting employees from *asking* about information does not

---

[4] The federal government contends that the policy's exception for information "regarding a person's 'citizenship or immigration status'" is somehow pretextual. *See* Compl. ¶ 138. But the government offers no facts to support that conclusory allegation. *See Nugent*, 72 F.4th at 138 (courts should disregard conclusory allegations). Conspicuously missing from the complaint is any allegation that a Washtenaw prosecutor has ever refused an ICE request for immigration-status information.

16

stop them from *sharing* information they gather through other means with the federal government.  Nor has the government alleged that the Order's prohibition on using "resources to enforce federal immigration law or assist in immigration related matters" prevents officers from responding to lawful ICE requests for immigration-status information.  *Id.* at 3.  The Sheriff's Office does not interpret this provision to prevent information sharing.  Indeed, as the complaint acknowledges, the County continues to share information requested by ICE from the Sheriff's Office pursuant to FOIA requests.  Compl. ¶ 56.  Thus, there is no conflict between federal law and the Sheriff's Order.  *See Illinois*, 796 F. Supp. 3d at 523.[5]

   3.  ***The Board of Commissioners Resolution*** prohibits "County employees, contractors, and agents" from "voluntarily assist[ing], facilitat[ing], or cooperat[ing] with [ICE] civil immigration enforcement activities within County-owned, leased, or operated buildings … *except where such assistance is required by law*."  Ex. 7, at 3-4 (emphasis added).  To the extent this language restricts information-sharing, it complies with sections 1373 and 1644 by directing employees to offer ICE any "assistance … required by law."  *Id.*; *see New York*, 810 F. Supp. 3d at 350.

---

[5] The federal government also argues that the Order's prohibition on "honoring ICE detainer requests" is "expressly preempted" by the INA's directive "to have state and local law enforcement working together with federal immigration officials."  Compl. ¶¶ 127-28.  That argument fails because the government identifies *no* express preemption provision requiring cooperation.  *See State Farm Bank v. Reardon*, 539 F.3d 336, 341-42 (6th Cir. 2008).

17

Because the challenged policies do not restrict Washtenaw officials from freely communicating with ICE about noncitizens' "immigration status[es]," sections 1373 and 1644 do not preempt the policies.

**B.      The Challenged Policies Do Not Present an Improper Obstacle to Federal Immigration Enforcement**

To meet the "high threshold" required for implied preemption, *Chamber of Com.*, 563 U.S. at 607, the federal government must point to some conflict between a "federal statute's text" and the contrary commands of a local regulation, *Gen. Motors, LLC*, 139 F.4th at 581.  The government attempts to carry that burden here by citing the INA's provisions on information sharing, detention, and state cooperation which, it says, the challenged policies obstruct.  None of the challenged policies, however, prevent the federal government from carrying out its responsibilities under the INA.  Instead, the policies reflect Defendants' decision to spend resources on local priorities rather than making it "easier for immigration agents to discharge their obligations."  *Illinois*, 796 F. Supp. 3d at 529.

*1. Information-sharing provisions.*  The federal government first suggests that the policies obstruct its ability to request immigration-status information under sections 1373 and 1644 by stopping Washtenaw prosecutors from giving ICE "basic information about … alien[s]," Compl. ¶¶ 140-42, and by forcing ICE to use "FOIA requests to obtain … heavily redacted and delayed" criminal records from the Sheriff's Office.  Compl. ¶ 56; *see also id.* ¶¶ 69, 119, 132.

18

But the challenged polices do not prohibit the sharing of any "immigration status" information. *See supra*, pp. 14-18. Tellingly, the government never alleges that Washtenaw officials have ever rebuffed a request for such information or required ICE to use FOIA to ask about a person's immigration status. And although the policies direct County officers not to provide *other* information—like custody status and release dates—no provision of the INA commands Defendants to provide those facts. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008) ("congressional motives" must be found in "the text of the statute"). If anything, Congress' express command in sections 1373 and 1644 that localities must not obstruct the flow of information concerning "immigration status" indicates that Defendants may withhold other information not mentioned in the statute. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).

That information in Defendants' possession might be useful to ICE's enforcement efforts does not mean that Defendants must provide it. Where inaction is "permitted by [federal immigration law]," a locality's decision not to assist in immigration enforcement does not pose an obstacle to federal law. *Illinois*, 796 F. Supp. 3d at 527; *California*, 921 F.3d at 890.

**2. Detention authority.** The government argues that the challenged policies frustrate its ability to detain noncitizens pending removal under 8 U.S.C. § 1226. Compl. ¶ 70; *see also* 8 U.S.C. § 1231(a) (requiring federal officials to detain certain

19

noncitizens).  But Congress' decision to authorize federal officials to detain noncitizens does not show that Congress also meant to conscript local governments in those efforts.  Courts should not lightly assume that "Congress would have wanted to prohibit States from pursuing regulations that may happen to touch … on unenacted federal purposes and objectives."  *Va. Uranium*, 587 U.S. at 778.

Start with the Prosecuting Attorney's Policy Directive.  According to the government, requiring local prosecutors to consider immigration consequences in "charges and plea agreements" presents an "obstacle" to immigration enforcement because the imposition of "more-lenient charges and plea agreements" forces ICE to "re-arrest[]" noncitizens "in the community at large."  Compl. ¶ 141, *see also id.* ¶ 63.  But federal immigration law does not purport to require local prosecutors to maximally charge state offenses to facilitate federal immigration efforts.  If Congress were to take that extraordinary (and unconstitutional, *see infra*, pp. 24-26) step in a "field of traditional State regulation," it would surely make its purpose "clear and manifest."  *Lorillard Tobacco*, 533 U.S. at 541-42 (citation omitted).  Yet Congress did no such thing.[6]  The Policy does not stop federal officials from exercising their statutory authority to arrest noncitizens pursuant to administrative warrants.  8

---

[6] The government's position that prosecutors should not consider immigration consequences in plea negotiations is hard to square with the Supreme Court's recognition that prosecutors' "consideration of possible deportation" during plea bargaining "can only benefit … the State."  *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010).

20

U.S.C. § 1226.  Indeed, the complaint admits that ICE officers continue to arrest noncitizens after their release from Washtenaw County custody.  *See, e.g.*, Compl. ¶ 115.

Nor does the Sheriff's Order unlawfully obstruct detention efforts.  To be sure, the Order directs officers not to "detain an individual" pursuant to an ICE detainer request unless the request is "accompanied by a federal court order or warrant signed by a federal magistrate judge."  Ex. 4, at 4; Compl. ¶¶ 57-59, 96, 131.  But no federal statute requires local governments to detain noncitizens merely because ICE asks them to.  Although Congress has authorized *federal* officials to detain noncitizens pursuant to administrative warrants, *see* 8 U.S.C. § 1226(a), nothing in federal law requires local officials to do the same.  And ICE detainers are merely *requests*.  Section 1357(d) authorizes federal officials to "request … notice of a prisoner's release" from state or local custody in certain circumstances—it does not mention (let alone command) local officials' detention of noncitizens.  *Galarza v. Szalczyk*, 745 F.3d 634, 641 (3d Cir. 2014) (discussing 8 U.S.C. § 1357(d)).

True, a federal regulation directs the recipient of a detainer request to detain a noncitizen while ICE assumes custody.  *See* 8 C.F.R. § 287.7.  But "[e]very federal court of appeals that has considered" detainer requests under that regulation has "characterize[d] them as 'requests' that impose no mandatory obligation on the part of the detainer's recipient."  *Illinois*, 796 F. Supp. 3d at 528 (citation omitted); *see,*

21

*e.g.*, *Galarza*, 745 F.3d at 645.  The federal government has admitted as much in other litigation, telling courts that "ICE detainers … are voluntary requests" on which "state or local law enforcement agenc[ies] may rely." *See, e.g.*, Defs.' Mem. in Supp. of Mot. for Partial J. on the Pleadings at *9, *Moreno v. Napolitano*, 2014 WL 4814776 (N.D. Ill. Sept. 29, 2014).  Here, too, the United States repeatedly characterizes detainers as "request[s]." *See, e.g.*, Compl. ¶¶ 40, 58, 95-96.  Accordingly, the Order does not frustrate Congress' objectives in the INA by instructing local police to decline requests that even the federal government admits are voluntary.

Indeed, if ICE could compel local law enforcement to detain noncitizens based only on suspected civil immigration violations, ICE would force local officers to violate the Fourth Amendment.  The Fourth Amendment prohibits law enforcement from detaining suspects without "probable cause to believe that [they are] engaged in criminal activity," yet "civil immigration violations do not constitute crimes" and so cannot support probable cause.  *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013); *see Arizona*, 567 U.S. at 413.

For similar reasons, the Board of Commissioners' Resolution does not undermine the federal government's detention authority.  The Resolution prevents ICE officers from accessing County property to make immigration arrests.  *See* Ex. 7, at 3-4; Compl. ¶¶ 146-47.  Nothing in the INA purports to grant ICE access to state or

local property.  Quite the contrary, Congress in the INA authorized immigration officers to access certain property—*e.g.*, "private lands" (except "dwellings") within "twenty-five miles" of the border to "prevent the illegal entry of aliens," 8 U.S.C. § 1357—but did not permit warrantless access to property owned by local governments in the American interior.  Washtenaw County cannot frustrate the INA's purposes by denying access to property that Congress declined to authorize the government to enter.  *See New York*, 810 F. Supp. 3d at 346; *McHenry County v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022).

*3. Cooperative federalism.*  The government faults Washtenaw County for declining to "enter [an] … agreement with ICE" pursuant to 8 U.S.C. § 1357(g), which would have allowed "ICE to work directly with … local agencies to enforce federal immigration laws."  Compl. ¶ 95.  Yet section 1357(g) only serves to illustrate why the federal government's preemption arguments must fail.  That provision gives States and localities the *option* of *voluntarily* agreeing to assist the federal government.  *See* 8 U.S.C. § 1357(g) (noting that agreements are permissible only "to the extent consistent with State and local law").  It "would make no sense" for a "federal statute premised on State cooperation [to] preempt[] a State law withholding that cooperation."  *McHenry County*, 44 F.4th at 592.

23

### C.     The Government's Reading of the INA Violates the Anti-Commandeering Doctrine

Interpreting the INA to *require* States to cooperate with immigration enforcement efforts would violate the Tenth Amendment.  That is additional reason to reject the government's implausible interpretation of the INA.  *See Hamama v. Adducci*, 946 F.3d 875, 880 (6th Cir. 2020) (courts should prefer "plausible interpretations" of statutes that do not violate the Constitution over readings that do).

Because the Constitution withholds from Congress "the power to issue direct orders to the governments of the States," the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Murphy*, 584 U.S. at 471-73; *accord Printz v. United States*, 521 U.S. 898, 935 (1997).

Yet the federal government's reading of the INA generates at least two commandeering problems.  *First*, requiring States and localities to "collect[] and shar[e] information with the Federal Government" or to "hold individuals purely for federal civil immigration purposes" would violate the Tenth Amendment by forcing localities to "bear the cost of enforcing the federal immigration scheme" and removing "their authority to determine the proper allocation of state resources." *Colorado*, 2026 WL 878882, at *5.  Those concerns are even more acute here because the government asserts federal control over core local powers, like decisions whether to charge defendants with state offenses and whether to grant access to local property.

24

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[C]ourts will … not lightly assume that Congress intended to … usurp power constitutionally forbidden it."); *see also Bond v. United States*, 572 U.S. 844, 848 (2014) ("[O]ur constitutional structure leaves local criminal activity primarily to the States.").

*Second*, even if the INA provisions on which the government relies *did* apply to the policies, those provisions would *still* have no preemptive effect. *See supra*, pp. 13-14. Because "the Constitution confers upon Congress the power to regulate individuals, not States," only those federal statutes that "regulate[] the conduct of private actors" have any preemptive force. *Murphy*, 584 U.S. 453 at 477-80 (citation omitted). Yet none of the INA provisions the government identifies actually regulates any private person. Take, for instance, the INA's prohibitions on state or local laws restricting officials from sharing "immigration status" information with ICE. *See* 8 U.S.C. §§ 1373, 1644. Those provisions, as other courts have held, do not preempt state laws because they are "prohibition[s] on state action" that "say[] nothing about private actors." *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021); *accord Illinois*, 796 F. Supp. 3d at 522. The other statutes the government cites in support of its preemption argument are instructions to *federal* officials on how to carry out their responsibilities, not efforts to regulate private (or local) individuals. *See* 8 U.S.C. § 1226a (directing DHS Secretary to

25

"take into custody" certain noncitizens); *id.* § 1226(c) (similar); *id.* § 1231(a) (directing Secretary to remove and detain certain noncitizens); *id.* § 1357 (describing powers of immigration officers). Thus, the government identifies no federal statute capable of serving as a valid basis for preemption. *Murphy*, 584 U.S. at 479-80.

But this Court need not grapple with these constitutional issues to resolve this case. The Court may instead reject the federal government's effort to conscript localities in immigration enforcement by interpreting the INA to mean what it says: States may elect to assist the federal government, but have no obligation to do so.

## II. The Challenged Policies Do Not Violate Intergovernmental Immunity (Counts IV-VI)

The federal government contends that the challenged policies "are invalid under the Supremacy Clause" because they interfere with federal officers' accomplishment of their duties and so violate the intergovernmental-immunity doctrine. Compl. ¶¶ 19, 72-80, 149-77. But as the federal government acknowledges, intergovernmental immunity applies only to local laws that "either regulate the United States directly or discriminate against the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up); *see* Compl. ¶ 26. The challenged policies neither discriminate nor regulate.

26

### A.     The Challenged Policies Do Not Regulate the United States

The intergovernmental-immunity doctrine bars local rules that *directly* regulate the federal government by, for example, placing a "prohibition" on federal actions or taxing the United States.  *McHenry County*, 44 F.4th at 592 (citation omitted); *see Washington*, 596 U.S. at 835.  To avoid restricting local prerogatives, courts have "thoroughly repudiated" the notion that the doctrine invalidates laws that *indirectly* burden federal activity.  *North Dakota v. United States*, 495 U.S. 423, 434-35 (1990) (plurality op.).  Here, the challenged policies steer well clear of direct regulation: each governs only county employees, county resources, and county property.

### 1.     *Prosecuting Attorney's Policy Directive.*  The federal government alleges that the Policy impermissibly "regulates federal immigration officials by depriving them of the relevant information they need to perform their lawful duties."  Compl. ¶¶ 75-76.  By its terms, however, the Policy regulates the conduct of *local* officials, not *federal* agents.  As the government admits, the policy "requir[es] *local county prosecutors* to withhold … information from federal immigration officials," subject to and consistent with applicable governing law.  *Id.* (emphasis added); *see* Ex. 6, at 8-9.  At most, then, the Policy imposes an incidental burden on federal immigration enforcement by refusing local assistance beyond what the law requires, all while "leav[ing] open ICE's ability" to "receiv[e] the assistance and information" to which the INA entitles it.  *Illinois*, 796 F. Supp. 3d at 535.  A local regulation that

27

merely "make[s] it more costly for the Government to do business" is not unlawful under the Supremacy Clause. *North Dakota*, 495 U.S. at 434-35.

2.   ***Sheriff's General Order.***   The federal government contends that the Order regulates it by "eliminat[ing]" detainer requests and administrative warrants as a "means for federal immigration officials to carry out their statutory functions." Compl. ¶ 155.  But the Order nowhere prohibits ICE from using those tools.  Instead, the Order directs *local employees* not to use *local resources* by detaining noncitizens without a judicial warrant.  As discussed *supra*, pp. 18-23, that is a choice that localities are free to make because the INA does not require localities to honor ICE detainer requests or administrative warrants.  Where a locality merely "withhold[s] … cooperation" consistent with the law, it "directly regulates … local entities and law enforcement—not the federal government." *McHenry County*, 44 F.4th at 593.

3.   ***Board of Commissioners' Resolution.***   Finally, the federal government claims the County's decision to "restric[t] access to Washtenaw County property" is a direct regulation because it "prevent[s] the Federal Government from carrying out the INA's command that aliens in this country '*shall* be inspected by immigration officers.'" Compl. ¶ 173-75 (citing 8 U.S.C. § 1225(a)(3)); Ex. 7, at 3-4.  Again, the INA does not give ICE officers the right to access local property in the American

28

interior without a judicial warrant.  *See supra*, pp. 22-23.  And localities do not directly regulate the federal government by withholding assistance they are not required to provide.  *McHenry County*, 44 F.4th at 593.

Indeed, the absence of any direct regulation is especially obvious where, as here, a local government acts in its capacity "as a proprietor, not a regulator."  *New York*, 810 F. Supp. 3d at 352-53 (citation omitted).  That is because "pre-emption doctrines" apply "only to state regulation," not to local efforts to "manag[e] property."  *See Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993).  Recognizing as much, other courts have repeatedly rejected intergovernmental-immunity challenges regarding state and municipal property.  *See, e.g.*, *Illinois*, 796 F. Supp. 3d at 529-31 (state-owned facilities); *New York*, 810 F. Supp. 3d at 352-53 (state courthouses).

In sum, to the extent that the challenged policies affect the federal government at all, they merely "incidentally" reduce the government's options for carrying out its responsibilities.  *Texas v. DHS*, 123 F.4th 186, 206 (5th Cir. 2024).  Such incidental burdens arising from a locality's authority over its personnel and property do not constitute regulation under the intergovernmental-immunity doctrine.  *See id.*

### B. The Challenged Policies Do Not Discriminate Against the United States

For a local policy to unconstitutionally discriminate against the federal government, the policy must both (1) treat comparable classes of federal and non-federal

29

employees differently, disadvantaging the federal employees, and (2) burden the government's lawful activities. *Washington*, 596 U.S. at 839, 841; *North Dakota*, 495 U.S. at 435. The challenged policies do neither. The policies target particular *conduct*—immigration enforcement—not the federal government. And even if the policies treat federal officials differently than their local counterparts, the policies impose no cognizable burden on federal action.

   ***1. The challenged policies do not disfavor the federal government.*** "Differential treatment is critical to a discrimination-based intergovernmental immunity claim." *McHenry County*, 44 F.4th at 594. A policy cannot discriminate against federal officials "unless it treats someone else better than it treats them." *Washington*, 460 U.S. at 544-45. For example, a local policy might discriminate by exempting from taxation all state retirement benefits, but not federal retirement benefits. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 815-17 (1989).

   The challenged policies do not treat the federal government any worse than state or local officials. Instead, the policies limit local assistance for immigration enforcement, regardless of whether the person doing the enforcing is a federal agent or a deputized state or local officer. Pursuant to an agreement with the Attorney General, a state or locality may agree to perform certain immigration functions. 8 U.S.C. § 1357(g); *see supra*, p. 23. Acting in that capacity, local officers may, for instance, request immigration-status information or issue immigration detainers. *See*

30

*Immigration Detainers*, ICE (May 8, 2026), https://perma.cc/7TQ9-X9EF ("state and local officers … may issue immigration detainers").  The challenged policies would equally burden local officials' ability to exercise those functions.

Consider a few more examples.  Although the government alleges that the Prosecuting Attorney's Policy "singles out federal immigration officials by … concealing information," Compl. ¶ 161, the Policy's rules on avoiding immigration consequences in charging decisions and refraining from asking witnesses questions about immigration status would make such information unavailable to local officers acting as ICE deputies as well.  Ex. 6, at 7, 10.  Likewise, the government contends that the Sheriff's Order subjects "federal immigration officials … [to] unfavorable and uncooperative treatment."  Compl. ¶ 151.  But the policy restricts "assist[ance]" for any "immigration related matters" whatsoever, not just those conducted by federal officers.  Ex. 4 at 3.  And the Board of Commissioners' Resolution places reasonable limits on "civil immigration enforcement activities within County buildings," which "may deter residents … from accessing essential services."  Ex. 7, at 3.

To be sure, the policies mention ICE.  For instance, the Board of Commissioners' Resolution specifies that "ICE officers" may not enter County buildings.  Ex. 7, at 3; *see also* Ex. 4, at 3 (Sheriff's Office policy referring to warrants issued by "ICE").  But, in context, those short-hand references are best understood to refer to anyone seeking to enforce "federal immigration law," Ex. 4 at 2—including state

31

or local officers deputized by ICE.  Indeed, the Board of Commissioners' Resolution covers ICE's "contractors."  Ex. 7, at 2.  No fair reading of the Resolution suggests that the County might let deputized state officers enter County property to execute an immigration arrest merely because they are not ICE employees.[7]

Regardless, even if the policies singularly apply to ICE, they still do not discriminate.  Where local laws apply only to the federal government as a practical matter because they "touc[h] on an exclusively federal sphere," the government cannot establish discrimination unless it shows that the local law treats "similarly situated" local officials more favorably.  *See McHenry County*, 44 F.4th at 594; *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1119 (9th Cir. 2025).  To the extent federal officials are the only ones enforcing immigration law, that is the case here.  Reasoning along those lines, courts have consistently found policies governing local officials' cooperation with federal immigration authorities to be neutral and nondiscriminatory.  *See*, *e.g.*, *McHenry County*, 44 F.4th at 594; *Illinois*, 796 F. Supp. 3d at 534.  So too here.  The complaint does not (and could not) identify any local official engaged in immigration enforcement efforts that Defendants' policies treat more favorably than ICE officials engaged in those same activities.

---

[7] Notably, courts have found that similar local access restrictions do not discriminate against the federal government.  *See, e.g.*, *Illinois*, 796 F. Supp. 3d at 533-34; *New York*, 810 F. Supp. 3d at 353-54.

32

***2. The challenged policies do not burden the federal government.***  The government's intergovernmental-immunity claim fails for a second reason:  the policies do not impose any cognizable burden.  *See North Dakota*, 495 U.S. at 435 ("the nondiscrimination rule" applies where states "obstruct the activities of the Federal Government"); *M'Culloch v. Maryland*, 17 U.S. 316, 436 (1819) ("states have no power … to *retard, impede, burden*, or in any manner control the operations of the constitutional laws enacted by congress" (emphasis added)).

The challenged policies merely withhold assistance, *see supra*, pp. 18-23; they do not impose *additional* roadblocks to the government's efforts to enforce federal immigration law.  Because States' cooperation with the federal government under the INA is wholly discretionary, simply declining to ease the existing burden of civil immigration enforcement does not amount to the sort of discriminatory burden or obstruction contemplated by the intergovernmental-immunity doctrine.  *See McHenry County*, 44 F.4th at 594 n.7.  Compare this case to *Washington*, where the Supreme Court found that a state law allowing workers to assert certain compensation claims against the federal government imposed a discriminatory burden because it forced the government to shoulder "costs that state or private entities do not bear." 596 U.S. at 839.  The challenged policies here, by contrast, impose no extra burden on the government; the policies simply refuse to make the government's job in enforcing immigration laws any *easier*.

33

### C. The Anti-Commandeering Doctrine Forecloses the Government's Intergovernmental-Immunity Arguments

The federal government's position on intergovernmental immunity also presents a significant commandeering problem. An injunction against the challenged policies on the basis that they regulate or discriminate against the federal government would require Washtenaw County to affirmatively assist federal immigration enforcement efforts, effectively creating "an end-run around the Tenth Amendment." *Illinois*, 796 F. Supp. 3d at 535; *see also California*, 921 F.3d at 891.

Consider what the federal government's position would mean. Forcing Defendants to honor detainer requests would require the County to use its limited "law enforcement time, resources, and custodial facilities to arrest and hold individuals purely for federal civil immigration purposes," *Colorado*, 2026 WL 878882, at *5—possibly in violation of the Fourth Amendment, *see supra*, pp. 16-23. Compelling Defendants to share all manner of information about noncitizens with ICE would make the County "administer or enforce a federal regulatory program." *Murphy*, 584 U.S. at 473; *see supra*, pp. 24-26. And obligating the County to permit ICE agents onto its property would allow the federal government to override the County's power to "preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. State of Florida*, 385 U.S. 39, 47 (1966).

Because the Constitution cannot countenance those results, the government's attempt to "conscript [County officials] as its agents" must fail. *Murphy*, 584 U.S.

34

at 472; *see, e.g.*, *California*, 921 F.3d at 890 (emphasizing that the State "retains the right of refusal" under the Tenth Amendment); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (similar); *Galarza*, 745 F.3d at 644 (similar).

## CONCLUSION

For the above reasons, the Court should dismiss the complaint with prejudice.

Dated:  June 17, 2026

MARY B. MCCORD*
  *Counsel of Record*
SHELBY CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY AND PROTECTION
  *Georgetown University Law Center*
  *600 New Jersey Avenue NW*
  *Washington, DC 20001*
  *(202) 661-6607*
  *mbm7@georgetown.edu*

ROBERT BURTON-HARRIS (P81843)
BURTON-HARRIS LAW, PLC
  *500 Griswold St., Suite 2450*
  *Detroit, MI 48226-3421*
  *Office: (313) 572-4397*
  *Fax: (734) 999-0452*
  *Robert@BurtonHarrisLaw.com*

*Attorneys for Defendants County of*
*Washtenaw Sheriff's Office and*
*Alyshia M. Dyer, Sheriff of the County*
*of Washtenaw, Michigan*

*Application for admission pending.

Respectfully submitted,

/s/ *Dane H. Butswinkas*
  DANE H. BUTSWINKAS
    *Counsel of Record*
  AMY MASON SAHARIA
  NICHOLAS G. GAMSE
  EDWARD PICKUP
  MEGAN R. IZZO
  WILLIAMS & CONNOLLY LLP
    *680 Maine Avenue, S.W.*
    *Washington, DC 20024*
    *(202) 434-5000*
    *dbutswinkas@wc.com*

MICHELLE K. BILLARD (P81507)
OFFICE OF CORPORATION COUNSEL,
WASHTENAW COUNTY
    *220 N. Main St.*
    *Ann Arbor, MI 48104*
    *(734) 222-6738*
    *billardm@washtenaw.org*

*Attorneys for Defendants County of*
*Washtenaw; Eli Savit, Prosecuting*
*Attorney for the County of*
*Washtenaw; The County of*
*Washtenaw Office of the Prosecuting*
*Attorney; and the Washtenaw County*
*Board of Commissioners*

35