# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civ. Action No. 4:26-cv-11166 |
| v. | Hon. F. Kay Behm |
| COUNTY OF WASHTENAW, Michigan et al; | Mag. Elizabeth A. Stafford |
| Defendants. | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................3

  A.   Federal Law ................................................................................................3

  B.   Washtenaw County Sheriff General Order .................................................8

  C.   Washtenaw County Prosecuting Attorney Policy Directive ......................9

  D.   Washtenaw County Board of Commissioners Resolution ........................10

  E.   Impact of Challenged Policies on Immigration Enforcement...................11

III. LEGAL STANDARD............................................................................................13

IV.  ARGUMENT ........................................................................................................13

  A.   The Challenged Policies Are Preempted By Federal Law........................13

    1.   The Challenged Policies Are Expressly Preempted By Federal
         Law  ................................................................................................13

         a. *Prosecuting Attorney's Policy Directive* .....................................14

         b. *Sheriff's Office General Order* ....................................................17

    2.   The Challenged Policies Present an Improper Obstacle to Federal
         Immigration Enforcement.................................................................19

    3.   The INA Does Not Violate the Anti-Commandeering Doctrine......25

  B.   The Challenged Policies Violate Intergovernmental Immunity................28

    1.   The Challenged Policies Regulate the Federal Government............28

         a. *Sheriff's Office General Order*....................................................30

         b. *Board of Commissioners Resolution* ...........................................31

    2.   The Challenged Policies Discriminate Against the Federal
         Government ......................................................................................33

  C.   The Anti-Commandeering Doctrine Does Not Foreclose the Federal
       Government's Intergovernmental-Immunity Arguments..........................35

V.   CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  790 F.3d 641 (6th Cir. 2015)......................................................................13
*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ....................................................................................20
*Arizona v. California*,
  283 U.S. 423 (1931) ..................................................................................29
*Arizona v. United States*,
  567 U.S. 387 (2012) .......................................................................... *passim*
*Berger v. New York*,
  388 U.S. 41 (1967) ....................................................................................31
*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014)....................................................................33
*City of New York v. United States*,
  179 F.3d 29 (2d Cir. 1999) .............................................. 19, 23, 26, 28
*CoreCivic, Inc. v. Governor of N.J.*,
  145 F.4th 315 (3d Cir. 2025) ...................................................................30
*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000) ..................................................................................20
*Davis v. Elmira Sav. Bank*,
  161 U.S. 275 (1896) .......................................................................... 20, 21
*FERC v. Mississippi*,
  456 U.S. 742 (1982) .......................................................................... 26, 27
*Fiallo v. Bell*,
  430 U.S. 787 (1977) ..................................................................................33
*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995) ..................................................................................20
*GEO Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022)....................................................................30
*Hancock v. Train*,
426 U.S. 167 (1976)....................................................................................29
*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ....................................................................................20
*Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ..................................................................................26
*In re Neagle*,
  135 U.S. 1 (1890) .............................................................................. 32, 33
*Johnson v. Maryland*,
  254 U.S. 51 (1920)....................................................................................29

*Keys v. Humana, Inc.*,
684 F.3d 605 (6th Cir. 2012) ..................................................................13

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ...............................................................................18

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956) ...............................................................................31

*Mayo v. United States*,
319 U.S. 441 (1943) ...............................................................................28

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .................................................. 19, 28, 29

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ..................................................................35

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ...............................................................................13

*Murphy v. NCAA*,
584 U.S. 453 (2018) ...............................................................................25

*Nielsen v. Preap*,
586 U.S. 392 (2019) .................................................................................7

*North Dakota v. United States*,
495 U.S. 423 (1990) .............................................................................4, 30

*Printz v. United States*,
521 U.S. 898 (1997) .......................................................................... 25, 27

*Reno v. Condon*,
528 U.S. 141 (2000) ...............................................................................28

*Savage v. Jones*,
225 U.S. 501 (1912) ...............................................................................20

*State v. Department of Justice*,
951 F.3d 84 (2d Cir. 2020) .....................................................................27

*Tennessee v. Davis*,
100 U.S. 257 (1879) .................................................................................4

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ..................................................................29

*United States v. Ferrara*,
847 F. Supp. 964 (D.D.C. 1993) .............................................................22

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ......................................................14

*United States v. King Cty., Washington*,
122 F.4th 740 (9th Cir. 2024) ........................................................... 28, 32

*United States v. Kraemer*,
933 F.3d 675 (7th Cir. 2019) ..................................................................18

*iv*

*United States v. New York*,
  810 F. Supp. 3d 329 (N.D.N.Y. 2025) ................................................14

## U.S. Constitution

U.S. Const. art. I, § 8, cl. 3 ...........................................................3
U.S. Const. art. I, § 8, cl. 4 ...........................................................3
U.S. Const. art. II, § 3 ...................................................................3
U.S. Const. art. IV, cl. 2 ................................................................3

## Statutes

8 U.S.C. § 237(a)(1)(C) .................................................................31
8 U.S.C. § 237(a)(1)(D) .................................................................31
8 U.S.C. § 1101 ..............................................................................4
8 U.S.C. § 1103(a)(3) ......................................................................6
8 U.S.C. § 1103(a)(11) ....................................................................4
8 U.S.C. § 1182 ..............................................................................4
8 U.S.C. § 1225 ..............................................................................4
8 U.S.C. § 1226 .............................................................. 4, 7, 8, 10, 21
8 U.S.C. § 1226(a) ................................................................. 5, 6, 30
8 U.S.C. § 1226(c) ................................................................. 5, 6, 22
8 U.S.C. § 1226(c)(1)(E)(ii) ...........................................................8
8 U.S.C. § 1226(d)(1)(A) .............................................................6, 7
8 U.S.C. § 1226(d)(1)(B) ................................................................6
8 U.S.C. § 1227 ..............................................................................4
8 U.S.C. § 1228 ..............................................................................4
8 U.S.C. § 1231 ..............................................................................4
8 U.S.C. § 1231(a) .......................................................................6, 22
8 U.S.C. § 1231(a)(4)(A) ...................................................... *passim*
8 U.S.C. § 1231(g) ..........................................................................4
8 U.S.C. § 1324(a)(1)(A)(iii) .........................................................7
8 U.S.C. § 1357(d) ..........................................................................6
8 U.S.C. § 1357(g) ........................................................................12
8 U.S.C. § 1357(g)(10)(A) ..............................................................7
8 U.S.C. § 1372(a) ........................................................................16
8 U.S.C. § 1373(a) ................................................................ *passim*
8 U.S.C. § 1373(b) ........................................................................14
8 U.S.C. § 1373(c) ..........................................................................7
8 U.S.C. § 1644 .................................................................... *passim*
Immigration and Nationality Act of 1952, Pub. L. 82–414, ch. 477,
66 Stat. 163 (1952) ........................................................................4

Mich. Comp. L. § 333.7411 ....................................................................................16
Mich. Comp. L. § 762.11 ........................................................................................16
Mich. Comp. L. § 769.4(a) ......................................................................................16

**Regulations**

8 C.F.R. § 287.7(a)............................................................................................5, 6
8 C.F.R. § 287.7(d) .................................................................................................6

**Other Authorities**

Kevin Meerschaert, *Washtenaw County Board of Commissioners votes to ban ICE without a warrant*, *WEMU All Things Considered*, at 2 (Jan. 22, 2026), https://www.wemu.org/wemu-news/2026-01-22/washtenaw-county-board-of-commissioners-votes-to-ban-ice-without-a-warrant [https://perma .cc/MZ2C-9AX2] .............................................................................................34
ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf [https://perma.cc/ VQ38-U39G].....5, 6
*Interlocal Agreement For The Washtenaw Area Mutual Aid Council (WAMAC)* (Apr. 24, 2024), https://wamac.us/wp-content/uploads/2025/11/ WAMAC-Full-Agreement-Final.pdf [https://perma.cc/H89X-JNMP].......................................33
P.D. Lesko, *Ypsi Police Chief and County Sheriff Sign Secret "Mutual Aid Agreement" Without Votes of Elected Officials*, The Ann Arbor Independent (July 31, 2023), https://a2independent.com/2023/07/31/ypsi-police-chief-and-county-sheriff-sign-secret-mutual-aid-agreement-without-vot es-of-elected-officials/ [https://perma.cc/2SUW-GNET].......................................33
Washtenaw County Board of Commissioners' Resolution, *A Resolution Opposing the Use of County Buildings and Face Coverings by Immigration and Customs Enforcement (ICE) Officers, Customs and Border Protection Officers, or their Contractors During Civil Immigration Enforcement Activities in Washtenaw County* (Jan. 21, 2026) ........................................passim
Washtenaw County Office of the Prosecuting Attorney, *Policy Directive 2021-12: Policy Regarding Immigration and Immigration-Adjacent Issues* (Feb. 24, 2021)................................................................................passim
Washtenaw County Sheriff's Office, *General Order 1.14* (Jan. 30, 2025)......*passim*

## I.  INTRODUCTION

This case involves several "sanctuary" policies adopted by officials of Washtenaw County, Michigan (the "County") specifically designed to interfere with the Federal Government's enforcement of our Nation's immigration laws. Individually and collectively, these policies seek to make it more difficult for federal immigration officers to effectuate lawful (and, in some cases, mandatory) arrests within the County to fulfill Congress's goal that criminal aliens released from state custody be immediately taken into federal custody. The County has sought the advantages of Congress's comprehensive scheme for handling criminal aliens while intentionally rejecting the concomitant obligations. There is no dispute that Congress intended to allow states and localities to incarcerate persons subject to removal before the federal government removed them. Nor is there any dispute that Congress directed federal officials to take custody of criminal aliens after their release from state or local custody, or that Congress authorized them to use administrative warrants and detainers to do so. The County attempts to undo this scheme Congress established to protect the Nation and provide for the orderly removal of illegal aliens.

First, Washtenaw County Sheriff's Office, *General Order 1.14* (Jan. 30, 2025), Compl. (ECF No. 1), at Ex. 4 ("General Order") prohibits its employees from transferring an alien into federal custody pursuant to U.S. Immigration and Customs Enforcement ("ICE") detainer requests. Second, Washtenaw County Board of

1

Commissioners' Resolution, *A Resolution Opposing the Use of County Buildings and Face Coverings by Immigration and Customs Enforcement (ICE) Officers, Customs and Border Protection Officers, or their Contractors During Civil Immigration Enforcement Activities in Washtenaw County* (Jan. 21, 2026), Compl. (ECF No. 1), at Ex. 7 ("Resolution") bans ICE agents from all county buildings unless they provide a judicial warrant and prohibits County employees, contractors and agents from transferring or permitting the transfer of aliens to federal custody.[1] The Challenged Policies have the purpose and effect of preventing custodial transfer of illegal aliens into federal custody, leading to the release of dangerous criminals into the community, endangering public and federal immigration officials, and are unlawful under the Supremacy Clause of the United States.

These "sanctuary" policies represent an open assault on the Federal Government's plenary authority over immigration and are invalid for at least four independent reasons. First, the Sheriff's Office General Order and the Washtenaw County Office of the Prosecuting Attorney, *Policy Directive 2021-12: Policy Regarding Immigration and Immigration-Adjacent Issues* (Feb. 24, 2021), Compl. (ECF No. 1), at Ex. 6 ("Policy Directive") are expressly preempted by federal statute, which does not permit the prohibition of information sharing between state and local

---

[1] The General Order, the Policy Directive, and the Resolution are collectively referred to herein as the "Challenged Policies."

2

governments to federal immigration agencies regarding citizenship or immigration status. 8 U.S.C. §§ 1373(a), 1644. Second, each of the Challenged Policies are preempted because they serve as an obstacle to the Federal Government's enforcement of our Nation's immigration laws, particularly the custodial transfer of aliens in local government custody into federal custody. Third, they each represent unlawful discrimination against the Federal Government by singling out civil immigration enforcement for unfavorable treatment. And fourth, each amounts to an unlawful attempt to regulate the Federal Government by adding requirements for judicial warrants that Congress did not require.

## II. BACKGROUND

### A. Federal Law

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Constitution also affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. The President has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3. Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has broad authority to

3

establish immigration laws, the execution of which state and local governments cannot obstruct or take discriminatory actions against. *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012); *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

Congress has exercised its authority by enacting laws governing the entry, presence, status, and removal of aliens within the United States in various provisions of the Immigration and Nationality Act of 1952, Pub. L. 82–414, ch. 477, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1101, et seq.) ("INA"). These laws confer extensive authority on the Executive Branch to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. They also direct the Executive Branch to arrange for appropriate detention locations for aliens pending removal or a decision on removal. *See, e.g.*, *id.* §§ 1103(a)(11), 1231(g). Responsibility for enforcing these laws is vested principally in the U.S. Department of Homeland Security ("DHS") and two of its component agencies: ICE and Customs and Border Protection ("CBP"). Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the States," *Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

4

Congress gave DHS several tools to fulfill its mission. For example, the INA expressly authorizes DHS to arrest and detain aliens pursuant to administrative warrants. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). These administrative warrants "must establish probable cause to believe that the subject is an alien who is removable from the United States." ICE Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017), https://www.ice.gov/sites/default/files/ documents/Document/2017/10074-2.pdf [https://perma.cc/VQ38-U39G].

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to confinement for state or local criminal law violations. Under those circumstances, the INA dictates that federal immigration officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." 8 U.S.C. § 1231(a)(4)(A). The INA further authorizes, and in some cases requires, federal immigration officials to assume custody immediately upon the alien's release from state or local custody. *See id.* § 1226(a), (c).

If an alien DHS seeks is in the custody of another law enforcement agency, DHS may issue an "immigration detainer" to advise that agency that DHS seeks custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a);

5

*see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). Immigration detainers must be accompanied by an administrative warrant, either an alien arrest warrant or a warrant of removal, signed by an ICE immigration officer. ICE Policy No. 10074.2, § 2.4. Once a detainer is issued to a local agency, "such agency *shall* maintain custody of the alien for a period not to exceed 48 hours." 8 C.F.R. § 287.7(d) (emphasis added).

To fulfill their duties, federal immigration officials rely on law enforcement partners across the country. *Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). The INA reflects that expectation of collaboration. For example, the Federal Government must furnish resources to state authorities to help determine whether individuals arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the Federal Government to designate liaisons to "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id.* § 1226(d)(1)(B).

The INA requires collaborative information-sharing in particular. If state officials "seek[] to verify or ascertain the citizenship or immigration status of any

6

individual," the Federal Government must share the requested information. *Id.* § 1373(c). And federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* §§ 1644 (similar), 1357(g)(10)(A) (no formal agreement is required for a state or local official to communicate with immigration officials regarding the immigration status of any individual, including knowledge of unlawful presence).

Furthermore, Congress affirmatively penalizes efforts to obstruct immigration enforcement by, *inter alia*, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

These laws promote public safety. Although "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona*, 567 U.S. at 396, Congress was concerned "that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted). Thus, in 1996, Congress amended 8 U.S.C. § 1226 to mandate the detention of certain aliens who, based on their commission of specified "predicate" crimes, pose a threat to public safety. *See id.* And last year, again recognizing the vital importance

7

to having federal and state/local law enforcement working together, Congress strengthened the INA in passing The Laken Riley Act, thereby "mandat[ing] the federal detention of illegal immigrants who are accused of burglary, theft, larceny, shoplifting, or assaulting of a law enforcement officer, and any crime that causes death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii).

### B.   Washtenaw County Sheriff General Order

On January 30, 2025, the Washtenaw County Sheriff's Office declared that the enforcement of federal immigration law "is not an investigative or law enforcement role or activity of the Sheriff's Office" and announced that "[t]he Sheriff's Office will not detain an individual under the sole justification of an Immigration Detainer or Warrant of Removal/Deportation issued by [ICE] and signed by an ICE agent when there is no valid judicial warrant or order by a judge." General Order, at 1-2. The General Order specifically instructs the Corrections department that "The Sheriff's Office will not detain an individual under the justification of an Immigration Detainer or Warrant of Removal/Deportation issued by ICE and signed by an ICE agent." *Id.* at 3. Instead, detention will only be permitted "accompanied by a federal court order or warrant signed by a federal magistrate or judge." *Id.* The General Order also states that those who violate the policy are in violation of the Sheriff's Office professional conduct standards and may receive disciplinary action, including potential discharge from the department.

8

The actions of the Washtenaw County Sheriff's Office make it clear that Washtenaw County has indeed prohibited "all full and part-time Sheriff's Office employees who make or have investigative, law enforcement, or custodial contact with individuals and the incarcerated population as a part of their assigned duties" from honoring immigration detainers. *Id.* at 1; *see also* Compl. (ECF No. 1) Ex. 5, Raycraft Decl., at ¶¶ 16-48 ("Raycraft Decl.").

### C.   Washtenaw County Prosecuting Attorney Policy Directive

Among other things, the Policy Directive contains a paragraph specifically addressing the interactions of Washtenaw County Assistant Prosecuting Attorneys ("APAs") with ICE officials and warns that "APAs should not contact [ICE] to verify the record of a noncitizen or *to inform ICE of pending charges.*" Policy Directive at 7 (emphasis added). Acknowledging that federal law does expressly prohibit restrictions on the sending or receiving of information regarding a person's "citizenship or immigration status" and purporting to adhere to that federal requirement, the Policy Directive re-emphasizes the point that "APAs should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies to enforce federal immigration laws or policies." *Id.* at 8.

The Policy Directive further acknowledges that there may indeed be circumstances in which APAs are legally obligated to provide information to ICE. To address such situations where information sharing is required, the Policy

9

Directive instructs all APAs who are contacted by ICE about criminal aliens to "immediately inform *both* the Chief Assistant Prosecuting Attorney and the Prosecuting Attorney so a determination can be made as to what the law requires," *id.* (emphasis added), including whether "any applicable state or federal law, *mandates provision of the relevant information*." *Id.* at n.41 (emphasis added).

The Policy Directive requires APAs to immediately inform leadership of all ICE inquiries, and no APA is authorized to make an independent legal determination about whether to share information with ICE. This directive applies to *every* information request received from ICE, including requests for information about criminal aliens that accompany lawful detainer requests.

### D.    Washtenaw County Board of Commissioners Resolution

On January 21, 2026, Defendant Washtenaw County Board of Commissioners adopted a Resolution that ICE officers "shall not be permitted to enter, remain in, or conduct civil immigration enforcement activities within any Washtenaw County-owned, leased, or operated building, facility, or property (including parking areas) unless required by law or pursuant to a valid judicial warrant or court order." Resolution, at 2. The Resolution extends to "County employees, contractors, and agents." *Id.* at 2-3. The Resolution facially prevents federal immigration agents from entering county-owned property, including Washtenaw County Jail, accessible to

10

state, county, city, and other local law enforcement and prohibits County employees, contractors, and agents from facilitating such access.

### E.   Impact of Challenged Policies on Immigration Enforcement

The Challenged Policies impact both federal immigration enforcement efforts and the community at large. "At first, the non-cooperation began with the refusal to honor ICE detainers." Raycraft Decl. ¶ 58. Under the General Order, sheriff deputies "must ignore ICE detainers thereby facilitating the release of criminal aliens." *Id.* ¶ 32. The refusal to honor detainers has resulted in ICE having "to expend additional valuable federal resources to rearrest the individual at-large." *Id.* ¶ 43; *see id.* ¶¶ 44-48, 52-55 (listing examples).

The Sheriff's Office's refusal to honor detainers has since expanded to include a refusal to provide police reports on detained aliens, along with the demand that all requests for information must be submitted through a formal Freedom of Information Act ("FOIA") request, *id.* ¶ 58, "making the procurement of intelligence unnecessarily cumbersome and difficult." *Id.* ¶ 22. This has resulted today in information sharing between the Sheriff's Office and ICE Enforcement and Removal Operation ("ERO") coming to a complete halt. *Id.* ¶ 22. And the little information that the ERO is able to obtain from the Sheriff's Office arrives "so heavily redacted it renders [the information] nearly useless." *Id.* ¶ 59.

11

Under the Prosecuting Attorney's Policy Directive, aliens receive reduced sentences to ensure they remain in custody at the Washtenaw County jail, and thus subject to the Sheriff's Office General Order, and not transferred to the Michigan Department of Corrections where ICE detainer requests would be honored. *See id.* ¶¶ 36, 38. The Policy Directive instructs APAs to restrict the flow of information to federal immigration officials by offering aliens special plea deals, eliminating multiple counts of the same charge, and carefully crafting the language used in dispositions to "avoid triggering immigration consequences." *Id.* ¶ 39. This lack of information helps aliens evade ICE, while leaving ICE ERO officers "without information from the County regarding the of [the alien's] sentence, where the alien may travel upon their release, or information regarding their criminal charges," making subsequent apprehension more difficult and dangerous *Id.* ¶ 56.

By prohibiting ICE access to Washtenaw County property, the Resolution has "force[d] ICE to conduct more at-large arrests instead of secure transfers from local custody." *Id.* ¶ 33. The Resolution's ban on county employees, contractors, and agents cooperating with ICE has also resulted in the Defendants declining to enter into § 287(g) agreements with ICE.[2] *Id.* ¶ 33. This lack of cooperation "pose[s] significant safety risks, not only to ICE officers, but also the public." *Id.* ¶ 110.

---

[2] Section 287(g) of the INA authorizes ICE to delegate state and local law enforcement officers the authority to perform specified immigration officer functions under ICE's direction and oversight. *See* 8 U.S.C. § 1357(g).

### III.   LEGAL STANDARD

On a motion to dismiss, the court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) (citation omitted). Specific facts are not required; rather, the plaintiff must only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citation omitted).

### IV.   ARGUMENT

#### A.   The Challenged Policies Are Preempted By Federal Law

The Challenged Policies are preempted for two independent reasons. First, they are expressly preempted by federal statute. Second, they are preempted because they serve as an obstacle to the Federal Government's enforcement of our Nation's immigration laws. Either reason serves as a sufficient basis for finding the Challenged Polices invalid under the Supremacy Clause of the U.S. Constitution.

##### 1.   The Challenged Policies Are Expressly Preempted By Federal Law

Express preemption occurs when Congress explicitly precludes state or local regulation in a particular area. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). State and local governments may not prohibit or restrict the sharing of "information regarding the citizenship or immigration status" with federal

13

immigration officials. 8 U.S.C. § 1373(a); *see also id*. § 1644 (similar). Further, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity" from "[s]ending", "[m]aintaining," or "[e]xchanging" with any other government entity "information regarding the immigration status, lawful or unlawful, of any individual." *Id*. § 1373(b).

Defendants contend that "the government fails to identify a single provision of the INA that conflicts with the challenged policies." Defs. Mem at PageID.9.[3] Not so. 8 U.S.C. § 1373(a) provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Compl. ¶¶ 38, 46, 47, 126; *see also* 8 U.S.C. § 1644 (similar). Each of the Challenged Policies violates these federal statutory mandates.

### a.    *Prosecuting Attorney's Policy Directive*

Start with the Policy Directive, which instructs local prosecutors to "avoid immigration consequences wherever possible." The Policy Directive further denies

---

[3] Defendants' Memorandum of Law relies heavily on two recent district court decisions for several propositions throughout their Motion to Dismiss, citing in passim *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025) and *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025). However, the United States has appealed those decisions, which are incorrect for essentially the same reasons expressed here. The cases remain pending before the United States Courts of Appeals for the Second Circuit (No. 26-104) and the Seventh Circuit (No. 25-2904).

that the Prosecuting Attorney's Office has an obligation to cooperate with federal immigration officials: "APAs should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies to enforce federal immigration laws or policies."

Although the Policy Directive acknowledges that local government officials "cannot be restricted from 'sending to, or receiving from' the federal government information regarding a person's 'citizenship or immigration status,'" *id.* at 7, the entire Policy Directive is dedicated to showing local prosecutors exactly how to avoid sharing information with Federal immigration officials. "If an APA is contacted by ICE about any noncitizen, the APA should immediately inform both the Chief Assistant Prosecuting Attorney and the Prosecuting Attorney so a determination may be made as to what the law requires." *Id.* at 8; *accord id.* at n.41 ("Again: if a federal immigration-related request is made to any APA, the APA should refer the inquiry to the Chief Assistant Prosecuting Attorney and the Prosecuting Attorney to determine whether … any applicable state or federal law, **mandates provision of the relevant information**." (emphasis added)).

Under the INA, the commission of a crime defines an alien's "immigration status." This "immigration status" is variable depending on the crime at issue and the context within which it was committed. For example, a conviction for simple assault might place an alien into one "immigration status" with less-severe

15

immigration consequences, but if that same act of simple assault occurred in the context of domestic violence, the alien's "immigration status" would be one having more-severe immigration consequences, even if no conviction resulted under state law. This is so because, under Mich. Comp. L. § 769.4(a), cases of domestic violence for first-time offenders can be taken under advisement to avoid a permanent criminal record. Under this deferral program, the court places the individual on probation instead of entering a judgment of guilt, which can later result in the complete dismissal of the charge. And because the INA's definition of "conviction" is broader than the conventional understanding of the term "conviction," to include criminal adjudications where a judgment of conviction is withheld,[4] the INA considers all information "regarding the … immigration status, *lawful or unlawful*, of any individual" to be very important in determining the "immigration status" of aliens and thus may not be withheld from federal immigration authorities under 8 U.S.C. §§ 1372(a), 1644.

In the County's view, it is not required to provide *any* such information to federal immigration officials, because it "has blocked all information sharing with ICE." Raycraft Decl. ¶ 58; see also Compl. ¶¶ 119, 138. The net result of the Policy

---

[4] *See, e.g.*, Mich. Comp. L. §§ 762.11(Holmes Youthful Training Act), 333.7411 (drug rehabilitation), and 769.4(a) (domestic violence pleas held under advisement).

16

Directive, then, is a *de facto* ban on information sharing and is exactly what 8 U.S.C. § 1373(a) and 1644 prohibit.

The only exception to the ban on sharing information with federal officials is when the Chief Assistant Prosecuting Attorney grants an exception "only in exceptional circumstances, and where public safety requires that deviation." *Id.* at 11. There is no evidence in the record of this exception being used even once. Regardless, the Policy Directive flouts federal law by prohibiting information sharing with ICE, and these measures stand in direct conflict with federal law. The Policy Directive is thus expressly preempted by Congress's directive to have state and local officers work with federal immigration officials to accomplish the INA's objectives.

### b.     Sheriff's Office General Order

Like the Policy Directive, the Washtenaw County Sheriff's Office General Order denies that it has any obligation to cooperate with federal immigration officials. The General Order prohibits Sheriff's Office employees from honoring ICE detainer requests "when there is no valid judicial warrant or order by a judge."

This, too, withholds information from federal immigration officials and conflicts with federal law as detainer requests seek information about the release of the alien from local custody. Compl. ¶ 58; Raycraft Decl. ¶14. Illegal aliens cannot be removed by federal immigration officials "until [the alien] is released from

17

imprisonment." 8 U.S.C. § 1231(a)(4)(A). When released, the alien becomes removable, and then he *must* be detained by federal immigration authorities while removal is pending. *See id.* § 1231(a)(1)(A), (2)(A). Therefore, information about an illegal alien's release date is highly relevant to removability and necessary for DHS to fulfill its obligations under the INA. Prohibitions against sharing that information are themselves prohibited by federal law. *Id.* § 1373.

Information that governs whether and when an alien is subject to removal from the United States plainly "regard[s]" immigration status, especially because words such as "regarding" in statutory construction "generally ha[ve] a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). When Congress uses them—as it did in 8 U.S.C.§§ 1373(a) and 1644—it intends "to reach any subject that has 'a connection with, or reference to,' the topics the statute enumerates." *United States v. Kraemer*, 933 F.3d 675, 679 (7th Cir. 2019) (citation omitted) (discussing the related phrase "relating to"). Defendants appear to inherently acknowledge this broadening effect by admitting that "the INA prohibits localities from restricting local officials' communications with immigration officers *concerning* 'immigration status' information." Defs. Mem. at PageID.9 (emphasis added). Accordingly, the challenged General Order is expressly preempted.

18

Defendants argue that "the County continues to share information requested by ICE from the Sheriff's Office pursuant to FOIA requests." Defs. Mem at PageID.24 (citing Compl. ¶ 56). But Defendants are using FOIA to halt information sharing, not facilitate it. As Plaintiff has alleged, "information sharing has come to a complete halt" and "the information that is provided under a FOIA request is heavily redacted and delayed, making the procurement of intelligence unnecessarily cumbersome and difficult." Compl. ¶ 56; *see also* Raycraft Decl. ¶ 59 (same). That is not the information-sharing required by the INA, and requiring the Federal Government to proceed by FOIA request is the exact "resort to legal processes in every routine or trivial matter" that would render immigration enforcement a "practical impossibility." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). Moreover, FOIA is *not* intended as a tool for federal employees or agents to obtain records needed for their official duties. Instead, federal employees— including immigration officers—are expected to use established internal procedures and interagency channels to request information necessary for their work.

> **2.     The Challenged Policies Present an Improper Obstacle to Federal Immigration Enforcement**

"[T]he very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Accordingly, state law is in conflict with federal law—and thus "conflict" preempted—where it "stands as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-773 (2000) (quotations omitted); *see, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby*, 530 U.S. at 373.

Congress may also indicate preemptive intent through "a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). A statute's pre-emptive effect "is guided by the rule that '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Id.* (internal quotation marks omitted). The "entire scheme" of the federal statute "must … be considered," and "that which needs must be implied is of no less force than that which is expressed." *Savage v. Jones*, 225 U.S. 501, 533 (1912).

Through the General Order forbidding local officials from honoring ICE detainers, to the Policy Directive reducing immigration consequences of convictions, to the Board of Commissioner's Resolution prohibiting ICE from accessing County property making custodial transfers impossible, Defendants have imposed numerous obstacles to the enforcement of federal immigration law.

20

*First*, the General Order's refusal to honor ICE detainer requests upon the release of criminal aliens—a release process solely under that locality's control—presents an obstacle to federal immigration enforcement. The General Order's prohibition on honoring ICE detainer requests neutralizes the congressional scheme for cooperative custodial transfers of criminal aliens. That forces immigration officers to track down and rearrest the criminal aliens at large when (and if) those agents learn that the criminal alien has been released from local custody. This "frustrates the purpose of the national legislation [and] impairs the efficiency of [] the federal government to discharge th[eir] duties." *Davis*, 161 U.S. at 283.

Defendants argue that the "[t]he challenged policies merely withhold assistance" or are simply "withhold[ing] … cooperation." Defs. Mem. at PageID.35, 40. But cooperation is *central* to enforcing our Nation's immigration laws. *Arizona*, 567 U.S. at 411. Congress permitted states and localities to impose criminal punishment on an alien *before* the alien is removed from the country. But in honoring the state's and locality's interests in enforcing their laws, Congress did not waive its own. Once the state or local detention ends, the alien is once again removable and *must* be detained by federal immigration authorities. *Id.* § 1226(c); 1231(a)(4)(A). That is only possible if states and localities share the information and access necessary for an immediate (and safe) transfer. *Id.* §§ 1225(b)(2)(A), 1226(c); *see id.* § 1231. A state or locality that denies or obstructs federal officers access to the

21

alien at that moment does not merely delay removal or commit an act of "withholding cooperation"; it prevents exactly the custodial transfer that Congress intended.

Congress could have asserted first right over all aliens, but it permitted states and localities to prosecute and incarcerate aliens for non-federal crimes first, with the understanding that the Federal Government would subsequently take custody when the state and local process concluded. *Id.* § 1231(a)(4)(A). By detaining removable aliens for state and local criminal law violations, state and local law enforcement make a deliberate choice to embrace that cooperative scheme. Refusing to transfer aliens to federal custody on the back-end is not simply passive; it is "state interference with acts necessary and proper to the accomplishment of" the "federal dut[y]" to continue to enforce the immigration laws. *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993).

Defendants' arguments largely frame state-federal cooperation as always optional and conflate withholding cooperation with banning it. They are wrong on both counts. For one, continued cooperation is not optional after a locality takes up the Federal Government's invitation to involve itself in an exclusively federal area and then refuses to uphold its end of the bargain. That is why Congress *requires* federal immigration agents to detain criminal illegal aliens immediately upon their release from local custody, 8 U.S.C. §§ 1226(c), 1231(a), and why Congress has

prohibited federal immigration authorities from taking custody before the aliens sentenced to imprisonment have completed their sentences. *See, e.g., id.* § 1231(a)(4)(A) ("the [Secretary of DHS] may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"); *id.* § 1231(a)(1)(B) (The removal period begins … the date the alien is released from detention or confinement."). For another, "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs." *City of N.Y.*, 179 F.3d at 35. As the Second Circuit reasoned, "[i]f Congress may not forbid states from outlawing even voluntary cooperation with federal programs by state and local officials, states will at times have the power to frustrate effectuation of some programs." *Id.* That is precisely what the General Order effectuates by prohibiting Sheriff's Office employees from briefly extending detention of criminal aliens to facilitate an orderly custodial transfer from state/local custody to federal custody.

The INA cannot function absent adequate notice to federal immigration authorities to facilitate custodial transfers. State and local law enforcement cannot frustrate this cooperative scheme by refusing to transfer or release criminal aliens into federal immigration authority custody state custody is completed. The General Order is far more than the "passive resistance" the Second Circuit found unprotected by the Tenth Amendment—it is affirmative obstruction. *Id.*

23

The challenged Resolution achieves the same effect through a different mechanism. By barring federal agents from County property—including County jails—custodial transfers are made impossible. By restricting the locations in which federal immigration agents can perform their duties the Resolution impedes federal immigration officials' ability to engage in civil immigration enforcement. None of the provisions of the INA place any geographic limitations on where federal agents may exercise their arrest authorities. The Resolution, therefore, "stand[s] as an obstacle to the accomplishment and execution" of federal immigration law and is conflict preempted under the Supremacy Clause. *Arizona*, 567 U.S. at 406.

Additionally, both the Policy Directive's and General Order's prohibition against compliance with reasonable information requests from the Federal Government further leaves federal agents to facilitate congressionally authorized arrests without the most basic information about the alien and creates yet another obstacle to Congress's "full purposes and objectives" of the INA. And to the extent that Defendants argue that the challenged policies promote public safety, the Complaint clearly explains that ICE's enforcement actions are focused on removing criminal aliens who pose a danger to public safety. Compl. ¶ 104 ("Each ICE detainer that is not honored is an opportunity for a criminal alien to reoffend and requires federal immigration officials to expend additional valuable federal resources to rearrest the individual in the community at large."). When Washtenaw County

24

refuses to honor ICE detainers or prosecute criminal aliens, individuals who have committed serious offenses are released back into the community. In such cases, witnesses and survivors may refuse to testify or drop charges out of fear that offenders will remain in the community.

### 3. The INA Does Not Violate the Anti-Commandeering Doctrine

There is no merit to Defendants' argument that prohibiting Washtenaw County and its officials from restricting on the way federal officials carry out their federal functions somehow contravenes the anti-commandeering doctrine. The Tenth Amendment bars Congress from "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (alteration and quotation marks omitted). Invalidating the Challenged Policies would do no such thing.

The modest measures of cooperation sought here are far different from requiring state and local officials "to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). The United States is *not* arguing that state or local law enforcement must arrest aliens, or even that they must extend the period of a criminal alien's custody. Instead, this case depends on the far simpler proposition that states and localities who elect to assume custody of criminal aliens must do so on the terms contemplated by Congress.

25

Defendants' commandeering argument boils down to the extraordinary contention that even if Congress had expressly conditioned states' authority to incarcerate criminal aliens on agreeing to simple measures like allowing a smooth transfer of custody, the Tenth Amendment would prohibit such a condition. That contention is wrong for the same reasons discussed above, as it follows from defendants' erroneous framing of the Challenged Policies as merely involving a decision to refrain from taking action. Defendants are not standing by idly; they are regulating in a manner fundamentally inconsistent with the federal scheme.

"Congress could have" required that aliens convicted of certain crimes be immediately deported, but instead "adopted a less intrusive scheme and allowed the States to" incarcerate criminal aliens, with federal agents taking custody upon release. *See FERC v. Mississippi*, 456 U.S. 742, 765 (1982). Barring state and local officials from undermining Congress's goals by thwarting federal agents from taking custody of criminal aliens is not "invalid" under the Tenth Amendment, any more than it would be if Congress had made state incarceration of criminal aliens *expressly subject to* a provision mandating the transfer of criminal aliens to federal custody after their sentences were served. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981); *City of N.Y.*, 179 F.3d at 35. Indeed, the United States could have prescribed the procedures state and local officials would have to use to decide whether to accept that scheme. *See FERC*, 456

26

U.S. at 771. The more modest request here—that states and localities do not categorically bar all cooperation with federal immigration officials—is not the type of "federal command to the States" the Tenth Amendment bars. *Id.* at 762.

Defendants fret about sharing information about criminal aliens in their custody with federal immigration authorities and "'bear[ing] the cost of enforcing the federal immigration scheme' and removing 'their authority to determine the proper allocation of state resources.'" Defs. Mem. at PageID.31. But this mischaracterizes what 8 U.S.C. § 1373 does. All that provision of the INA says is that state and local laws may not prohibit information sharing with immigration authorities "regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). It is not a positive command to States and localities to allocate resources. And while "*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering[,] . . . the conclusion that § 1373, on its face, violates the Tenth Amendment does not follow." *State v. Department of Justice*, 951 F.3d 84, 113 (2d Cir. 2020). And even if 8 U.S.C. §§ 1373(a) and 1644 regulated states, they are still valid because they require only the "provision of information," and "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program," *Printz*, 521 U.S. at 918. Thus, the Second Circuit correctly held that 8

27

U.S.C. §§ 1373(a) and 1644 do not compel "state and local governments to enact or administer any federal regulatory program." *City of N.Y.*, 179 F.3d at 35.

The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state or local] employees' time and thus the State's resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also United States v. King Cty., Washington*, 122 F.4th 740, 758 (9th Cir. 2024) ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."). This Court should as well.

### B.   The Challenged Policies Violate Intergovernmental Immunity

#### 1.   The Challenged Policies Regulate the Federal Government

The Challenged Policies violate the United States' intergovernmental immunity because they purport to regulate the Federal Government's functions. For centuries, the Supreme Court has repeatedly stated that, absent express congressional authorization, state and local governments have no authority to directly regulate the Federal Government. *Mayo v. United States*, 319 U.S. 441, 445 (1943). Such political subdivisions of the United States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. (4

28

Wheat.) at 436. Accordingly—because no one contends Congress authorized otherwise—the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931).

Decisions of the Supreme Court and courts of appeals illustrate the kinds of state laws that unlawfully regulate the Federal Government's operations. For instance, in *Johnson v. Maryland*, the Supreme Court held that a state could not require a Post Office employee to obtain a driver's license from the state, explaining that the state may not "requir[e] qualifications in addition to those that the [Federal] Government has pronounced sufficient." 254 U.S. 51, 57 (1920). Similarly, in *Hancock v. Train*, the Supreme Court concluded that a state could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." 426 U.S. 167, 179-80 (1976) (quotation marks omitted). And in *United States v. City of Arcata*, the Ninth Circuit invalidated local ordinances that prohibited federal military recruiters from recruiting minors. 629 F.3d 986, 991-92 (9th Cir. 2010). "By constraining the conduct of federal agents and employees," the ordinances impermissibly "regulate[d] the [Federal] [G]overnment directly." *Id.* at 991.

These principles apply with full force to the Federal Government's immigration-enforcement functions. Several courts of appeals have held, for example, that state bans on private detention facilities unlawfully regulated the

29

Federal Government. *See, e.g.*, *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 759-61 (9th Cir. 2022) (en banc). That is because such laws "prevent[] the federal government from choosing how … it will carry out a core federal function"—immigration detention. *CoreCivic*, 145 F.4th at 325; *see also GEO Grp.*, 50 F.4th at 757 (explaining that state law would impermissibly "give California the power to control ICE's immigration detention operations in the state"). And these cases involved regulation of federal *contractors*; the Federal Government itself and federal employees have "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see North Dakota*, 495 U.S. at 436-37 (plurality opinion).

### a. *Sheriff's Office General Order*

The challenged Sheriff's Office General Order improperly regulates the Federal Government by requiring immigration enforcement authorities to procure judicial warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes. Congress expressly provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). And the Supreme Court has acknowledged the role that administrative warrants play in the detention and removal process. *See Arizona*, 567 U.S. at 407–08 (noting that the

Attorney General has discretion to issue warrants, which are executed by federal officers). Whereas administrative warrants issue on probable cause that the individual is an alien subject to removal (which does not necessarily require that the alien committed a criminal offense, *see, e.g.*, 8 U.S.C. §§ 237(a)(1)(C), (D)), criminal judicial warrants issue on probable cause that the subject has committed a crime, *see Berger v. New York*, 388 U.S. 41, 55 (1967). Congress allows federal agents to detain illegal aliens under the former standard, but the General Order prevents federal agents from doing so unless they satisfy the latter, higher standard.

This forecloses federal immigration authorities' use of the detention method Congress authorized and directly imposes a different method—with a different standard—on the Federal Government. Defendants have no such power. *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)).

### b.     *Board of Commissioners Resolution*

The Washtenaw County Board of Commissioners' Resolution regulates the United States directly: it requires federal agents to obtain a judicial warrant or court order to enter County property and perform their assigned mission. Federal agents risk criminal or civil penalties for violating this requirement. And the Board of

Commissioners adopted this Resolution based on its disagreement with how federal authorities were conducting their operations "across the country." Resolution, at 1.

Defendants argue that the Commissioners are simply acting "as a proprietor, not a regulator." Defs. Mem. at PageID.36. But banning ICE officers from "enter[ing] … any Washtenaw County … property, unless required by law or pursuant to a valid judicial warrant or court order," the Resolution *does* regulate how ICE officers fulfill their statutory duties. The Resolution "'requires ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees," and forces ICE to obtain judicial warrants and court orders when Congress expressly contemplated otherwise. *See King Cnty.*, 122 F.4th at 756. "Because this impermissibly 'override[s] the federal government's decision, pursuant to discretion conferred by Congress,'" as to how to detain and remove aliens, the challenged Resolution constitutes an unlawful regulation of federal immigration officials and is therefore invalid under the intergovernmental immunity doctrine. *See id.* at 756-57.

In addition to interfering with federal immigration enforcement in and of themselves, the challenged Resolution could also be used by local prosecutors to charge ICE officials in local courts on allegations of contempt for violating the ban on entry by ICE officials onto Washtenaw County property. Compl. ¶ 78; *In re*

32

*Neagle*, 135 U.S. 1 (1890) (under the Supremacy Clause, a federal officer acting within the scope of their authority is immune from state criminal prosecution).

### 2.   The Challenged Policies Discriminate Against the Federal Government

Defendants argue that the Challenged Policies target "immigration enforcement—not the federal government." Defs. Mem. at PageID.37. This illusory distinction is really a red herring because *only* the Federal Government exercises plenary power of immigration enforcement. *See, e.g.*, *Fiallo v. Bell,* 430 U.S. 787, 792 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens."). To the extent that Defendants assert that they care only about immigration enforcement, they are targeting the Federal Government and one of its core functions.

The Ninth Circuit has already rejected Defendants' tailored-discrimination argument. In *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014), the court held that a state enactment applicable only to a single nuclear site owned by the Federal Government discriminated against the Federal Government. And that makes sense. It would be extraordinary if local officials could discriminate against the Federal Government by simply naming those activities rather than identifying the Federal Government specifically—although the challenged policies *do* discriminate against ICE by name. Resolution at 3; Policy Directive at 7; General Order at 2.

33

Washtenaw County officials routinely sign "mutual aid agreements" with neighboring jurisdictions.[5] And yet, Washtenaw County refuses to cooperate with federal immigration officials because Washtenaw County officials disagree politically with the enforcement of immigration laws. For example, upon adoption of the challenged Resolution, Board member Yousef Rabhi was reported to have said "when the Nazis come to Ann Arbor, we are going to have to stand as a community to face them." *See* Kevin Meerschaert, *Washtenaw County Board of Commissioners votes to ban ICE without a warrant*, *WEMU All Things Considered*, at 2 (Jan. 22, 2026), https://www.wemu.org/wemu-news/2026-01-22/washtenaw-county-board-of-commissioners-votes-to-ban-ice-without-a-warrant [https://perma.cc/MZ2C-9AX2]. Defendants attempt to deflect from this hard truth by arguing that the Challenged Policies target *any* official engaged in immigration enforcement within Washtenaw County, including any Washtenaw County employee who might be deputized by the Federal Government to engage in such enforcement, only to

---

[5] *See, e.g.*, P.D. Lesko, *Ypsi Police Chief and County Sheriff Sign Secret "Mutual Aid Agreement" Without Votes of Elected Officials*, The Ann Arbor Independent (July 31, 2023), https://a2independent.com/2023/07/31/ypsi-police-chief-and-county-sheriff-sign-secret-mutual-aid-agreement-without-vot        es-of-elected-officials/ [https://perma.cc/2SUW-GNET] (a mutual aid agreement to handle high-profile crimes such as homicides, attempted murders, and suspicious deaths); *Interlocal Agreement For The Washtenaw Area Mutual Aid Council (WAMAC)* (Apr. 24, 2024), https://wamac.us/wp-content/uploads/2025/11/ WAMAC-Full-Agreement-Final.pdf [https://perma.cc/H89X-JNMP] ("promot[ing] effective fire and rescue services within the governmental … parties to this agreement.").

34

recognize that "federal officials are the only ones enforcing immigration law." Defs. Mem. at PageID.39. That refusal singles "out the Federal Government for unfavorable treatment." *McHenry Cty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022).

Moreover, Washtenaw County's policies discriminate against the Federal Government by imposing unique restrictions and obstacles on federal immigration enforcement that do not apply to other law enforcement agencies or functions. Specifically, the requirement that ICE must use FOIA to obtain police reports creates barriers that single out federal immigration authorities for less favorable treatment.

### C. The Anti-Commandeering Doctrine Does Not Foreclose the Federal Government's Intergovernmental-Immunity Arguments

Defendants revisit the anti-commandeering doctrine again with respect to its application to the Federal Government's arguments about intergovernmental immunity. Defs. Mem at PageID.41. In so doing, they make the same arguments about the Federal Government "Forcing Defendants." *Id.* Plaintiff incorporates by reference the arguments it has made on this subject in the obstacle preemption context. See supra pp. 24-27. The Federal Government is not forcing the Defendants to do anything. It merely wants Defendants not to interfere with federal immigration efforts and return to the status quo of cooperation that had existed for *decades* prior to the adoption of the Challenged Policies.

### V. CONCLUSION

For the foregoing reasons, this Court should deny the Motion to Dismiss.

35

DATED: July 17, 2026

Respectfully Submitted,

TODD M. BLANCHE
Acting Attorney General

*Robert O. Lindefjeld*
Assistant Director
U.S. Department of Justice

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7488
Email: robert.o.lindefjeld@usdoj.gov

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney
General, Civil Division

*Attorneys for the United States of America*

36

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Robert O. Lindefjeld
Assistant Director
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044-0386
Telephone: (202) 451-7488
Email: robert.o.lindefjeld@usdoj.gov

37