# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>COUNTY OF WASHTENAW, Michigan; ALYSHIA M. DYER, Sheriff of the County of Washtenaw, Michigan, in her official capacity; COUNTY OF WASHTENAW SHERIFF'S OFFICE; ELI SAVIT, Prosecuting Attorney for the County of Washtenaw, Michigan, in his official capacity; COUNTY OF WASHTENAW OFFICE OF THE PROSECUTING ATTORNEY; and the WASHTENAW COUNTY BOARD OF COMMISSIONERS,<br><br>    Defendants. | Civ. Action No. 4:26-cv-11166<br><br>Hon. F. Kay Behm<br><br>Mag. Elizabeth A. Stafford |

## DEFENDANTS' JOINT REPLY BRIEF IN SUPPORT OF <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ......................................................................................1

ARGUMENT ...........................................................................................2

I.     Federal Law Does Not Preempt the Challenged Policies.............................2

    A.    Express Preemption...............................................................2

    B.    Conflict Preemption ............................................................5

    C.    Anti-Commandeering..........................................................8

II.    The Intergovernmental-Immunity Doctrine Does Not Apply......................11

    A.    The Policies Do Not Regulate the United States ...............................11

    B.    The Policies Do Not Discriminate Against the United States ............13

CONCLUSION.......................................................................................15

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................3

*Bond v. United States*, 572 U.S. 844 (2014)..............................................................7

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) ........................................14

*Chevron USA, Inc. v. Plaquemines Parish*, 608 U.S. 1 (2026) ..................................4

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)....................4

*Colorado v. DOJ*, 455 F. Supp. 3d 1034 (D. Colo. 2020).........................................10

*CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315 (3d Cir. 2025).........................12

*Counts v. Gen. Motors, LLC*, 139 F.4th 576 (6th Cir. 2025)......................................6

*County of Ocean v. Grewal*, 475 F. Supp. 3d 355 (D.N.J. 2020).........................4, 7

*Gamble v. United States*, 587 U.S. 687 (2019)...........................................................7

*GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) ........................................12

*Hancock v. Train*, 426 U.S. 167 (1976).....................................................................11

*Hencely v. Fluor Corp.*, 608 U.S. 31 (2026) ..............................................................5

*Johnson v. Maryland*, 254 U.S. 51 (1920).................................................................11

*Martin v. United States*, 605 U.S. 395 (2025) ..........................................................13

*McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ............................11, 12, 14

*Murphy v. NCAA*, 584 U.S. 453 (2018)..........................................................8, 9, 10

*New York v. DOJ*, 951 F.3d 84 (2d Cir. 2020) ..........................................................10

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176
   (3d Cir. 2021)........................................................................................................4, 9

*Printz v. United States*, 521 U.S. 898 (1997).............................................................10

*Reno v. Condon*, 528 U.S. 141 (2000) ...............................................................10, 11

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ................................4, 5, 7

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) ........................*passim*

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024) ...........................10, 12

*United States v. Minnesota*, 2026 WL 2085701
   (D. Minn. July 20, 2026)...........................................................................8, 10, 12, 14

*United States v. New York*, 2026 WL 2225423
   (N.D.N.Y. Aug. 3, 2026) ...........................................................................................14

*United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025).................2, 8, 13

*United States v. Washington*, 596 U.S. 832 (2022) ............................................11, 13

*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)..................................................3, 6

*Williams v. Ford Motor Co.*, 2026 WL 1243764 (E.D. Mich.
   May 6, 2026)...............................................................................................................9

ii

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*................................*passim*
    § 1226(a) ................................................................................................6
    § 1357....................................................................................................8, 13
    § 1360(a) ................................................................................................5
    § 1373(a) ................................................................................2, 3, 4, 10
    § 1644....................................................................................2, 3, 4, 10

U.S. Const.
    amend. IV................................................................................................7
    amend. X .................................................................................................8

## INTRODUCTION

In the Immigration and Nationality Act, Congress gave States and localities the option of cooperating with federal immigration-enforcement efforts. Washtenaw County officials have declined. Unwilling to take "no" for an answer, the federal government insists that the INA does not offer localities a choice at all. In its view, the INA preempts local noncooperation policies, forcing localities to detain noncitizens, respond to sweeping federal information requests, and permit federal officials access to state property without a warrant.

The INA is not the statute the government imagines. As other courts have uniformly recognized (in decisions the government all but ignores), the INA *allows* States to withhold cooperation from federal immigration-enforcement efforts, foreclosing the government's preemption theories. By contrast, the government's atextual reading of the statute would walk into the teeth of the anti-commandeering doctrine by compelling States and localities to assist in running a federal program.

The government's suggestion that intergovernmental immunity bars the challenged policies fares no better. The policies regulate *local* officials, not *federal* ones—setting rules for *local police* interactions with noncitizens, access to *County* buildings, and allocation of *local* resources. Nor do the policies discriminate against federal officials, a point underscored by the government's conspicuous failure to identify anyone the policies treat better. This Court should dismiss the complaint.

1

## ARGUMENT

### I.     Federal Law Does Not Preempt the Challenged Policies

#### A.     Express Preemption

The government (at 14) contends that 8 U.S.C. § 1373(a) and § 1644 expressly preempt the Prosecuting Attorney's Policy Directive and the Sheriff's Office General Order because, in its view, those policies "prohibit" or "restrict" local officials from sharing with federal officers "information regarding … citizenship or immigration status."  Neither policy imposes any such prohibition or restriction.

*1. Policy Directive.*  As the government (at 15) admits, the Directive expressly provides that local government officials "cannot be restricted from 'sending to, or receiving from,'" the federal government information regarding "citizenship or immigration status."  Ex. 6, at 8-9.  The government (at 15) also accepts that the Directive includes a procedure for line prosecutors to process such information requests: "If an APA is contacted by ICE about any noncitizen, the APA should immediately inform [senior prosecutors] so a determination may be made as to what the law requires."  *Id.* at 9.  Those provisions foreclose the government's express preemption argument because they permit what sections 1373 and 1644 require: the exchange of immigration-status information.  *See* Washtenaw Br. 15; *United States v. New York*, 810 F. Supp. 3d 329, 349-50 (N.D.N.Y. 2025).[1]

---

[1] The government (at 17) contends that the Directive permits information sharing only if the Prosecuting Attorney or his Chief Assistant grant an "exception."  That

The government thus resorts to arguing that the Directive does not mean what it says.  In the government's view (at 16-17), the Directive imposes "a *de facto* ban on information sharing."  But the government offers no facts to support that allegation.  The government does not allege, for instance, that prosecutors have rebuffed specific information requests.  Instead, the complaint baldly asserts that "Washtenaw County has blocked all information sharing with ICE," Compl. ¶ 119; *see also id.* ¶ 138; Ex. 5, at 16 (similar).  That allegation is "conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

The government insists that receiving "immigration status" information is "very important" to "federal immigration authorities."  U.S. Br. 15-16.  Even so, where, as here, there is no conflict with the "text … of the law in question," the government cannot win preemption by pointing to "policy preference[s]." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.).

**2.  *Sheriff's Office General Order.*** The government (at 17) claims sections 1373 and 1644 expressly preempt the Order because the Order prohibits the sharing of release dates for individuals in local custody.  That argument fails.

The Order prohibits staff from *inquiring* about individuals' "immigration status[es]" and bars officers from *detaining* people based on detainer requests without

---

is wrong.  Senior prosecutors need not grant an exception for information sharing because the Directive *itself* expressly permits it.  Ex. 6, at 8.

a judicial warrant—the Order does not mention information sharing.  Ex. 4, at 2-4.

To be sure, one effect of declining detainer requests is that ICE does not know when

individuals are being released from custody.  But sections 1373 and 1644 do not

require disclosure of release dates.  Those provisions concern only information "re-

garding … immigration status," not *other* information that might be helpful to the

government's immigration-enforcement efforts.  *See* Washtenaw Br. 15.

The government (at 18) counters that the word "regarding" in sections 1373

and 1644 sweeps in any information that could potentially concern "whether and

when" a person is subject to removal, including release dates.  But the ordinary

meaning of "regarding" is not "so broad that it is meaningless," and instead "requires

a connection that is not 'tenuous, remote, or peripheral.'"  *See Chevron USA, Inc. v.*

*Plaquemines Parish*, 608 U.S. 1, 11-12 (2026) (discussing meaning of similar phrase

"relating to").  That is why other courts have uniformly held that "information re-

garding … immigration status" encompasses only "an individual's category of pres-

ence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident,

U.S. citizen."  *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa.

2018), *aff'd in part*, 916 F.3d 276 (3d Cir. 2019); *United States v. California*, 921

F.3d 865, 891 (9th Cir. 2019).  Release dates, plainly, do not provide such infor-

mation.  *See County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020),

*aff'd on other grounds sub nom Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*,

8 F.4th 176 (3d Cir. 2021); *United States v. Illinois*, 796 F. Supp. 3d 494, 516-17 (N.D. Ill. 2025)).[2] That information might be helpful to federal immigration authorities does not make it information "regarding … immigration status."[3]

Although the government (at 14 n.3) acknowledges in a footnote that other courts have rejected its arguments, the government essentially ignores those cases—merely observing that it has noticed two appeals. The government's conspicuous failure to offer any response on the merits suggests that it has none.

### B.    Conflict Preemption

The government next contends that federal law preempts the challenged policies because they "present an improper obstacle to federal immigration enforcement." U.S. Br. 19 (capitalization altered). In support, the government claims that it may invoke vague statutory "purposes and objectives" with which the challenged policies purportedly conflict. *Id.* at 20 (citation omitted). But "there is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Hencely v. Fluor Corp.*, 608 U.S. 31, 38 (2026) (cleaned up). "Whether a state-law

---

[2] Confirming this reasonable reading of the statutes, Congress "used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019); *see, e.g.*, 8 U.S.C. § 1360(a) (mandating that noncitizen admission records contain any "relevant information as the Attorney General shall require").

[3] The government (at 19) generally suggests that "Defendants are using FOIA to halt information sharing," but it does not allege that Defendants have ever rebuffed a request or required ICE to use FOIA to ask about an individual's immigration status.

claim presents such an 'obstacle' depends on the federal statute's text, not on a judge's sense of what the statute's purposes might be." *Counts v. Gen. Motors, LLC*, 139 F.4th 576, 581 (6th Cir. 2025); *see* Washtenaw Br. 18-20. Here, the government identifies no conflict between a federal statute and any of the challenged policies.

**1.** *Information sharing.* The government (at 24) argues that both the Policy Directive and General Order frustrate federal objectives by depriving federal officials of the information they need to conduct "congressionally authorized arrests." But the challenged policies do not prohibit the sharing of immigration-status information. *See supra* pp. 2-5; Washtenaw Br. 19. And the government may not expand the sweep of the INA's information-sharing provisions by asserting "some brooding federal interest," *Va. Uranium*, 587 U.S. at 767, in *other* information that may be useful to enforcement efforts or to "promote public safety." U.S. Br. 24-25.

**2.** *Detention authority.* The government (at 21) contends that the Sheriff's Order obstructs "the congressional scheme for cooperative custodial transfers of criminal aliens" by preventing local police from "honoring ICE detainer requests." But the INA nowhere requires localities to detain noncitizens. To be sure, Congress has authorized *federal* officials to detain certain noncitizens pursuant to administrative warrants, 8 U.S.C. § 1226(a), once they are "released from imprisonment," *id.* § 1231(a)(4)(A). Those provisions, however, do not mention States or localities, let alone direct them to assist in federal immigration-enforcement efforts by detaining

noncitizens past the dates authorized by their criminal sentences—in possible viola-

tion of the Fourth Amendment—to make it easier for federal officials to take cus-

tody. *See* Washtenaw Br. 22. In short, the INA's detention provisions "impose

obligations solely on the federal government" with no "implied[] mandate[] that

state and local governments" must "act in accordance." *County of Ocean*, 475 F.

Supp. 3d at 380 (citing *California*, 921 F.3d at 887); *accord Illinois*, 796 F. Supp.

3d at 530.

Still more implausible is the government's extraordinary suggestion (at 21,

25-26) that Congress "permitted states and localities to impose criminal punishment

on … alien[s]" in exchange for localities' ensuring the "immediate … transfer" of

noncitizens to federal custody after state detention. That argument turns federalism

on its head. "Because our constitutional structure leaves local criminal activity pri-

marily to the States," *Bond v. United States*, 572 U.S. 844, 848 (2014), localities do

not need federal permission to impose criminal punishment—even if local defend-

ants have also violated federal immigration laws. The States and the United States

are "two separate sovereigns," each of which is free to punish offenses without the

permission of the other. *Gamble v. United States*, 587 U.S. 687, 688-89 (2019). No

statutory text suggests that Congress attempted such a sea change. *See Illinois*, 796

F. Supp. 3d at 530 n.19 ("[I]mmigration officers' obligation to permit state custody

to conclude before exercising jurisdiction is … not part of a *quid pro quo*.").

7

***3. Access to County property.*** The government (at 24) contends that the Board of Commissioners' Resolution obstructs federal law by "barring federal agents from County property." Yet the government (at 24) fails to identify a statutory provision granting federal officers access, instead asserting that the INA contains "no geographic limitations." Not so. The INA expressly authorizes immigration officers to access certain property—but does not permit warrantless access to property owned by local governments. *See* Washtenaw Br. 22-23 (citing 8 U.S.C. § 1357); *see New York*, 810 F. Supp. 3d at 346. That provision confirms that localities do not unlawfully obstruct federal law by declining ICE access to their property, yet the government does not address it.

### C.     Anti-Commandeering

Interpreting the INA to require States and localities to cooperate with federal immigration-enforcement efforts would violate the Tenth Amendment by forcing them to "administer or enforce a federal regulatory program." Washtenaw Br. 24 (quoting *Murphy v. NCAA*, 584 U.S. 453, 473 (2018)). At least nine courts have reached precisely that conclusion, and the government offers no reason for this Court to reach a different result here. *See United States v. Minnesota*, 2026 WL 2085701, at *15 (D. Minn. July 20, 2026) (collecting cases).

For starters, the government does not respond to Defendants' argument that the provisions of the INA the government invokes have no preemptive effect because

they do not regulate private individuals. *See* Washtenaw Br. 25 (citing *Murphy*, 584 U.S. at 477-80; *Ocean Cnty.*, 8 F.4th at 182). The government's failure to "substantively respond" decisively resolves its preemption claims because Defendants' "unrebutted argument[] establish[es] relief under the 12(b)(6) standard." *Williams v. Ford Motor Co.*, 2026 WL 1243764, at *4 (E.D. Mich. May 6, 2026) (Behm, J.).

Even setting that point aside, the government fails to explain away the obvious commandeering problem generated by its reading of the INA. *See* Washtenaw Br. 24-26. The government (at 25) first suggests that the cooperation it seeks is "modest." But there is no *de minimis* exception to the anti-commandeering doctrine. Anytime a "State imposes regulations only because it has been commanded to do so by Congress," the lines of political accountability are blurred and the costs of federal regulation are improperly shifted to the States. *Murphy*, 584 U.S. at 473-74.

In any case, the government demands more than "modest" cooperation. Although the government (at 23) disavows the position that "state or local law enforcement must arrest aliens" or "extend … [their] custody," in the next breath it claims that localities must "extend[] detention of criminal aliens to facilitate an orderly custodial transfer." And the complaint goes further still, asserting that the INA allows the government to force local officials to maximally charge local offenses and permit federal officers access to county property. *See, e.g.*, Compl. ¶¶ 141, 146-47. Those measures "would commandeer Defendants' legislative and executive processes in

9

significant ways." *Minnesota*, 2026 WL 2085701, at *15.

The government's reading of the information-sharing mandates in sections 1373(a) and 1644 also raises a commandeering problem. *Cf.* U.S. Br. 27. If the INA requires local officials to provide any information even tangentially connected to an individual's "immigration status," as the government (at 18) suggests, localities "would be unable to limit or control how much work time employees spend" tracking down information for federal authorities—forsaking local priorities for federal ones. *Colorado v. DOJ*, 455 F. Supp. 3d 1034, 1060 (D. Colo. 2020). To be sure, as the government (at 27) notes, *Printz v. United States*, 521 U.S. 898, 918 (1997), indicated that laws requiring "the provision of information" to federal officials present a different "issue" than laws requiring enforcement of federal programs. But *Printz* did not bless information-sharing mandates, *see Illinois*, 796 F. Supp. 3d at 523-24, and *Murphy* confirms that the Constitution withholds from Congress "the power to issue orders directly to the States," 584 U.S. at 470—including the power to direct the provision of information.[4]

---

[4] The government's remaining citations (at 27-28) do not help its cause. *New York v. Department of Justice*, 951 F.3d 84, 114 & n.27 (2d Cir. 2020), expressed "doubt" whether section 1373(a) was facially unconstitutional *in all its applications* under the anti-commandeering doctrine—but did not decide that question. And *United States v. King County*, 122 F.4th 740, 758 (9th Cir. 2024) and *Reno v. Condon*, 528 U.S. 141, 150 (2000), stand for the unremarkable proposition that the mere expenditure of state resources, in the absence of a federal command requiring state "assist[ance]," *Reno*, 528 U.S. at 151, does not create an anti-commandeering problem.

## II.     The Intergovernmental-Immunity Doctrine Does Not Apply

The government insists that the challenged policies violate the intergovernmental-immunity doctrine, but fails to show that the policies "regulate the United States directly" or "discriminate against" it. *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up).

### A.     The Policies Do Not Regulate the United States

A state law does not violate intergovernmental immunity when it "directly regulates only State and local entities and law enforcement—not the federal government." *McHenry County v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022); Washtenaw Br. 27.  The government's citations (at 29) prove the point, demonstrating that "state laws … unlawfully regulate" when they impose requirements on *federal* officials. A State's mandate that a federal Post Office employee obtain a state driver's license, *Johnson v. Maryland*, 254 U.S. 51, 57 (1920), or that a federal facility obtain a state pollution permit, *Hancock v. Train*, 426 U.S. 167, 179-80 (1976), are a far cry from the challenged policies, which explicitly constrain the conduct of *local* officials.

Ignoring this distinction, the government (at 30) asserts that the Sheriff's Order improperly regulates federal officials "by requiring immigration enforcement authorities to procure judicial warrants to access detainees and obtain information." But nothing in the Order stops federal officials from arresting noncitizens pursuant to administrative warrants or from issuing detainer *requests* to local police.  The

11

Order merely "regulate[s] how … local officials perform their duties," *Minnesota*, 2026 WL 2085701, at \*21, by directing *them* not to detain individuals pursuant to detainer requests absent a judicial warrant.  That instruction is leagues away from direct regulation of the federal government.  *See Illinois*, 796 F. Supp. 3d at 535; *McHenry County*, 44 F.4th at 593.

The government's argument (at 32) that the Board of Commissioners' Resolution regulates federal officials by requiring ICE to "entirely transform its approach to … transporting and removing noncitizen detainees" is equally unavailing.  Unlike laws that courts have held to be impermissible regulations, the Resolution does not control the *manner* in which federal officials carry out their duties, mandate *how* to detain and remove noncitizens, or regulate *who* the federal government may contract with to do so.  *United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 759-61 (9th Cir. 2022) (en banc).  At most, the Resolution affects *where* immigration-enforcement operations can occur absent a judicial warrant.  That is a reasonable exercise of Washtenaw County's inherent authority to manage use of its own property, not an unconstitutional effort to regulate federal officials.  *See* Washtenaw Br. 29.  Other courts have rejected similar intergovernmental-immunity challenges to state laws governing use of local property.

12

*See, e.g., Illinois*, 796 F. Supp. 3d at 535; *New York*, 810 F. Supp. 3d at 352-53.  The government offers no basis for distinguishing those cases.[5]

### B.      The Policies Do Not Discriminate Against the United States

For a local policy to discriminate against the federal government, it must treat the federal government *worse* than someone else.  Washtenaw Br. 29-30 (citing *Washington*, 596 U.S. at 839, 841).  The challenged policies do not.

*First*, the policies do not single out the federal government because they apply equally to federal officials and to local officials deputized to enforce federal immigration law.  Washtenaw Br. 30-31.  The government (at 33-35) retorts that, in practice, "federal officials are the only ones enforcing immigration laws."  But regardless whether ICE has *yet* deputized state and local officers in Michigan, it *could*, *see* 8 U.S.C. § 1357(g), and the challenged policies would then apply equally to those deputized officials.  Although the policies mention "ICE by name," as the government (at 33) observes, that is a shorthand that would cover any official from any state or federal agency enforcing immigration laws.  *See* Washtenaw Br. 31.

---

[5] The government (at 32) also suggests that the Resolution might regulate the federal government because federal officers who violate the Resolution by trespassing on County property could face local charges.  But no such prosecutions have occurred and, in any case, would implicate very different constitutional doctrines. *See Martin v. United States*, 605 U.S. 395, 412-13 & n.2 (2025).  Thus, any such claim is not ripe.

*Second*, even if the challenged policies *did* apply only to federal officials, the "mere fact that [a local law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry County*, 44 F.4th at 594. The government's citation (at 33) to *Boeing Co. v. Movassaghi* does not say otherwise. There, the Ninth Circuit identified a relevant comparator: the California law at issue imposed a more "stringent cleanup scheme" on a federal nuclear site than on other sites "elsewhere in the state." 768 F.3d 832, 842 (9th Cir. 2014); *see also Illinois*, 796 F. Supp. 3d at 533-34 (requiring comparator); *Minnesota*, 2026 WL 2085701, at *21 (same).

The government (at 34 & n.5) attempts to identify a comparator, claiming that Washtenaw County has entered two "'mutual aid agreements' with neighboring jurisdictions." But the County is not even a party to one of those agreements, which provides for sharing fire-and-rescue resources among *towns* within the County. The other agreement is with the police department of a town *within* the County. And because neither agreement concerns immigration, the agreements say nothing about whether the County discriminates in cooperating with immigration enforcement. *See United States v. New York*, 2026 WL 2225423, at *18 (N.D.N.Y. Aug. 3, 2026) (rejecting similar apples-to-oranges comparison). Regardless, the government's theory proves too much, suggesting that if a locality signs *any* cooperation agreement on *any* topic, it must also agree to cooperate with ICE on immigration enforcement. The government cites no authority for that remarkable proposition.

14

Finally, if the government is correct that the challenged policies violate the intergovernmental-immunity doctrine, that would generate a significant anti-commandeering problem. *See supra* pp. 8-10; Washtenaw Br. 34; *cf.* U.S. Br. 35.

## CONCLUSION

For the above reasons, the Court should dismiss the complaint with prejudice.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Mary B. McCord*
MARY B. MCCORD
  *Counsel of Record*
SHELBY CALAMBOKIDIS
ALEXANDRA LICHTENSTEIN
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY AND PROTECTION
  *Georgetown University Law Center*
  *600 New Jersey Avenue NW*
  *Washington, DC 20001*
  *(202) 661-6607*
  *mbm7@georgetown.edu*

/s/ *Dane H. Butswinkas*
  DANE H. BUTSWINKAS
    *Counsel of Record*
  AMY MASON SAHARIA
  NICHOLAS G. GAMSE
  EDWARD PICKUP
  MEGAN R. IZZO
  WILLIAMS & CONNOLLY LLP
    *680 Maine Avenue, S.W.*
    *Washington, DC 20024*
    *(202) 434-5000*
    *dbutswinkas@wc.com*

ROBERT BURTON-HARRIS (P81843)
BURTON-HARRIS LAW, PLC
  *500 Griswold St., Suite 2450*
  *Detroit, MI 48226-3421*
  *Office: (313) 572-4397*
  *Fax: (734) 999-0452*
  *Robert@BurtonHarrisLaw.com*

MICHELLE K. BILLARD (P81507)
OFFICE OF CORPORATION COUNSEL,
WASHTENAW COUNTY
  *220 N. Main St.*
  *Ann Arbor, MI 48104*
  *(734) 222-6738*
  *billardm@washtenaw.org*

*Attorneys for Defendants County of Washtenaw Sheriff's Office and Alyshia M. Dyer, Sheriff of the County of Washtenaw, Michigan*

*Attorneys for Defendants County of Washtenaw; Eli Savit, Prosecuting Attorney for the County of Washtenaw; The County of Washtenaw Office of the Prosecuting Attorney; and the Washtenaw County Board of Commissioners*