UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

COUNTY OF WASHTENAW, *et al.*,

Defendants.
_____________________________ /

Case No. 26-11166

Hon. F. Kay Behm
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 7)**

This is one of a series of lawsuits in which the President of the United States has sought to compel states and localities to do the work and bear the cost of enforcing his preferred immigration agenda. The Immigration and Nationality Act contemplates the possibility of state and local cooperation with federal immigration officials, but it generally does not require cooperation with any particular federal request. Some localities, such as Washtenaw County, disagree with the President's mass deportation scheme and have ended prior cooperation agreements with the federal government, largely leaving the work of federal immigration enforcement to federal officers and agencies – and have

enacted policies to that end. Unwilling to take "no" for an answer, the federal government now insists that the INA does not offer localities a choice at all. Apparently flummoxed by the County's decision to focus its resources on local priorities and public safety, the United States sues to demand Washtenaw County's cooperation, the use of its jail cells, and its resources.

The Constitution imparts much authority on the federal government. But neither the federal government nor the President may conscript local officials to enforce their will. As explained in detail below, nothing in the text of the INA requires the result the government seeks, and the government cannot otherwise compel localities to enforce the President's priorities in the manner it wishes. The Washtenaw County Defendants' motion is therefore granted in full, and this case is **DISMISSED**.

## I. PROCEDURAL HISTORY

The United States filed this lawsuit on April 9, 2026. ECF No. 1. Defendants are the County of Washtenaw, Michigan; Alyshia M. Dyer, Sheriff of the County of Washtenaw, Michigan, in her official capacity; County of Washtenaw Sheriff's Office; Eli Savit, Prosecuting Attorney

for the County of Washtenaw, Michigan, in his official capacity; County of Washtenaw Office of the Prosecuting Attorney; and the Washtenaw County Board of Commissioners. For brevity, the court at times refers to the Defendants collectively as Washtenaw County or simply the County. This motion to dismiss was filed on June 17, 2026, by all Defendants, and the motion is fully briefed. ECF Nos. 7 (motion), 26 (response), 29 (reply), 24 (amicus brief of interested cities, counties, and elected officials in support of the motion to dismiss). Oral argument was held on August 17, 2026, at which counsel for all parties appeared. This opinion follows.

## II. FACTUAL BACKGROUND

### A. "Sanctuary" Policies and President Trump's Agenda

Within hours of assuming the Presidency in 2025, President Donald Trump declared that a "national emergency exists at the southern border of the United States" from the unprecedented "illegal entry of aliens." Proclamation 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). Following President Trump's declaration, the U.S. Department of Homeland Security ("DHS") and its components U.S.

Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP") prioritized nationwide efforts to identify and remove noncitizens from the United States, often with tragic consequences for public safety and for the individuals and communities targeted. To give just one example, "[i]n early June[ 2025], the Government launched immigration enforcement raids across Los Angeles and its surrounding counties. During the raids, teams of armed and masked agents pulled up to car washes, tow yards, farms, and parks and began seizing individuals on sight, often before asking a single question." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 6 (2025) (Sotomayor, J., dissenting).

At the same time, the federal government began a different kind of campaign against those who differed in their view of immigration enforcement. On January 20, 2025, the President directed the Attorney General and the Secretary of Homeland Security to withhold "Federal funds" from "'sanctuary' jurisdictions" and to bring "criminal or civil" lawsuits against local "practices that interfere with the enforcement of Federal law." Executive Order 14,159 § 17, 90 Fed. Reg. 8443 (Jan. 20,

2025).[1] On April 28, 2025, the President further directed the Attorney General and the Secretary to "publish a list of States and local [sanctuary] jurisdictions," "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law," and "pursue all necessary legal remedies and enforcement measures to end these violations." Executive Order 14,287 §§ 2-3, 90 Fed. Reg. 18761 (Apr. 28, 2025); *see also* Executive Order 14,218 § 2(a)(ii), 90 Fed. Reg. 10581 (Feb. 19, 2025) (restricting funding to "sanctuary" cities).

Pursuant to those executive orders, the Attorney General issued a directive requiring the DOJ's Civil Division to "identify state and local laws, policies, and practices that facilitate violations of federal immigration laws or impede lawful federal immigration operations" and to "take legal action to challenge such laws, policies, or practices."

---

[1] Jurisdictions with policies like Washtenaw's are labeled with a variety of descriptors, including "sanctuary cities" and "welcoming jurisdictions." Although the Trump Administration has adopted the term "sanctuary cities" to characterize such places that enact laws to prioritize local resources for local purposes, "that term is commonly misunderstood." *Chicago v. Sessions*, 888 F.3d 272, 281 (7th Cir. 2018). The term is considered a misnomer because such jurisdictions "do[] not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government." *Id.* Given the common usage of the term, however, this opinion occasionally uses it to refer to those jurisdictions and policies that seek to limit the entanglement of local law enforcement with federal immigration efforts. *See* ECF No. 24, PageID.357 n.1 (brief of amicus curiae, explaining this point).

Memorandum from the Attorney General Re. Sanctuary Jurisdiction Directives (Feb. 5, 2025) [https://perma.cc/N4KE-K3MW].

The Civil Division followed that command, filing more than a dozen lawsuits in 2025 and 2026 attempting to force States and localities to assist federal immigration efforts. The government has taken the position that federal immigration laws preempt local measures limiting cooperation with immigration enforcement.

Between 2021 and 2026, Washtenaw County, Michigan, and its officials joined other jurisdictions nationwide by limiting assistance to federal immigration authorities. The County decided that spending finite local resources helping federal immigration efforts risked undermining local policing and the provision of services to residents. If interactions with local government carry the risk of increased exposure to immigration enforcement, the County concluded, residents might be less likely to report crimes, participate in public processes, or access essential services. To that end, the County adopted three relevant policies, described in more detail below. Pursuant to the President's stated priorities, DOJ sued.

### B. Washtenaw County Policies

The policies at issue are as follows. The County's Office of the Prosecuting Attorney instructed prosecutors to consider immigration consequences in charging decisions and to refrain from sharing information with ICE beyond what federal law requires. The Sheriff's Office ordered officers not to ask about immigration status when performing their duties and determined that the Office would not detain noncitizens solely at ICE's request when ICE lacked a judicial warrant or court order. And the County's Board of Commissioners decided not to allow federal immigration officers into County property without a judicial warrant or court order. Each policy expressly states that local officials must comply with applicable laws. The United States takes issue with all three. The Sheriff's Office General Order, the Prosecutor's Office Policy Directive, and the Board of Commissioners' Resolution are collectively referred to as the "Challenged Policies." The most relevant portions of these policies (all of which are attached to the Complaint) are included below.

### i. The Prosecuting Attorney's Policy Directive 2021-12 (Feb. 24, 2021).

The Washtenaw County Prosecutor's Office Policy Directive directs prosecutors to avoid adverse immigration consequences for defendants when consistent with ensuring "the safety and security of crime survivors and their families." ECF No. 1-5, PageID.105. The Office chose this action because fear of adverse immigration consequences can deter "noncitizen survivors and witnesses" from reporting crimes, and defendants from cooperating, and the Washtenaw County Prosecutor's Office resolved to "minimize" those consequences. *Id.* at PageID.101. The Prosecutor's Office thus directed prosecutors to "refrain from questioning witnesses about immigration status," and not to "assist in any way with federal immigration enforcement related to noncitizen civilians, crime survivors, witnesses, or defendants." *Id.* Therefore, while keeping public safety front and center, prosecutors are instructed to consider: (1) plea deals that do not carry immigration consequences, (2) charges without "multiple counts of the same charge" to avoid "unfair collateral consequences that may attach to multiple convictions," and (3) sentences that do not carry immigration penalties

(e.g., terms of imprisonment under 365 days). *Id.* at PageID.105-06. The policy also instructs prosecutors to refrain from "contact[ing] [ICE] to verify the record of a noncitizen or to inform ICE of pending charges," to the extent consistent with state and federal laws requiring the communication of a person's "citizenship or immigration status." *Id.* at PageID.106-07 & n.41. "Beyond these legal requirements . . . [prosecutors] should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies." *Id.* at PageID.107.

**ii. The Sheriff's Office General Order 1.14 (Jan. 30, 2025).**

Taking the view that "federal immigration law" is a federal "function," not a local responsibility, the Washtenaw County Sheriff's Office resolved not to use its "resources to enforce federal immigration law or assist in immigration related matters." ECF No. 1-4, PageID.64-65. Specifically, officers may not use immigration status as a "reason to take investigative action" or "ask about an individual's immigration status when performing their duties." *Id.* Although the Order prevents officers from asking about immigration status while performing their

duties, the Order does not stop employees from sharing information with ICE if gathered through other means. *Id.* The Order also states that the Sheriff's Office "will not detain an individual under the sole justification of an Immigration Detainer or Warrant of Removal/Deportation issued by [ICE] and signed by an ICE agent when there is no valid judicial warrant or order by a judge." *Id.* at PageID.65.

Pursuant to the Order, the Sheriff's Office has declined "at least four immigration detaine[r]" requests, and the complaint states that the office declined forty ICE detainers in 2025. ECF No. 1, PageID.32, 75. The Office also has required ICE to submit FOIA requests to access police reports, rather than disclosing them voluntarily to ICE. ECF No. 1-5, PageID.83; ECF No. 1, PageID.33-57, Compl. ¶¶ 56, 120-21.

**iii. The Board of Commissioners' Resolution (Jan. 21, 2026).**

Following reports of ICE officers eroding community trust by conducting "discriminatory enforcement actions" based on racial "profiling" and "wearing masks or other face coverings" during "enforcement," Washtenaw County's governing body, the Board of Commissioners, partially restricted ICE officers' access to County

buildings. ECF No. 1-7, PageID.200-02. The Board feared that "the presence of ICE officers conducting civil immigration enforcement activities within County buildings may deter residents . . . from accessing essential services, participating in public processes, or engaging with County programs." *Id.* at PageID.201.

The Board thus denied ICE officers permission "to enter, remain in, or conduct civil immigration enforcement activities within any Washtenaw County–owned, leased, or operated building, facility, or property (including parking areas) unless required by law or pursuant to a valid judicial warrant or court order." *Id.* The Board also directed "County employees, contractors, and agents" not to "cooperate" with ICE within "County-owned, leased, or operated buildings, facilities," "except where such assistance is required by law." *Id.* at 201-02.

### C. This Lawsuit

On April 9, 2025, ICE wrote to the Washtenaw County Sheriff's Office to "express [its] dissatisfaction" with the County's policies, claiming that they "obstruc[t] lawful federal immigration operations." ECF No. 1-5, PageID.92-93. As "consequences" for the Office's "actions," ICE excluded the Sheriff's Office from a Homeland Security

Investigations task force dedicated to investigating sex-trafficking crimes, stopped sharing funds generated from asset seizures, and threatened "additional consequences" for both the Office and Washtenaw County more generally, including the loss of federal government "contracts, subcontracts, grants, cooperative agreements, loans, and other covered transactions." *Id.* When those threats proved ineffective, on April 9, 2026, the United States filed this lawsuit against the Defendants. As in similar suits against other localities, the United States argues that Washtenaw County's policies are either preempted by federal immigration laws (Counts I to III) or unlawfully regulate or discriminate against the federal government in violation of the intergovernmental-immunity doctrine (Counts IV to VI). The government seeks a declaratory judgment and injunctive relief as to each of the challenged policies.

## III. STANDARD OF REVIEW

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the nonmoving party and accept all well-pleaded factual allegations as true. *League of United Latin Am. Citizens (LULAC) v. Bredesen*, 500 F.3d

523, 527 (6th Cir. 2007); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562 (6th Cir. 2003). The complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). The factual allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *LULAC*, 500 F.3d at 527. The sufficiency of a complaint is a question of law. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011).

## IV. ANALYSIS

As a threshold matter, the court notes that no party has raised the issue of standing. Standing, however, goes to the court's subject matter jurisdiction, which the court has an independent duty to address. *See Akno 1010 Mkt. St. St. Louis Mo. LLC v. Pourtaghi*, 43 F.4th 624 (6th Cir. 2022) (reiterating the district court's duty to assure subject matter jurisdiction at the earliest opportunity, even if no party raises the issue); *Loren v. Blue Cross & Blue Shield*, 505 F.3d 598, 607 (6th Cir. 2007) (a plaintiff's lack of standing equates to a court's lack of

subject matter jurisdiction). So before evaluating the sufficiency of Plaintiff's complaint, the court starts with a brief standing analysis.

### A. Standing

To establish standing, a plaintiff must have suffered an injury-in-fact that is fairly traceable to the defendant's challenged action and is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[T]he actual or threatened invasion of [the government's] sovereign right to enforce the law" is sufficient to show injury in fact. *See Saginaw Cty. v. STAT Emergency Med. Servs.*, 946 F.3d 951, 956 (6th Cir. 2020); *United States v. Missouri*, 114 F.4th 980, 985 (8th Cir. 2024) ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States. Whether the United States is entitled to relief from that injury is a question on the merits of the dispute.").

Several district courts, faced with these same claims from the United States regarding similar local policies, have heard and ruled on challenges to the United States' standing to assert its claims. Some of those courts have found that the United States lacks standing as to

some or all of its claims. *See United States v. City of Boston*, No. 25-12456, __ F.Supp.3d __, 2026 WL 1493706, 2026 LX 267813, at *20-21 (D. Mass. May 28, 2026); *United States v. Minnesota*, No. 25-cv-3798, __ F.Supp.3d __, 2026 WL 2085701, 2026 LX 352005, at *20 (D. Minn. July 20, 2026); *United States v. City of Newark*, No. 25-cv-5081, 2026 LX 377963, at *50 (D.N.J. June 24, 2026). Those decisions, however, have turned on specific factual or legal circumstances that no party has asserted are present here. More specifically, in several cases, state law concurrently operated to constrain the actions of local officers, and so the court found that a holding as to local entities could not redress the United States' injuries caused by operation of a statewide law, or otherwise held that the United States' alleged injury was not fairly traceable to operation of the local law rather than the state law. *See City of Boston*, 2026 LX 267813, at *20-21 ("As a matter of Massachusetts law, Boston law enforcement officers may not detain a person solely based on a federal civil immigration detainer or administrative warrant . . . . With or without the Boston Trust Act, then, Boston police officers cannot detain a person pursuant solely to a federal civil immigration detainer or administrative warrant.");

*Minnesota*, 2026 LX 352005, at *20 (dismissing some claims on jurisdictional grounds because "the Complaint alleges no facts tending to show . . . that Minneapolis, Saint Paul, Hennepin County, or the Hennepin County Sheriff possess enforcement authority over any of the challenged state laws."); *City of Newark*, 2026 LX 377963, at *50 ("the Complaint contains no injury solely traceable to the Challenged Policies that a favorable decision in this suit would redress"). Or, in some instances, they have found no nonconclusory allegations as to the involvement of particular actors, and therefore the complaint failed to trace causation to those actors or plausibly allege the ability of those actors to redress the alleged injury. *See, e.g.*, *United States v. Illinois*, 796 F. Supp. 3d 494, 512 (N.D. Ill. 2025) (finding brief mentions of individual actors "insufficient to show that the alleged injuries are traceable to" those persons). But where the proper defendants are named as to policies within their control, district courts have found that the United States has sufficiently asserted standing. *E.g.*, *id.* at 511 ("the United States's allegations are sufficient to establish standing to seek injunctive relief against Illinois, Cook County, and Chicago."); *Minnesota*, 2026 LX 352005, at *23 (the United States' "allegations

plausibly show an impairment to the United States' 'legally protected interest in enforcing federal law.'") (quoting *Missouri*, 114 F.4th at 984).

The court finds the latter set of conclusions analogous to the factual and legal landscape in this suit. The United States has plausibly asserted an injury to its interests that is fairly traceable to Washtenaw County's so-called sanctuary policies, and that a declaration and injunction voiding those policies would remove impediments to federal interests. *See, e.g.*, *Illinois*, 796 F. Supp. 3d at 510 (finding standing on similar facts). And the United States has properly alleged each count against the Defendants who are plausibly responsible for those policies.[2] Here, the United States has plausibly and specifically alleged that detainers have not been honored, that the handling of these detainers directly flow from the Sheriff's Office policy, and that an injunction against the named Defendants would change

[2] The United States names, under each count, the specific official(s), the municipal entity they are a part of, and the County itself. These are, in effect, the same entity. Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citing *Monell* v. *New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978)). And suits against a sub-unit such as the Prosecutor's Office, the Sheriff's Office, or Board of Commissioners are generally considered suits against the municipality itself. *See Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 891 (6th Cir. 2025) (applying Ohio law under 42 U.S.C. § 1983).

how that office handles those requests to the benefit of the United States. ECF No. 1, PageID.47. The United States has plausibly and specifically alleged that the Prosecutor's Office has, as a result of the Policy Directive, changed how much information they share with ICE about noncitizens in state custody on criminal charges, and that a holding voiding that directive as unconstitutional as to the named Defendants would alter that arrangement in the United States' favor. *Id.* at PageID.49. The United States has plausibly and specifically alleged that the Commissioners' Resolution prevents ICE officers from entering County property, which impedes their work, and that a favorable resolution binding the named Defendants would therefore redress that harm. *Id.* at PageID.51. The court finds no question, at this stage, that the United States has standing to pursue each of the named Defendants as to the relevant Challenged Policies.

### B. The Constitution's Promise of Dual Sovereignty

"[O]ur system of government is said to be one of "dual sovereignty." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (quoting *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991)). The "[p]reservation of the States as independent political entities [was] the price of union[.]"

*Printz v. United States*, 521 U.S. 898, 919 (1997). But "[t]he Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992) (citation omitted). This dual sovereignty passes to a state's municipalities: "The local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." *See Printz*, 521 U.S. at 920-21 (quoting The Federalist No. 39, 245 (James Madison)); *id.* at 931 n.15 (noting that the question of whether a municipality receives Eleventh Amendment sovereign immunity does not apply to the Tenth Amendment's federalism guarantees).

"The Constitution limits state sovereignty in several ways. It directly prohibits the States from exercising some attributes of

sovereignty." *Murphy*, 584 U.S. at 470-71 (citing U.S. CONST. art. I, § 10). And the Constitution indirectly restricts the States by granting certain legislative powers to Congress. *Id.* at 471. This means that when federal and state law conflict, federal law generally prevails and state law is preempted. But the Constitution "confers on Congress not plenary legislative power but only certain enumerated powers." *Id.* "Therefore, all other legislative power is reserved for the States." *Id.*; *see* U.S. CONST. amend. X. "And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471.

From this foundational division of sovereignty, three relevant principles emerge.

**i. Preemption**

First, the Constitution's Supremacy Clause supplies a rule of priority, ensuring that federal laws take precedence over contrary state statutes. U.S. Const. art. VI, cl. 2. Federal law can preempt state law in three ways: express preemption, conflict preemption, or field preemption. *Murphy*, 584 U.S. at 477. These types of preemption arise slightly differently. Congress may "expressly" preempt state authority

"by so stating in express terms." *Kansas v. Garcia*, 589 U.S. 191, 202-03 (2020) (quoting *Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203 (1983)); *Fednav, Ltd. v. Chester*, 547 F.3d 607, 618 (6th Cir. 2008) ("Express preemption occurs when Congress 'explicitly state[s]' that it intends a statute to have that effect.") (quoting citation omitted). However, it is well-established that "preemption may also occur by virtue of restrictions or rights that are inferred from statutory law." *Kansas*, 589 U.S. at 203. This "implied" preemption is also referred to as "conflict" preemption and comes in two forms—impossibility and obstacle preemption. *McDaniel v. Upsher-Smith Labs.*, 893 F.3d 941, 944 (6th Cir. 2018); *State Farm Bank v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008). Impossibility preemption exists when compliance with both federal and state law is impossible. *McDaniel*, 893 F.3d at 944 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992), *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)). Obstacle preemption exists when state law serves as an obstacle to the purposes and objectives embodied in a federal law. *McDaniel*, 893 F.3d at 944 (citing *Gade*, 505 U.S. at 98; *Hines v. Davidowitz*, 312 U.S. 52, 67

(1941)). And finally, though not at issue here, field preemption occurs when federal law occupies a "field" of regulation "so comprehensively that it has left no room for supplementary state legislation." *Murphy*, 584 U.S. at 479 (quoting *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U.S. 130, 140 (1986)).[3] Ultimately, however, each type of preemption works according to the same principle: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*

Obstacle preemption can be difficult to establish. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to

[3] Plaintiff asserts that "express" and "obstacle" preemption are relevant here (ECF No. 26, PageID.410), but does not assert impossibility or field preemption. The court accordingly does not address those types of preemption any further.

the regulation of Congress within the sphere of its delegated power." *Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)). The Supreme Court has cautioned, however, that courts may not conduct a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (internal quoting punctuation omitted). A "high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." *Id.* (quoting *Gade*, 505 U.S. at 110 (1992) (Kennedy, J., concurring in part and concurring in the judgment)); *see also Counts v. GM, LLC*, 139 F.4th 576, 581 (6th Cir. 2025) (finding obstacle preemption "depends on the federal statute's text, not on a judge's sense of what the statute's purposes might be"); *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1128 (6th Cir. 2025) ("finding obstacle preemption requires meeting a high threshold."). That is, mere "tension" with federal goals is not enough; indeed, sometimes it is clear that Congress is "aware of the operation of state law in a field of federal interest, and has nonetheless decided to tolerate whatever tension there is between

them." *See Wimbush v. Wyeth*, 619 F.3d 632, 645 (6th Cir. 2010) (citation omitted, cleaned up). Thus, merely because a state law "inconveniences" the federal government does not render it preempted. *Goldstein v. California*, 412 U.S. 546, 555 (1973). Courts assume that Congress does not preempt lightly. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The repugnance must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Kelly v. Washington*, 302 U.S. 1, 10 (1937).

One particular concern, it must be said, perhaps applies with less force in much of this case. Courts apply an additional "presumption against preemption" when Congress acts to preempt state law "in areas of longstanding state concern[.]" *See Fenner v. GM, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (citing *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015); *Arizona*, 567 U.S. at 400 (preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But that additional "presumption against preemption" generally does not apply here "because immigration is an area

traditionally regulated by the federal government." *See United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013); *see also Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025).

Other limits on preemption, however, flow from the dual sovereignty inherent in federalism. First, given Congress' limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not "some brooding federal interest." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.); *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States. *Murphy*, 584 U.S. at 477-78. This is so because in exercising its enumerated powers, Congress may only legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their deliberate rejection of a plan that would have allowed Congress to legislate the States directly. *See New York v. United States*, 505 U.S. 144, 164-66 (1992).

**ii. Anti-Commandeering**

Federal preemption is also bounded by the anticommandeering doctrine, which flows from the Tenth Amendment. The Tenth Amendment reserves to the States any powers not delegated to Congress, except certain sovereign functions explicitly prohibited or held to be implicitly restricted. U.S. CONST. amend. X; *Murphy*, 584 U.S. at 470-71; *see also New York*, 505 U.S. at 156 ("[T]he Tenth Amendment 'states but a truism that all is retained which has not been surrendered.'" (quoting *United States v. Darby*, 312 U.S. 100, 124 (1941)). Anti-commandeering, therefore, "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470. Centered on the principle of voluntariness, the anticommandeering doctrine holds that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. Nor can it conscript state or local officers directly, *Printz*, 521 U.S. at 935, or coerce States to action through improper influence, *Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 578 (2012). This

holds true no matter how strong the federal interest at play. *New York*, 505 U.S. at 178.

In this way, anticommandeering is a bulwark against abuse of federal government power and the excesses of tyranny. *Murphy*, 584 U.S. at 473. It also promotes political accountability by enabling voters to distinguish which sovereign is responsible for a specific policy, and "prevents Congress from shifting the costs of regulation to the States." *Id.* at 473-74. At the same time, anticommandeering respects the separation of powers between the federal branches by ensuring that federal law remains subject to execution by the President. Put a slightly different way, anticommandeering also prevents Congress from locating the exercise of executive power with state or local officials, who the President has no ability to appoint or remove and over whom he lacks meaningful control. *See Printz*, 521 U.S. at 922 ("the power of the President would be subject to reduction, if Congress could . . . simply requir[e] state officers to execute its laws"); *see also Trump v. Slaughter*, 146 S. Ct. 2283 (2026) (concluding that to wield "the executive power" necessarily means that the wielder be "subject to the President's superintendence") (citing the papers of Thomas Jefferson). In sum,

"Congress may use its spending power to create incentives for States to act in accordance with federal policies[,]" *NFIB*, 567 U.S. at 577, or states and localities may choose to cooperate with its aims, but "it may not conscript state governments as its agents." *Murphy*, 584 U.S. at 472.

**iii. Intergovernmental Immunity**

A final principle complements the above doctrines. Rooted in the Constitution's Supremacy Clause, U.S. CONST. art. VI, cl. 2, the Supreme Court has long interpreted the "Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022) (citing *McCulloch v. Maryland*, 17 U.S. 316 (1819) (holding Maryland's effort to tax the Bank of the United States unconstitutional when Maryland imposed no comparable tax on any other bank within the State)). The doctrine thus prohibits state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals (*e.g.,* contractors). *Washington*, 596 U.S. at 835, 838; *see also North Dakota v. United States*, 495 U.S. 423, 438 (1990) ("a regulation imposed on one who deals with the Government

has as much potential to obstruct governmental functions as a regulation imposed on the Government itself"). As to the latter prohibition, a state law is not unconstitutional "just because it indirectly increases costs for the Federal Government, so long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington*, 596 U.S. at 839. And the federal government must show differential treatment; a state law "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983). Even if a law "discriminates against the federal government because it affects an exclusively federal domain, . . . [d]ifferential treatment is critical to a discrimination-based intergovernmental immunity claim." *McHenry Cty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). Further, a state or locality must act in its capacity as a government for the doctrine to apply. If, for example, it acts as "a proprietor and not a regulator" and "does not seek to control federal employees but, at most, only incidentally affect[] their duties[,]" then the doctrine does not apply. *See Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 205 (5th Cir. 2024). And

intergovernmental immunity is likewise bounded by the Tenth Amendment; if federal law permits localities to choose between cooperating with a federal scheme or not, a finding that noncooperation violates the doctrine of intergovernmental immunity would be inconsistent with not only the statute itself, but with the Tenth Amendment and the anticommandeering rule. *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

With these principles in mind, the court turns to the Challenged Policies at issue in this case.

**C. Application to the Challenged Policies**

**i. The Prosecutor's Office Policy Directive**

*a. Preemption*

The United States argues that the Prosecutor's Office Policy Directive is both expressly preempted and impliedly preempted by the Immigration and Nationality Act (INA). Both arguments are based on the text of 8 U.S.C. § 1373 and § 1644. Section 1373(a) states that state and local governments "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the

citizenship or immigration status, lawful or unlawful, of any individual." Further, "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity" from "[s]ending", "[m]aintaining," or "[e]xchanging" with any other government entity "information regarding the immigration status, lawful or unlawful, of any individual." *Id.* § 1373(b); *see also* § 1644 (similar to § 1373(a)).[4] And if state officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the Federal Government must share the requested information. *Id.* § 1373(c).

The express preemption argument quickly fails, because the Policy Directive does not purport to "prohibit" or "restrict" any state or local official from sending, maintaining, or exchanging information regarding the immigration status of any individual. The Policy Directive instead quite specifically acknowledges that "Federal law does provide that government agencies and officials cannot be restricted from 'sending to, or receiving from' the federal government information regarding a person's 'citizenship or immigration status.'" ECF No. 1-6, PageID.124

[4] The parties treat the provisions as coextensive, and so too does the court. *See, e.g.*, *City of Chicago v. Barr*, 961 F.3d 882, 888 (7th Cir. 2020) (treating §§ 1373 and 1644 as equivalent).

(citing 8 U.S.C. 1973(a)). "This Policy is of course subject to that law." *Id.* at PageID.124-25. It explains that "Beyond these legal requirements, however, APAs [Assistant Prosecuting Attorneys] should focus simply on prosecuting state-level offenses, not collaborating with ICE or federal immigration agencies to enforce federal immigration laws or policies." *Id.* at PageID.125. The plain text of the policy acknowledges that it is subject to the provisions Plaintiff cites, and does not purport to restrict any local official from complying with federal law.

Plaintiff makes three arguments that are unavailing. The first is an administrative complaint: Plaintiff says the policy is preempted when it tells APAs that "if a federal immigration-related request is made to any APA, the APA should refer the inquiry to the Chief Assistant Prosecuting Attorney and the Prosecuting Attorney to determine whether . . . any applicable state or federal law, mandates provision of the relevant information." ECF No. 26, PageID.412 (citing ECF No. 1-6, PageID.125). Frankly, it is hard to see what Plaintiff's argument is. If the claim is that the Supremacy Clause of the U.S. Constitution prevents a county prosecutor from telling his staff to direct

immigration requests to the head office (i.e. designating himself or his chief assistant prosecutor as the proper conduit of this information), that is, surely, a novel claim – and Plaintiff cites no support for it. *See id.*[5] So the court rejects that argument out of hand because it lacks any authority and intrudes on entirely local prerogatives of how to structure daily work in a county-level office.

The second argument is related to the first, but merits somewhat more attention. Plaintiff claims that, as a result of the policy, the Washtenaw County Prosecutor's Office "has blocked all information sharing with ICE." ECF No. 26, PageID.413 (citing ECF No. 1-5, PageID.83, Raycraft Decl. ¶ 58, ECF No. 1, PageID.36, 42, Compl. ¶¶ 119, 138). This allegation, however, is conclusory and not entitled to the assumption of truth as it applies to the sharing of "immigration status" under § 1373. Plaintiff, by its argument, understands "information sharing" to be a broad term that encapsulates a great deal of information (e.g. ECF No. 26, PageID.416); Defendants, on the other hand, concede in their own policies that they may be required to share a

[5] Indeed, Plaintiff's counsel admitted at oral argument that there is no authority that prevents having a spokesperson of such information on behalf of a given local entity.

person's "immigration status" under certain circumstances. ECF No. 7, PageID.243, 249. So does Plaintiff allege that Defendants are failing to follow that portion of their policy? Or does Plaintiff mean that Defendants are not sharing all of the information ICE believes it is entitled to? A fair reading of the complaint admits only the second interpretation, because in every allegation the complaint treats "information sharing" as synonymous with Plaintiff's preferred, more capacious meaning. *E.g.* ECF No. 1, PageID.36 ("Washtenaw County has blocked all information sharing with ICE . . . ICE was notified that Defendant Washtenaw County would no longer provide police reports"); ECF No. 1-5, PageID.83 (Raycraft Declaration) (the same). And that claim the court addresses below.

But at oral argument Plaintiff's counsel told this court that, yes, his argument was that Defendants are violating their policies by failing to share even "immigration status" as *Defendants* understand the statute. This makes for an odd claim. In this alternative scenario – that is, assuming that this allegation that the Prosecutor's Office has "blocked all information sharing" specifically alleges that the Prosecutor's Office is somehow violating § 1373(a) – the point is

rebutted by the exhibit the government attaches to its complaint. When a "written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017). The Policy Directive by its terms requires compliance with § 1373(a); but it is the policy itself the government seeks to enjoin by its suit. ECF No. 1, PageID.52 (seeking that "this Court issue a permanent injunction that prohibits Defendants . . . from enforcing or implementing the challenged Washtenaw County Prosecutor's Office *Policy Directive* . . .") (italicization in original). So even assuming, for the moment, that the government's allegation can be very generously construed to allege that the WCPO is not sharing "immigration status" about particular individuals when ICE requests, then there is no showing on these facts that enjoining the Policy Directive would provide the government any relief at all because the Policy Directive does not instruct that result to occur. To the extent this is the Government's argument, an injunction against the Policy Directive would not redress the alleged injury, and they lack standing to challenge the Policy Directive on that ground. *See Sprint Communs. Co., L.P. v. APCC Servs.*, 554 U.S. 269, 271 (2008)

(the "redressability inquiry . . . focuses on whether the injury that a plaintiff alleges is likely to be redressed through the litigation") (emphasis omitted). However, even if Plaintiff could make it past that jurisdictional problem, the complaint has another issue on this point. Defendants correctly point out that there is no allegation – not in the complaint, nor in the attached Raycraft Declaration – that specifically states that ICE has actually requested the immigration status (under the meaning that the statute contains, not the meaning Plaintiff would attach) of any individual, and that request has been rebuffed.[6] So this argument also lacks the well-pleaded factual content that would allow the court to draw the plausible inference that Defendants are liable for such an act. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

The last argument is the most developed of the three, but still fails. The Government's final argument is that "immigration status" is a far more capacious term than it reads at face value. According to Plaintiff, "immigration status" is a "variable" concept that necessitates

[6] Defendants' counsel also represented that a release date is public information; all one has to do is call and ask. That local officials may not be volunteering that information without a specific request is not violative of the statute.

the country prosecutor communicate to ICE any crimes charged, because (according to Plaintiff) "immigration status" changes "depending on the crime at issue and the context within which it was committed." ECF No. 26, PageID.412. According to Plaintiff, the use of the word "regarding" in the statute has a "broadening effect, ensuring that the scope of a provision covers not only its subject but also" "any subject that has 'a connection with, or reference to,' the topics the statute enumerates." *Id.* at PageID.415 (citing *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) (discussing statutory construction about the phrase "relating to" in a different context), *United States v. Kraemer*, 933 F.3d 675, 679 (7th Cir. 2019) (discussing the related phrase "relating to")). Although the exact range of information Plaintiff seeks is not obvious, Plaintiff has at least made it clear that a detainee's release date and criminal charges are, in particular, information it considers highly relevant and important. *See* ECF No. 26, PageID.415, 412.

Unfortunately for Plaintiff, no court has accepted that reading.[7] Courts have uniformly held that "information regarding . . . immigration status" in § 1373 encompasses only "an individual's category of presence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen." *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018), *aff'd in part*, 916 F.3d 276 (3d Cir. 2019); *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (affirming the district court's conclusion that "[t]he plain meaning of Section 1373 limits its reach to information strictly pertaining to immigration status (i.e. what one's immigration status is) and does not include information like release dates and addresses."). The Government has tried this argument before many courts, and "[w]ithout exception, each has rejected the United States's capacious reading of § 1373." *United States v. Illinois*, 796 F. Supp. 3d 494, 516 (N.D. Ill. 2025) (collecting cases). "While, generally, a term like 'regarding' has a broadening effect, to read it as broadly as advanced by . . . the United States would impermissibly expand the scope of these

[7] At oral argument, Plaintiff's counsel admitted that he was not aware of any case that supports his argument.

statutes to sweep in *any* information, including personal identifying data, concerning [a noncitizen] in the United States." *Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 375 (D.N.J. 2020). Plaintiff makes two specific arguments in this case worth addressing. First, they say a noncitizen's "release date is highly relevant to removability" because when released, the noncitizen becomes removable, and then he must be detained by federal immigration authorities while removal is pending. ECF No. 26, PageID.415 (citing 8 U.S.C. § 1231(a)(4)(A)). "But § 1231(a)(4)(A) only specifies *when* a noncitizen who has already been deemed removable may be removed. It doesn't concern their immigration *status*, i.e., 'an individual's category of presence in the United States.'" *Illinois*, 796 F. Supp. 3d at 517 (quoting *City of Philadelphia*, 309 F. Supp. 3d at 333). And second, the government argued that criminal convictions or charges must be shared with ICE, because criminal activity can affect removability under the INA. ECF No. 26, PageID.412-13 (offering the example that the factual context of a simple assault conviction would potentially have different immigration consequences). The consensus reading has rejected this kind of indeterminate, predictive sense of what information relates to

"immigration status." *See California*, 921 F.3d at 891 (rejecting the government's reading that information potentially affecting removability counts as "information regarding" a noncitizen's legal classification on the grounds that under such indeterminacy, "for all practical purposes pre-emption would never run its course"). After all, "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *Id.* at 892.

This court sees no difficulty or impropriety in joining every other court to consider the matter in their conclusion. While the Policy Directive may restrict information sharing of some kinds, it does not by its terms restrict the sharing of information regarding "immigration status" (legal classification) within the meaning of the INA. The savings clause in the Policy Directive is dispositive of this claim. *See California*, 921 F.3d at 891 (citing the savings clause in Cal. Gov. Code § 7284.6(e) to hold that the California Values Act "expressly *permits* the sharing of [information required by § 1373], and so does not appear to conflict with [Section] 1373") (emphasis in original). The Policy Directive is not expressly preempted.

Perhaps recognizing the weak argument for express preemption, the United States next seeks refuge in obstacle preemption. However, the vast majority of Plaintiff's argument is directed at the General Order and Resolution. ECF No. 26, PageID.416-22. The United States only makes a few arguments specific to the Policy Directive. The first is that the "Policy Directive reduc[es] immigration consequences of convictions," which poses an "obstacle[] to the enforcement of federal immigration law." *Id.* at PageID.417. Second, it insists that "cooperation is *central* to enforcing our Nation's immigration laws[,]" and when a noncitizen is released from state criminal custody, they become removable and "must" be detained by federal immigration authorities. *Id.* at PageID.418 (emphasis in original). That is only possible, says Plaintiff, "if states and localities share the information and access necessary for an immediate (and safe) transfer." *Id.* Third, "the Policy Directive's . . . prohibition against compliance with reasonable information requests from the Federal Government further leaves federal agents to facilitate congressionally authorized arrests without the most basic information about the [noncitizen] and creates yet another obstacle to Congress's 'full purposes and objectives' of the

INA." *Id.* at PageID.421. And finally, it insists that public safety is threatened by the Policy because it permits individuals who have committed serious offenses to be released back into the community. *Id.* at PageID.422. Take these in turn.

First, "our constitutional structure leaves local criminal activity primarily to the States," *Bond v. United States*, 572 U.S. 844, 848 (2014), so localities do not need federal permission to impose criminal punishment. To the extent that the United States appears to complain that some noncitizens' criminal sentences in Washtenaw County are too short to carry immigration consequences, and disagrees with the charging decisions of the local prosecutor and APAs, such decisions are quintessentially local in nature and are firmly within the state's police power. Whatever tertiary effect those decisions may have on the current administration's federal immigration priorities, they certainly are not preempted by the INA, nor the kind of discrimination anticipated by the intergovernmental immunity doctrine. *See Fisher v. United States*, 328 U.S. 463, 476 (1946) ("The administration of criminal law in matters not affected by constitutional limitations or a general federal law is a matter peculiarly of local concern."). No text in the INA

suggests Congress intended such a seismic effect on the ordinary exercise of prosecutorial discretion.

The second and third arguments, as far as they apply at all to the Policy Directive, appear to be essentially that ICE prefers that the Prosecutor's Office share information such as noncitizens' impending charges or the expected release dates of noncitizens serving jail time. But as explained, the relevant provisions of the INA do not require the sharing of that particular information. So even if noncooperation is more inconvenient than if the Office voluntarily offered up the information, the Policy Directive does not present an unconstitutional obstacle to federal enforcement. "[T]he choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *See McHenry Cty. v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (quoting *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019)). "Extending conflict or obstacle preemption to" these policies "would, in effect, 'dictate[] what a state legislature may and may not do,' *Murphy*, 138 S. Ct. at 1478, because it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state

law." *California*, 921 F.3d at 890; *see also Illinois*, 796 F. Supp. 3d at 531; *New York*, 810 F. Supp. 3d at 350; *United States v. Colorado*, No. 25-cv-01391, 2026 LX 185291, at *12 (D. Colo. Mar. 31, 2026) ("state implementation and enforcement of the federal immigration scheme is necessarily voluntary"). Plaintiff's reliance on a Second Circuit decision, *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999), for the proposition that "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," is unavailing. As several courts or judges, including in the Second Circuit, have pointed out, the full implications of that conclusion are hard to square with the Supreme Court's decision in *Murphy*. *See United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018) ("[T]he Supreme Court's holding in *Murphy* undercuts portions of the Second Circuit's reasoning [in *City of New York*] and calls its conclusion into question."); *New York v. United States DOJ*, 964 F.3d 150, 164 (2d Cir. 2020) (Pooler, C.J., dissenting from denial of rehearing en banc) ("the Supreme Court's recent decision in *Murphy v. NCAA* . . . calls the viability of *City of New York* into serious question."); *cf. New York v.*

*United States DOJ*, 951 F.3d 84, 113 (2d Cir. 2020) ("*Murphy* may well have clarified that prohibitions as well as mandates can manifest impermissible commandeering."). "The Supremacy Clause undoubtedly prevents states from contradicting or obstructing the federal immigration scheme, *Arizona v. United States*, 567 U.S. 387, 407 (2012),[8] but it does not go so far as to compel state assistance." *Colorado*, 2026 LX 185291, at *8 (D. Colo. Mar. 31, 2026).

Plaintiff's final argument is not truly a legal argument at all. It represents, instead, just one perspective in a fairly contentious policy debate. In the United States' view, when Washtenaw County "refuses to honor ICE detainers or prosecute criminal aliens, individuals who have committed serious offenses are released back into the community. In such cases, witnesses and survivors may refuse to testify or drop charges out of fear that offenders will remain in the community." ECF No. 26, PageID.422; *see generally* ECF No. 1, PageID.3, 25-28 (alleging

---

[8] Plaintiff's counsel relies heavily on *Arizona*, but it cannot bear the weight he would place on it. In that case, the State of Arizona's laws were preempted by the INA because the State's choices attempted to regulate immigration beyond what Congress authorized in the INA, and for example, allowed state officers to conduct immigration arrests when no federal authorization for that arrest existed. *See Arizona*, 567 U.S. at 410. This case has the opposite scenario; Defendants have declined to participate in the federal immigration scheme, and no conflict with federal enforcement arises from the decision to reallocate state and local resources.

threats to public safety). In general, the government's position is that "ICE's enforcement actions are focused on removing criminal aliens who pose a danger to public safety." ECF No. 26, PageID.421. On a motion to dismiss, the court likely must accept this argument as plausible[9] – but this policy preference and alleged effect of that preference have no legal effect on the preemption analysis. And with that argument set to the side, obstacle preemption too falls away.

With that said, the Defendants do not agree with the United States' view of the inevitable consequences of their policies. Nor do amici, constituting one hundred and forty-seven cities, counties, and elected officials, who filed a brief in support of the motion to dismiss offering their view on the public safety aspect of this argument. ECF No. 24. Again, the court does not see this debate as critical to any of its legal analysis. But having given the Government a fair airing of its side

[9] A note is warranted. As all federal district court judges are aware, a flood of habeas litigation has arisen from the government's detention policies. In many of the cases that have come before the undersigned, no criminal history was indicated. *See, e.g.*, *Kadagan v. Raycraft*, No. 25-13602, 2025 WL 3268895, at *1 (E.D. Mich. Nov. 24, 2025) ("Mr. Kadagan has no criminal history other than traffic tickets."); *Romero Garcia v. Raycraft*, No. 25-CV-13407, 2025 WL 3252286, at *2 (E.D. Mich. Nov. 21, 2025) ("Petitioner has no criminal history apart from minor traffic violations."); *Zambrano Paz v. Raycraft*, No. 25-13563, 2025 WL 3473361, at *2 (E.D. Mich. Dec. 3, 2025) ("Mr. Zambrano Paz has no criminal history.").

of the story, it is worth spending a moment to acknowledge the other side of that debate. Amici offer the argument that "[e]xtensive research shows that jurisdictions adopting policies similar to those in Washtenaw—in which scarce local law enforcement resources are allocated to the investigation of crimes, and county activities are disentangled from enforcement of federal civil immigration laws—have safer, healthier, and more economically resilient communities." ECF No. 24, PageID.356. In particular, the United States offered the argument that witnesses and crime victims may refuse to testify or drop charges if offenders remain in the community. ECF No. 26, PageID.422. But amici offer a counter-perspective: "extensive studies show that immigrants who fear removal for themselves or members of their communities are less likely to cooperate with local law enforcement." ECF No. 24, PageID.360. And as another example, "one study found that increased information sharing between local police and federal immigration authorities reduced Hispanics' crime reporting rate by 30 percent and increased their crime victimization rate by 16 percent." *Id.* at PageID.361 (citing Felipe M. Gonçalves, Elisa Jácome & Emily K. Weisburst, *Immigration Enforcement and Public Safety*,

Nat'l Bureau of Econ. Rsch., Working Paper No. 32109 (Feb. 2024) https://www.nber.org/papers/w32109). The entire amicus brief offers several more arguments and perspectives, but these in particular help point out why localities such as Washtenaw County may rationally elect to forego cooperation with the sort of mass deportation efforts and masked capture that ICE has chosen to partake in. The court does not purport to make any factual findings; the court merely sketches the competing views.

In sum: the challenged portions of the Policy Directive are not expressly preempted by the INA, nor do they pose an unconstitutional obstacle to Congress' goals in enacting the statute.[10] Count Two is, therefore, dismissed.

*b. Intergovernmental immunity*

As explained, a state law may be unconstitutional under the intergovernmental immunity doctrine if it (a) regulates the United States directly or (b) discriminates against the Federal Government.

---

[10] Given the above findings, the court does not find it necessary to address another preemption argument that Defendants raised, that § 1373 and § 1644 lack preemptive force because they regulate state actors and not private actors. *See, e.g.*, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021); *but see New York v. United States DOJ*, 951 F.3d 84, 114 n.27 (2d Cir. 2020).

*United States v. Washington*, 596 U.S. 832, 838 (2022). The United States does not offer any argument at all that the Policy Directive regulates the federal government, so the court proceeds only to the second option. Plaintiff argues that the Challenged Policies as a whole discriminate against the federal government because they target immigration enforcement and name ICE specifically. Because only the Federal Government exercises plenary power of immigration enforcement, says Plaintiff, and because the policies mention ICE specifically, they are targeting the Federal Government and one of its core functions. ECF No. 26, PageID.430. The majority of Plaintiff's argument on this point appears to be directed towards the Sheriff's General Order and the Commissioners' Resolution. *See id.* at PageID.427-30 (arguments regarding those two policies). But to the extent that this argument makes any attempt to argue the Policy Directive violates intergovernmental immunity, it is wrong. The vast majority of the Policy Directive merely instructs APAs to avoid immigration consequences where possible, and if consistent with public safety. Only one of the many directives specifically mentions ICE at all, ECF No. 1-6, PageID.124-25, and it merely instructs that "APAs should

not contact the federal Immigration and Customs Enforcement (ICE) to verify the record of a noncitizen or to inform ICE of pending charges." *Id.*

While Defendants characterize the policies as equally applicable to ICE and any "deputized" local officer, the court simply assumes that the policy affects the federal government and its immigration functions almost exclusively. The more relevant point, in the court's view, is that Plaintiff cannot point to any comparator treated more favorably – that is, the government does not point to any entity that Washtenaw County is offering this information to. A state law "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983). "The mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). Even if a law "discriminates against the federal government because it affects an exclusively federal domain, . . . [d]ifferential treatment is critical to a discrimination-based intergovernmental immunity claim." *Id.* And perhaps most important of all, the court has

already described why the INA does not require localities or local officials to provide the information ICE seeks from the Prosecutor's Office. If the relevant federal statute already contemplates that the requested information may or may not be shared, then Plaintiff cannot maintain an intergovernmental discrimination claim when a locality simply elects not to share that information with anyone. "The State's refusal to cooperate in the immigration context — a possibility contemplated by the relevant federal statutes — does not constitute discrimination against the federal government." *See McHenry Cnty.*, 44 F.4th at 594 n.7. In other words, Plaintiff cannot prohibit through intergovernmental immunity what the text of the relevant federal statute permits. *See United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (finding intergovernmental immunity could not constitute an end-run around permissible non-cooperation with federal immigration enforcement efforts).[11]

[11] Because the Policy Directive is not preempted, nor unconstitutional discrimination against the federal government, the court does not find it necessary to further address anti-commandeering as to Plaintiff's information sharing claims. *See Torres v. Precision Indus.*, 938 F.3d 752, 756 (6th Cir. 2019) (noting that although preemption is a constitutional issue, "[t]he Supreme Court . . . treats preemption as 'statutory' in the sense that it will decide a preemption claim before addressing other constitutional issues in the case."). With that said, the scope of information that Plaintiff would read the statute to require seems to go far beyond a

Count Five is therefore dismissed for failure to state a claim.

**ii. The Sheriff's Office General Order**

Two specific portions of the Sheriff's Office's General Order are at issue. First, the Order states that the Sheriff's Office "will not detain an individual under the sole justification of an Immigration Detainer or Warrant of Removal/Deportation issued by [ICE] and signed by an ICE agent when there is no valid judicial warrant or order by a judge." ECF No. 1-4, PageID.65. As a result, the Office is not honoring ICE detainer requests. Second, the Office has required ICE to submit FOIA requests to access police reports, rather than disclosing information in police reports voluntarily to ICE. ECF No. 1-5, PageID.83; ECF No. 1, PageID.33-57, Compl. ¶¶ 56, 120-21; *see also* ECF No. 26, PageID.414-22.

*a. Preemption*

The United States argues that both provisions of the order are expressly preempted and impliedly preempted by the INA.

---

recordkeeping role, and would instead require that state actors essentially perform a background investigation for any information that might conceivably bear on an individual's immigration proceedings. *See Printz v. United States*, 521 U.S. 898, 933 (1997) (invalidating a federal requirement that state LEOs perform background checks on prospective handgun purchasers).

1. Information Sharing Provisions

*Express Preemption.* Like with the Policy Directive, Plaintiff reads 8 U.S.C. § 1373 to require sharing more information than the Sheriff's Office is willing to provide. ECF No. 26, PageID.415. But the court has discussed why that reading is not the correct one and that it finds no support in the case law. Absent that reading of § 1373, Plaintiff cannot state a plausible case for express preemption because there is no explicit statement of preemption in the statute.

*Conflict Preemption.* Lacking its preferred reading of the statute, Plaintiff turns to what it says is the practical effect of the General Order, which requires federal agents to use FOIA requests to seek the range of information they would prefer to receive voluntarily. According to the government, "information sharing has come to a complete halt" and "the information that is provided under a FOIA request is heavily redacted and delayed, making the procurement of intelligence unnecessarily cumbersome and difficult." ECF No. 1, PageID.17, Compl. ¶ 56; *see also* ECF No. 1-5, PageID.74, Raycraft Decl. ¶ 59 (same). In their view, requiring the Federal Government to proceed using FOIA requests forces ICE to "resort to legal processes in

every routine or trivial matter" and renders immigration enforcement a "practical impossibility." ECF No. 26, PageID.416 (citing *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999)). Without citation, the Government then argues that FOIA is "not intended as a tool for federal employees or agents to obtain records needed for their official duties. Instead, federal employees—including immigration officers—are expected to use established internal procedures and interagency channels to request information necessary for their work." *Id.* at PageID.416.

But "there is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Hencely v. Fluor Corp.*, 608 U.S. 31, 38 (2026) (cleaned up). The government's argument, at core, is that ICE is frustrated that the Sheriff's Office is not volunteering its resources to provide information, such as release dates and police reports, beyond what the text of the INA requires. The government may not expand the sweep of the INA's information-sharing provisions by asserting "some brooding federal interest," *Va. Uranium*, 587 U.S. at 767, in *other* information that may be useful to enforcement efforts or to promote public safety. As the court has

already held above, Plaintiff cannot use obstacle preemption to command what the statute permits. *See California*, 921 F.3d at 890; *Illinois*, 796 F. Supp. 3d at 531; *New York*, 810 F. Supp. 3d at 350.

Like the information sharing provisions of the Prosecutor's Office Policy Directive, the information sharing provisions of the Sheriff's Order are neither expressly nor impliedly preempted by the INA.

2. Detainers

The larger complaint that the federal government has with the Sheriff's Office General Order is that the General Order instructs officers not to honor ICE detainer requests unless the request is "accompanied by a federal court order or warrant signed by a federal magistrate judge." ECF No. 1-4, PageID.65. And Plaintiff says this too is both expressly and impliedly preempted by the INA.

*Express Preemption*. A bit of background: Congress has generally authorized federal officials to detain noncitizens pursuant to administrative warrants, *see* 8 U.S.C. § 1226(a), but nothing in federal law requires local officials to do the same. The INA further permits federal agents to ask, but not compel, state and local officers to provide advance notice of when a noncitizen charged with an offense involving

controlled substances will be released from jail or prison. *Arizona*, 567 U.S. at 410 ("a federal statute permit[s] state officers to 'cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States.'") (citing 8 U.S.C. § 1357(d)). Although the INA nowhere authorizes federal agents to request that state and local officers continue to detain noncitizens in their custody on a suspicion that they might be removable, the government has authorized such requests by regulation. *See* 8 C.F.R. § 287.7(a), (d). An ICE detainer "request[s]" that state and local agencies (1) "advise [ICE], prior to release of [an] alien, in order for [ICE] to arrange to assume custody" and (2) "maintain custody of the alien for a period not to exceed 48 hours." *Id.* By policy, immigration detainers must be accompanied by an administrative warrant, either a noncitizen arrest warrant or a warrant of removal, signed by an ICE immigration officer. ICE Policy No. 10074.2, § 2.4. Once a detainer is issued to a local agency, the regulation states that "such agency shall maintain custody of the alien for a period not to exceed 48 hours." 8 C.F.R. § 287.7(d) (emphasis added).

The government places emphasis on the “shall” in the later part of the regulation at § 287.7(d), and despite the word “request” in subsection (a), reads “shall” to *require* local law enforcement to assume custody of the noncitizen (*after* the relevant period of custody authorized under state law has ended) and until ICE assumes custody. This argument runs headlong into the statutory text: ICE detainers are not mandatory, they are requests – which can be refused or complied with at the election of the recipient. Section 1357(d) – the statute, not the regulation – authorizes federal officials to “*request* . . . notice of a prisoner’s release” from state or local custody in certain circumstances—it does not mention (let alone command) local officials’ detention of noncitizens. *Galarza v. Szalczyk*, 745 F.3d 634, 641 (3d Cir. 2014) (discussing 8 U.S.C. § 1357(d)) (emphasis added). Indeed, “[e]very federal court of appeals that has considered” detainer requests under the regulation has “characterize[d] them as ‘requests’ that impose no mandatory obligation on the part of the detainer’s recipient.” *Illinois*, 796 F. Supp. 3d at 528 (citation omitted); *see Galarza*, 745 F.3d

at 645;[12] *see also Ortega v. U.S. Immigration & Customs Enforcement*, 737 F.3d 435, 438 (6th Cir. 2013) (noting that federal immigration officials issue detainers to local LEAs "asking the institution to keep custody of the prisoner for the [federal immigration] agency or to let the agency know when the prisoner is about to be released"); *United States v. Minnesota*, No. 25-cv-3798, 2026 LX 352005, at *49 (D. Minn. July 20, 2026) ("According to their ordinary meaning, the words 'seek' and 'request' in § 287.7(a) indicate that § 287.7(d) detainers are not compulsory."). Because the statute thus imposes no mandate to comply with a detainer, there is no explicit statement that the choice to refuse a detainer is preempted.

---

[12] *Galarza* collects the following additional cases to have commented on the procedure: *Liranzo v. United States*, 690 F.3d 78, 82 (2d Cir. 2012) (noting that "ICE issued an immigration detainer to [jail] officials requesting that they release Liranzo only into ICE's custody" so that he could be removed from the United States); *United States v. Uribe-Rios*, 558 F.3d 347, 350 n.1 (4th Cir. 2009) (defining detainers as a "request that another law enforcement agency temporarily detain an alien" to permit immigration officials to assume custody (citing 8 C.F.R. § 287.7)); *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004) (noting that a "detainer . . . serves as a request that another law enforcement agency notify the INS before releasing an alien from detention" (citing 8 C.F.R. § 287.7(a))); *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992) (describing the procedure under § 287.7 as "an informal [one] in which the INS informs prison officials that a person is subject to deportation and requests that officials give the INS notice of the person's death, impending release, or transfer to another institution").

*Obstacle Preemption*. Plaintiff's obstacle preemption argument largely tracks its statutory reading explained in the above express preemption argument, though again with an eye to what Plaintiff alleges are the practical effects of the policy. In Plaintiff's words: "The General Order's prohibition on honoring ICE detainer requests neutralizes the congressional scheme for cooperative custodial transfers of criminal aliens. That forces immigration officers to track down and rearrest the criminal aliens at large when (and if) those agents learn that the criminal alien has been released from local custody. This 'frustrates the purpose of the national legislation [and] impairs the efficiency of [] the federal government to discharge th[eir] duties.'" ECF No. 26, PageID.418 (citation omitted).

Again, however, ICE cannot just point to some "brooding" interest in enforcing federal immigration law more efficiently, nor the mere inconvenience of tracking down noncitizens who have been released from local custody, if no relevant statutory text requires that cooperation from local officials. The court has already explained why the text of the INA does not support Plaintiff's reading, and Plaintiff cannot mandate cooperation through implication when the statute

contemplates noncooperation. The INA permits cooperation through its detainer "requests;" it does not mandate compliance. *McHenry Cty.*, 44 F.4th at 592; *California*, 921 F.3d at 890; *see, e.g.*, *Illinois*, 796 F. Supp. 3d at 529.

Another portion of Plaintiff's argument is the suggestion that Congress "permitted" states and localities to impose criminal punishment on a noncitizen before that person is removed from the country. ECF No. 26, PageID.419. The argument is that because Congress allows that to happen, there is an "understanding that the Federal Government would subsequently take custody when the state and local process concluded." *Id.* And in Plaintiff's view, "continued cooperation is not optional after a locality takes up the Federal Government's invitation to involve itself in an exclusively federal area and then refuses to uphold its end of the bargain." *Id.* at PageID.419.

Though presented as if this were common sense, the government attempts to smuggle in two sea changes in immigration law enforcement through this view. First, it takes the view that because "cooperation is *central* to enforcing our Nation's immigration laws," *id.* at PageID.418, cooperation is *mandatory*. That is quite the leap, and

runs right into the cases the court has already cited. *E.g. McHenry Cty.*, 44 F.4th at 592; *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities. SB 54 simply makes that choice for California law enforcement agencies."). Second, it takes the extraordinary view that Congress has somehow "permitted" states to exercise their police powers in enforcing criminal law in exchange for localities' ensuring the "immediate . . . transfer" of noncitizens to federal custody after state detention. ECF No. 26, PageID.418. States and localities, of course, simply possess the sovereign power to enforce their criminal laws within their jurisdiction. They do not require permission to do so. "A state's ability to regulate its internal law enforcement activities is a quintessential police power." *California*, 921 F.3d at 887 n.11 (citing *United States v. Morrison*, 529 U.S. 598, 618 (2000)). There is no authority for the proposition that the INA intended to create mutual obligations as part of some sort of criminal-immigration state-federal bargain, rather than simply respecting the sovereign authority of the States to enforce their own laws in a manner they see fit. *See Illinois*, 796 F. Supp. 3d at 530 n.19 ("[I]mmigration officers' obligation to

permit state custody to conclude before exercising jurisdiction is . . . not part of a *quid pro quo*."). In drafting legislation, "Congress may have hoped or expected that States would cooperate with" any detainer requests, but states are not "bound by that hope or expectation." *Minnesota*, 2026 LX 352005, at *54 (quoting *McHenry*, 44 F.4th at 592); *accord California*, 921 F.3d at 891 ("[W]hen questions of federalism are involved, we must distinguish between expectations and requirements."). Preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting citation omitted). Even assuming Plaintiff is correct that the federal government could choose to preempt the field in immigration law and require all noncitizens to be detained for removal purposes regardless of what criminal acts they may have committed, that is not the statute Congress wrote. Plaintiff's hypothesis about what could be is nowhere near sufficient to show why the statute that exists should be interpreted to impose reciprocal obligations in this way.

Plaintiff also seemed to claim at one point that Defendants' efforts run (at least implicitly) afoul of 8 U.S.C. § 1324(a), which penalizes

efforts to obstruct immigration enforcement by, *inter alia*, prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii); ECF No. 26, PageID.404. This portion of the statute is simply cited, but is not meaningfully applied to the facts of this case. No allegation in the complaint supports the contention that Defendants' policies constitute criminal harboring, concealing, or shielding from protection under 8 U.S.C. § 1324(a)(1)(A)(iii), and Plaintiff's counsel disavowed that he was alleging an act in violation of that statute had occurred. If the implication is that the statute frowns on policies like the County's, this unexplained inference runs up against all of the analysis explained thus far, and Plaintiff makes no attempt to reconcile that case law with the undeveloped citation to this provision.

ICE's preferred reading of the statute also creates severe anti-commandeering problems in regard to noncitizen detention. The government likely knows this, and so attempts to avoid it: "The United States is *not* arguing that state or local law enforcement must arrest aliens, or even that they must extend the period of a criminal alien's

custody." ECF No. 26, PageID.422. But as this court has recently reminded a self-represented litigant, "saying so does not make it so[.]" *See United States v. Adelson*, No. 96-60371, 2026 LX 484719, at *9 (E.D. Mich. Aug. 6, 2026). The core of the government's argument and reading is, in fact, that the Sheriff's Office *must* "briefly extend[] detention of criminal aliens to facilitate an orderly custodial transfer from state/local custody to federal custody[,]" because the INA does not permit otherwise. ECF No. 26, PageID.420. The government cannot seriously contest that its argument that a state is required to detain and assume custody of a noncitizen at ICE's demand until ICE assumes custody of the noncitizen goes well beyond recordkeeping. The courts to have considered this question view mandatory detainers as a severe commandeering problem. *See, e.g.*, *Illinois*, 796 F. Supp. 3d at 535; *United States v. Colorado*, No. 25-cv-01391, 2026 LX 185291, at *14-15 (D. Colo. Mar. 31, 2026) (finding the government's reading "would require Colorado and Denver to allow use of law enforcement time, resources, and custodial facilities to arrest and hold individuals purely for federal civil immigration purposes. Again, this would directly force Colorado and Denver to bear the cost of enforcing the federal

immigration scheme and remove their authority to determine the proper allocation of state resources"); *see also Printz v. United States*, 521 U.S. 898, 904 (1997) (invalidating a law that "direct[ed] state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme.").[13]

The government also seems to want to sidestep a core concern of *Printz*, which held that anticommandeering also flows from the preservation of Presidential authority; if local officers can be pressed into federal service, the President's ability to "take care" that the laws be faithfully executed is diminished. *See Printz*, 521 U.S. at 922 (expressing concern in transferring the responsibility to enforce federal law to "thousands" of local officers "in the 50 States, who are left to implement the program without meaningful Presidential control"). The government's preferred reading of the INA envisions that all local enforcement nationwide *must* track their detainees' immigration status (and any information that might conceivably have a future impact on

[13] Defendants also put forward an argument that there are Fourth Amendment concerns with the legality of detention during a detainer request. The court does not find it necessary to explore that issue where preemption and anti-commandeering each independently resolve the detainer point.

that status), and then use their jail cells to hold those detainees pursuant to detainers authorized by the INA. But if local law enforcement were to in any way fail in their alleged duties to enforce federal law and promote the President's mass deportation scheme, the President lacks any authority to remove those persons, hire replacements, or control their actions in any meaningful sense. That result runs straight into *Printz*'s logic, and the government offers no way out.[14]

Therefore, the Sheriff's Office General Order is not preempted. To the extent that the Government's reading of the INA would require any Defendant to detain noncitizens at ICE's demand and without the consent of the County, that is barred by the anti-commandeering doctrine. Count One is dismissed.

*b. Intergovernmental immunity*

*Regulation of the Federal Government.* Plaintiff next argues that the Sheriff's Office General Order improperly regulates the Federal

[14] True, "control by the unitary Federal Executive is also sacrificed when States voluntarily administer federal programs, but the condition of voluntary state participation significantly reduces the ability of Congress to use this device as a means of reducing the power of the Presidency." *Printz*, 521 U.S. at 923 n.12.

Government by "requiring immigration enforcement authorities to procure judicial warrants to access detainees and obtain information when Congress has authorized federal immigration officials to use detainers and administrative warrants for those purposes." ECF No. 26, PageID.427. On its face, this argument is predicated on the conclusion that Congress allows ICE to use detainers and does not mandate a different procedure. But as the court has explained, that ICE may use detainers consistent with the INA does not compel the conclusion that state or local officials must comply with those requests. If the statute does not mandate compliance with the detainer, then the mere choice of a locality not to cooperate with detainer requests does not "regulate" the federal government in any meaningful sense. Nothing in the General Order prevents the federal government from issuing administrative warrants or detainers, nothing in the General Order invalidates warrants or detainers, and nothing prevents ICE from simply obtaining a judicial warrant or court order. The General Order on its face regulates the conduct of local officers and officials, not federal officials.

*Discrimination against the Federal Government*. To the extent that the government's argument is simply that the effect of the General Order is to require ICE to obtain a judicial warrant to access local detainees, and that creates more work for ICE than they are used to, it is an argument that the order discriminates against the federal government. Again, however, Plaintiff identifies no comparator – no entity that is treated better than federal officials in this respect. This again covers Plaintiff's argument regarding information-sharing[15] – because Plaintiff points to no entity that receives any more information than the government does. The mere fact that these provisions affect federal immigration enforcement is not, on its own, sufficient to show discrimination.

Most importantly, however, "[w]here, as here, the Tenth Amendment permits a [locality] to decline to assist with federal immigration efforts, that [locality's] determination that its interests are best served by not permitting its resources to be conscripted for federal immigration enforcement cannot be invalidated merely by recasting

[15] Plaintiff also argues that "the requirement that ICE must use FOIA to obtain police reports creates barriers that single out federal immigration authorities for less favorable treatment." ECF No. 26, PageID.432.

that otherwise permissible choice under the intergovernmental immunity lens." *United States v. New York*, 810 F. Supp. 3d 329, 356 (N.D.N.Y. 2025); *Illinois*, 796 F. Supp. 3d at 535 (N.D. Ill. 2025). A finding that the General Order "violates the doctrine of intergovernmental immunity would imply that" Washtenaw County "*cannot* choose to . . . refus[e] to assist [federal] enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *See United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

Count Four is dismissed for failure to state a claim on which relief can be granted.

**iii. The Board of Commissioners' Resolution**

*a. Preemption*

With that, the court turns to the final challenged policy, the Board of Commissioners' Resolution restricting ICE's access to county-owned property without a warrant or court order. *See* ECF No. 1-7, PageID.201. The United States does not argue that the Resolution is expressly preempted by any provision of the INA, and waived argument on that point. *See* ECF No. 26, PageID.410-16 (express preemption

arguments, which do not address the Resolution); *see Kondaur Capital Corp. v. Smith*, 802 F. App'x 938, 946 (6th Cir. 2020) (collecting cases for the proposition that "if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion."). Instead, Plaintiff argues only conflict preemption: "By barring federal agents from County property—including County jails—custodial transfers are made impossible. By restricting the locations in which federal immigration agents can perform their duties the Resolution impedes federal immigration officials' ability to engage in civil immigration enforcement." ECF No. 26, PageID.421. The government says "[n]one of the provisions of the INA place any geographic limitations on where federal agents may exercise their arrest authorities. The Resolution, therefore, stands as an obstacle to the accomplishment and execution of federal immigration law and is conflict preempted under the Supremacy Clause." *Id.* (citing *Arizona*, 567 U.S. at 406) (quotation marks omitted).

Defendants, however, point out that the INA *does* define certain property that federal immigration officers can enter without a warrant.

Those include "private lands" (but not dwellings) within a distance of twenty-five miles the border. 8 U.S.C. § 1357(a)(3). So the INA does, in fact, define a set of property that officers can enter without a warrant, and Plaintiff identifies no Washtenaw County-owned property that would qualify under this provision. This definition of "powers without a warrant" (§ 1357(a)) is strong evidence against Plaintiff's preferred reading. "It is a familiar and general rule of statutory construction that the mention of one thing implies the exclusion of another." *Vance v. Amazon.com, Inc. (In re Amazon.com, Inc.)*, 852 F.3d 601, 611 (6th Cir. 2017); *cf. NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("The *expressio unius* canon applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded.") (cleaned up). "Congress' use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections." *New York*, 810 F. Supp. 3d at 346. That the INA defines a subset of geographic places that officers may enter without a warrant implies that a judicial warrant requirement is not impermissible outside of those boundaries. Plaintiff must meet a "high

threshold" to show obstacle preemption. *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011). But it cannot do so when the statutory text does not state or imply a federal officer's unfettered right to warrantless entry onto property in the nation's interior. The Resolution is not preempted, and Count Three is dismissed for failure to state a claim.

*b. Intergovernmental immunity*

That leaves only Plaintiff's argument that the Resolution regarding county property violates the intergovernmental immunity doctrine. Plaintiff says the Resolution both regulates and discriminates against the federal government.

Plaintiff says "the Washtenaw County Board of Commissioners' Resolution regulates the United States directly: it [effectively] requires federal agents to obtain a judicial warrant or court order to enter County property and perform their assigned mission." ECF No. 26, PageID.428. And although Plaintiff's discrimination argument is not particularly developed as to the Resolution itself, their argument against each of the Challenged Policies generally is that the targeting of immigration enforcement is itself discriminatory because only the

Federal Government exercises plenary power of immigration enforcement. *Id.* at PageID.430.

Several reasons independently warrant rejecting Plaintiff's arguments. First, as explained, the INA does not expressly or implicitly prohibit judicial warrant requirements (except as expressly preempted by § 1357(a)). Localities do not directly regulate the federal government by withholding assistance they are not required to provide. *See McHenry Cty. v. Raoul*, 44 F.4th 581, 593 (7th Cir. 2022). Electing not to "permit" ICE onto County property absent a warrant merely withholds consent to federal officers' warrantless entry onto or occupation of that property; it does not "regulate" the federal government in any legally meaningful sense under the intergovernmental immunity doctrine to choose to withhold that consent in a written resolution. To the extent that the Resolution affects the federal government, it merely "incidentally" reduces the government's options for carrying out its responsibilities. *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024); *see North Dakota v. United States*, 495 U.S. 423, 441 (1990).

Plaintiff responds that the Resolution "'requires ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees," and forces ICE to obtain judicial warrants and court orders "when Congress expressly contemplated otherwise." ECF No. 26, PageID.429. Defendants' concessions undercut this argument significantly. Defendants admit that the government continues to retain the ability to make civil immigration arrests in Washtenaw County using administrative warrants, for example, across the street from the jail or a courthouse. The Resolution simply incidentally limits where those arrests can occur absent a warrant, and does so in a manner that the INA does not prohibit. ICE remains able to enter County-owned property for the purposes of immigration enforcement with a judicial warrant or court order in hand. The United States' reading would, in its own words, permit it to use "Washtenaw County property as a staging area, processing location, or operations base for the purpose of facilitating federal enforcement of civil immigration law." ECF No. 1, PageID.51. But the government can ultimately point to no part of the INA that authorizes a federal occupation of locally-owned land, and the usurpation of control over

that land, in the manner the government suggests it intends to. Defendants point the court to just the opposite conclusion – a state or local entity may, consistent with its own authority, decline to permit such use of its land. *See McHenry Cty.*, 44 F.4th at 586 (upholding Illinois law that prevented ICE from using state-owned jail facilities to house immigration detainees). That choice does not reflect "regulation" of or discrimination against the federal government within the meaning of the intergovernmental immunity doctrine.

Second, to the extent that the Resolution does affect the activities of federal immigration officials, it imposes a requirement solely in the County's capacity as "proprietor" of the property it owns, not as "regulator." *See Texas*, 123 F.4th at 205. In *Texas*, the State of Texas alleged that United States Border Patrol agents were cutting a wire fence the State had placed along part of the border with Mexico. U.S. Border Patrol claimed that removing the wire fence is sometimes necessary to fulfill its duty of "patrolling the border to prevent the illegal entry of [noncitizens] into the United States." *Id.* at 192. There, as here, the federal government alleged the state's actions regulated and discriminated against it. As in that case, however, Washtenaw

County "does not seek to control how [ICE] agents carry out their duties. At most," the manner in which the County is "seeking to preserve its *own* property might incidentally affect how agents do their jobs." *Id.* at 207. The determination that acceptable use of its own property does not include becoming a staging ground for federal immigration raids (absent a judicial warrant or court order) is within the County's prerogative as proprietor.

Third, to the extent that the government reads the INA to prohibit the County from enacting such warrant requirements in locally-owned property in the first place (in ways not preempted by the INA), this reading runs right into the anti-commandeering doctrine. *Murphy* squarely held that Congress cannot "issue direct orders" to state legislatures or "impos[e] a prohibition" on what a state legislature can enact. *Murphy v. NCAA*, 584 U.S. 453, 475 (2018). That is true no matter how strong the purported federal interest. *New York*, 505 U.S. at 178.

And fourth, the government again does not identify any actors that are similarly situated to the federal government that receive more favorable treatment under the Resolution. Plaintiff tries to identify

comparators on this point, arguing that Washtenaw County officials routinely sign "mutual aid agreements" with neighboring jurisdictions. ECF No. 26, PageID.431. What that means for this case is a mystery. The government cites two agreements, one of which no Defendant is a party to, and has nothing to do with immigration enforcement.[16] The other similarly has nothing to do with immigration enforcement; it reflects that the Washtenaw County Sheriff offered resources to assist a neighboring locality in handling high-profile crimes.[17] None of these other localities, or officers of those localities, would be permitted to engage in civil immigration arrests on Washtenaw County property. ECF No. 7, PageID.266.

Plaintiff also raises several cases in response. In *United States v. King County*, 122 F.4th 740, (9th Cir. 2024), the Ninth Circuit

---

[16] *Interlocal Agreement For The Washtenaw Area Mutual Aid Council (WAMAC)* (Apr. 24, 2024), https://wamac.us/wp-content/uploads/2025/11/ WAMAC-Full-Agreement-Final.pdf [https://perma.cc/H89X-JNMP] ("promot[ing] effective fire and rescue services within the governmental … parties to this agreement.").

[17] P.D. Lesko, *Ypsi Police Chief and County Sheriff Sign Secret "Mutual Aid Agreement" Without Votes of Elected Officials*, The Ann Arbor Independent (July 31, 2023), https://a2independent.com/2023/07/31/ypsi-police-chief-and-county-sheriff-sign-secret-mutual-aid-agreement-without-vot es-of-elected-officials/ [https://perma.cc/2SUW-GNET] (a mutual aid agreement to handle high-profile crimes such as homicides, attempted murders, and suspicious deaths).

invalidated a County's Executive Order "prevent[ing] ICE's contractors from continuing to operate flights out of Boeing Field, thereby requiring ICE to entirely transform its approach to its sovereign function of transporting and removing noncitizen detainees." *See id.* at 756 (cleaned up). In *GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022), the Ninth Circuit invalidated a California law that would "prevent ICE's contractors from continuing to run detention facilities, requiring ICE to entirely transform its approach to detention in the state or else abandon its California facilities." *Id.* at 750. On similar logic, the Third Circuit invalidated a New Jersey law that banned "the state, its local governments, and private parties from making, renewing, or extending any contract to detain people for civil immigration violations." *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 320 (3d Cir. 2025). This case is far afield from *CoreCivic* and *GEO Grp.* Both of those cases regulated who the federal government could contract with, regulated the federal government's third party contractors directly, and "prevent[ed] ICE from hiring the personnel of its choice." *See GEO Grp.*, 50 F.4th at 757. No such regulation of third parties is alleged here; the Resolution does not purport to define who

ICE may work with other than to forbid "County employees, contractors, and agents" from assisting ICE in its immigration activities within County property. As to that instruction, "[t]he federal government remains free" to work with whomever it wishes, or conduct immigration enforcement on its own behalf. *See McHenry Cty.*, 44 F.4th at 593. This instruction to County personnel is within the County's power as employer to direct the work of its employees and control the use of state resources. *See id.* Nor is this case like *King County*. That case involved materially different facts regarding the relevant County-owned property; in that case, the United States retained a contractual right to "make nonexclusive use of the landing area of the airport . . . without charge." *King County*, 122 F.4th at 747. That right informed the court's analysis upholding intergovernmental immunity against a Tenth Amendment challenge: "the United States does not seek to compel King County to implement a federal immigration program. Rather, the United States seeks, at least in part, to enforce its contractual right . . . to use Boeing Field. Requiring a municipality to uphold its end of a contractual bargain is not commandeering." *Id.* at 758. There is no allegation in this case, however, that the federal

government possesses any particular right, contractual or otherwise, to perform its federal immigration enforcement in all spaces, public and nonpublic (ECF No. 1, PageID.50), on County-owned property, absent a judicial warrant. To the extent that the government reads its right to enforce immigration law to commandeer County-owned property as its "operations base," ECF No. 1, PageID.51, that result effectively forces the County to participate in federal immigration enforcement and violates the Tenth Amendment. *See McHenry Cty. v. Raoul*, 44 F.4th 581, 590 (7th Cir. 2022) (noting that ordering local governments to house detainees raises Tenth Amendment concerns); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("the Tenth Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement."). Such an arrangement would also run afoul of the political accountability and cost-shifting concerns explained in *Murphy*, by making it difficult to distinguish which sovereign is responsible for ICE's operations base on county property, and would

allow ICE to shift the costs of housing its officers to the County. *See Murphy*, 584 U.S. at 473-74.[18]

Fellow courts have addressed similar laws, and upheld them on these grounds. In Colorado, the district court found a Denver Ordinance valid that barred "federal immigration authorities access to city and county jails 'for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration' without a judicial warrant." *United States v. Colorado*, No. 25-cv-01391, 2026 LX 185291, at *15 (D. Colo. Mar. 31, 2026) (holding that the government's position "would require the city and county of Denver to allow the Federal Government access to and use of its facilities for federal immigration purposes," which would violate the Tenth Amendment); *see also United States v. Illinois*, 796 F. Supp. 3d 494, 535 (N.D. Ill. 2025) (upholding restriction on "giving immigration agents access to persons in custody unless presented with a criminal warrant"); *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (upholding "refusal of the local law enforcement to . . . provid[e] access

---

[18] These Tenth Amendment issues also apply to Plaintiff's preemption arguments as to the Resolution.

to [federal authorities] at the local law enforcement facility" on the basis that those actions did not constitute "any affirmative *interference* with federal law enforcement at all,"), *vacated in part on other grounds*, No. 17-2991, 2018 U.S. App. LEXIS 21801, at *4 (7th Cir. June 4, 2018) (leaving intact that portion of the panel decision). A New York district court upheld a similar restriction on civil immigration enforcement at New York courthouses and state facilities. *See New York*, 810 F. Supp. 3d at 356. Plaintiff's argument fails to grapple with these authorities other than to say that they are incorrect for the reasons it states in its brief. *See* ECF No. 26, PageID.411 n.3. All of these bolster the finding that Washtenaw County may place such a restriction on civil immigration activity on its own property.

Even if the above were not true, however, an independent procedural reason would warrant dismissal of Plaintiff's claims against the Resolution. Although no party addressed this issue (so the court considers the point orthogonal to its analysis) it is clear that Plaintiff's suit is an attack on the facial constitutionality of Washtenaw County's Challenged Policies. For example, as to the Resolution specifically, the Complaint challenges the operation of the resolution as to all "nonpublic

spaces of Washtenaw County property" and all "Washtenaw County property" in general, and asks that this court issue a permanent injunction that enjoins the Resolution entirely. ECF No. 1, PageID.50, 52. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications, to take the law off the books completely." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015). There is no suggestion in any of Plaintiff's briefing or argument that it believes there are any constitutional applications of the Resolution. But in making such a challenge, it is Plaintiff's burden to "establish that no set of circumstances exist under which the statute would be valid[,]" or "that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications." *Id.* (quotation marks and citation omitted); *Zillow, Inc. v. Miller*, 126 F.4th 445, 456 (6th Cir. 2025). Plaintiff has failed to establish either prong. Plaintiff makes no attempt at all to engage in a severability analysis, waiving argument on that point. Nor does Plaintiff truly attempt to establish that all of the applications of the Resolution are invalid, beyond its generalized arguments that it is completely preempted or unconstitutional under the intergovernmental immunity

doctrine. The court, however, cited many cases above that have found similar provisions constitutional, and agrees with those cases for the reasons explained above.

When it does get specific, Plaintiff's argument attempts only to show that the policy is invalid specifically as to ICE's access to the Washtenaw County Jail, which effectively prevents ICE from taking custody of noncitizens before they are released from County custody (see ECF No. 26, PageID.407-08).[19] But application of the Resolution to that particular space for that reason is constitutional. Jails limit the right of public access in a variety of ways and restrict access for a number of reasons, and the county has the right to make a determination about who can access a jail to take custody of its detainees absent legal authorization. *Colorado*, 2026 LX 185291, at *16 (upholding restriction on ICE entry into jails for purposes of immigration enforcement absent a judicial warrant); *Illinois*, 796 F. Supp. 3d at 535 (similar); *see also McHenry Cty.*, 44 F.4th at 585 (7th

[19] To the extent there is any as-applied argument happening at all, the sole specific property Plaintiff analyzes in any detail whatsoever is the Washtenaw County Jail. And that argument fails because the court joins the decisions cited in this section.

Cir. 2022) (upholding state prohibition on localities from contracting with the federal government to house immigration detainees against preemption and intergovernmental immunity challenge); *United States v. New York*, 810 F. Supp. 3d 329, 336 (N.D.N.Y. 2025) (upholding state law granting privilege against arrest while attending court proceedings absent a judicial warrant); *City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018) (upholding "refusal of the local law enforcement to . . . provid[e] access to [federal authorities] at the local law enforcement facility"), *vacated in part on other grounds*, No. 17-2991, 2018 U.S. App. LEXIS 21801, at *4 (7th Cir. June 4, 2018). Further, the court has already explained why the County Defendants can validly refuse detainer requests and require ICE to produce a judicial warrant for a custodial transfer at the County Jail. It would be odd if the government could achieve an end-run around that holding by saying that the County simultaneously lacks the authority to require a judicial warrant from ICE when its officers come to the County Jail. So whether construed as a facial attack against the Resolution or as-applied challenge to the Resolution's application to the Washtenaw County Jail, Plaintiff has failed to carry its burden.

Count Six is therefore dismissed for failure to state a claim.

## V. CONCLUSION

"[A] healthy balance of power between the States and the Federal Government [reduces] the risk of tyranny and abuse from either front." *Murphy v. NCAA*, 584 U.S. 453, 473 (2018). The United States' Complaint fails to allege that Washtenaw County has done anything more than exercise its constitutional authority under the Tenth Amendment. Therefore, the court **GRANTS** the Washtenaw County Defendants' motion to dismiss in full (ECF No. 7). This is a final order and closes the case. A judgment will follow.

**SO ORDERED**.

Date: August 21, 2026

s/F. Kay Behm
F. Kay Behm
United States District Judge